**IN THE UNITED STATES DISTRICT COURT FOR
THE DISTRICT OF COLUMBIA**

STATE OF WEST VIRGINIA,
EX REL. PATRICK MORRISEY
in his official capacity as
Attorney General of West Virginia
State Capitol Building 1, Room E-26
Charleston, WV 25305;

                                            Civil Action No. 14-1287

                *Plaintiff*,

v.

UNITED STATES DEPARTMENT OF
HEALTH AND HUMAN SERVICES
200 Independence Avenue, SW
Washington, D.C. 20201

                *Defendant*.

## COMPLAINT

1.      This case involves core questions about the rule of law and the proper role of the President and the States in our system of government.

2.      The Constitution prohibits the President from picking and choosing the laws that he enforces based on political convenience. The President has specified and defined authority to veto legislation, in its entirety, *before* it becomes law. *See* U.S. Const. art. I, § 7; *see also Clinton v. City of New York*, 524 U.S. 417 (1998). But after a bill becomes the law of the land, the Take Care Clause of the Constitution requires that the President "faithfully execute[]" the law. U.S. Const. art. II, § 3.

3.      President Obama and his agencies, however, have demonstrated a consistent and ongoing pattern of unlawfully and unilaterally amending or suspending the enforcement of duly enacted federal statutes to achieve the Administration's political agenda. Examples include the halting of federally mandated deportations for certain undocumented immigrants, the suspension

of the federally mandated welfare work requirement, the granting of healthcare premium subsidies to congressional employees, and the provision of retroactive subsidies towards insurance purchased outside of the ACA's exchanges.

4.    The Administration has also demonstrated a pattern of ignoring unambiguous statutory limitations on its authority, when such statutory limitations conflict with the Administration's political or policy goals.    Most recently, the President's Environmental Protection Agency ("EPA") has proposed to regulate existing coal-fired power plants under Section 111(d) of the Clean Air Act, 42 U.S.C. §  7411(d), notwithstanding EPA's admission that the "literal" terms of the Clean Air Act prohibits *exactly* such regulations.

5.    This case challenges one such unlawful action—the so-called "Administrative Fix" of the Patient Protection and Affordable Care Act (ACA)—by which the President has sought to shift to the States the burden and political responsibility for the cancellation or approval of individual health plans that do not comply with several requirements created by the President's signature law.

6.    The State of West Virginia believes that its citizens should be able to keep their individual health insurance plans if they like them.  But the State also believes that no President is above the law and that this Administration's actions set a dangerous precedent.  The changes in the law necessary to ensure that the State's citizens and all Americans can keep their desired plans must be obtained properly through the democratic process and in accordance with the legislative procedures set forth in the Constitution.

7.    Last fall, the President finally admitted that—contrary to the repeated promises he made to the American people—the ACA makes many Americans' individual health plans unlawful to renew after January 1, 2014, and subject to stiff federal penalties.  Rather than work

with Congress to amend the ACA so that federal law would no longer require those plans to be cancelled, however, President Obama and his agencies instead instituted the Administrative Fix.

8. Adopted without any advance notice or opportunity for public comment, the Administrative Fix unilaterally suspends federal enforcement of the ACA against individual plans made illegal by the ACA and fundamentally transforms what Congress intended to be a regime of "cooperative federalism." Prior to the Administrative Fix, the ACA gave the States the option of enforcing the law's federal requirements against non-compliant individual health plans, but required the federal Department of Health and Human Services to enforce the requirements if the States declined to do so. The States thus had no authority over whether the federally mandated requirements would ultimately be enforced. But under the Administrative Fix, HHS abdicated its enforcement role and left the States solely responsible—and accountable—for deciding whether federal law would be enforced.

9. With the Administrative Fix, the President intentionally and improperly sought to shift to the States the potential political burden for the cancellation of individual health plans. In announcing the new rule, he explained his desire "to be able to say to these folks, you know what, the Affordable Care Act is not going to be the reason why insurers have to cancel your plan." He stressed that after the Administrative Fix, it would be "state insurance commissioners [who] still have the power to decide what plans can and can't be sold in their states." Although the ACA still makes it unlawful to renew an individual plan that does not comply with the law's federally mandated market requirements, the President has attempted to transfer the legal and political responsibility to the States by giving them exclusive authority to determine whether to actually enforce the ACA's prohibition.

10. The Administrative Fix is an unlawful agency rule for several reasons.

a.     *First*, it is contrary to the ACA.  Under the ACA's enforcement scheme, HHS "shall enforce" the Act's eight market requirements against individual health plans if the States do not do so.  Put another way, the ACA sets up a mandatory regime of cooperative state/federal enforcement.  The Act prohibits HHS from leaving enforcement discretion over the ACA's eight federal market requirements solely to the States.

b.     *Second*, the Administrative Fix was promulgated without public notice and opportunity to comment as required by the Administrative Procedure Act.

c.     *Third*, the Administrative Fix constitutes unlawful delegation of federal executive and legislative powers by the Executive Branch to States.

d.     *Fourth*, the Administrative Fix violates the States' sovereignty under the Tenth Amendment and interferes with constitutional principles of federalism.  By making *States* solely responsible for determining under *federal* law whether plans made illegal by the ACA must be cancelled, the President has unlawfully conscripted States into federal service, making them part of the federal regulatory system and deliberately "diminish[ing]" "the accountability of . . . federal officials" at the expense of the States.  *New York v. United States*, 505 U.S. 144, 168 (1992).

11.     The State of West Virginia seeks judicial intervention against the Administrative Fix to vindicate the rule of law and protect itself from the harm of becoming the sole enforcer of federal law.  While consumers should be able to keep their health plans and States should be allowed to exercise their enforcement authority as they so choose, the President cannot ignore a duly enacted federal law or make the States exclusively responsible for enforcing that law.

## THE PARTIES

12.     Plaintiff the State of West Virginia is a sovereign State that regulates health insurance within its borders through duly enacted state laws administered by state officials and constituent agencies.

13.     It appears by and through Patrick Morrisey, Attorney General of West Virginia.

14.     Defendant U.S. Department of Health and Human Services (HHS) is an executive, Cabinet-level agency of the United States within the meaning of the Administrative Procedure Act.  *See* 5 U.S.C. § 551(1) (APA).  HHS and its sub-agencies are charged with administering many of the provisions of the Patient Protection and Affordable Care Act, Pub. L. No. 111-148, 124 Stat. 119 (2010), as amended by the Health Care and Education Reconciliation Act of 2010, Pub. L. No. 111-152, 124 Stat. 1029 (2010) (codified as amended in scattered sections of the code).  Those sub-agencies within HHS include the Centers for Medicare and Medicaid Services (CMS) and the Center for Consumer Information and Insurance Oversight (CCIIO).

15.     The relief requested in this action is sought against: the Defendant; the Defendant's officers, employees, and agents; and all persons acting in cooperation with the Defendant or under the Defendant's supervision, direction, or control.

## JURISDICTION AND VENUE

16.     This case arises under the APA, 5 U.S.C. §§ 701-706, and under the Constitution and laws of the United States.

17.     This Court has federal-question jurisdiction under 28 U.S.C. §§ 1331 and 1341.

18.     The Court may award declaratory and injunctive relief under the APA, as well as 28 U.S.C. §§ 1361, 2201–2202 and Federal Rules of Civil Procedure 57 and 65.

19.     Venue is proper under 28 U.S.C. § 1391(b) and (e)(l) because the Defendant is an agency of the United States and resides in this district.

## FACTUAL ALLEGATIONS

### A.   The ACA's Eight Federally Mandated Market Requirements

20.     Under the ACA, all individual health insurance plans begun or renewed after January 1, 2014, must comply with eight federally mandated market requirements, unless they qualify for the grandfathering exception.  42 U.S.C. §§ 300gg – 300gg-6, 300gg-8; *id.* § 18011; *see also* ACA § 1255 (effective "for plan years beginning on or after January 1, 2014").

21.     While the ACA as a whole imposes many mandates on many actors, these eight federally mandated market requirements relate to fair health insurance premiums; guaranteed availability of coverage; guaranteed renewability of coverage; the prohibition of pre-existing condition exclusions or other discrimination based on health status; the prohibition of discrimination against individual participants and beneficiaries based on health status; non-discrimination in health care; comprehensive health insurance coverage; and coverage for individuals participating in approved clinical trials.  42 U.S.C. §§ 300gg – 300gg-6, 300gg-8.

22.     As described more fully below, federal law creates an enforcement regime that: (a) permits the States the first opportunity to voluntarily enforce these federally mandated market requirements by restricting the issuance of non-compliant individual health plans; and (b) requires Defendant HHS to enforce the requirements if the States do not do so.  42 U.S.C. § 300gg-22; *see also* 78 Fed. Reg. 13406, 13419.

23.     The regime resembles an arrangement used in other federal laws—called "cooperative federalism"—in which States are given the chance to voluntarily participate in the

application of federal standards but are backstopped by mandatory enforcement by the federal government if the States choose not to enforce them.

### a. Voluntary State Enforcement Against Insurers

24.     Every State has long had the authority to restrict the sale of individual insurance plans in his or her State.  *E.g.*, W. Va. Code §§ 33-6-8; *see also id.* § 33-2-10 (listing the State's authority to regulate the insurance market and protect the interests of policyholders).

25.     Consistent with this pre-existing role in regulating health insurance, *see, e.g.,* 15 U.S.C. § 1011, 1012, federal law grants the States the initial opportunity to voluntarily enforce the ACA's eight federal market requirements against the issuers of individual insurance plans, *see* 42 U.S.C. § 300gg-22(a)(1) ("[E]ach State may require that health insurance issuers . . . meet the requirements of this part.").

26.     Soon after Congress enacted and the President signed the ACA, many States indicated whether they intended—consistent with their own state laws—to enforce some or all of the eight federally mandated requirements.  *See, e.g.*, National Association of Insurance Commissioners, Survey on State Authority to Enforce PPACA Immediate Implementation Provisions (Aug. 5, 2010), http://www.naic.org/documents/index_health_reform_section_ ppaca_state_enforcement_authority.pdf (attached as Exh. 1).

### b. Mandatory Federal Enforcement Against Insurers

27.     In contrast to the States, Defendant HHS has no discretion under federal law whether or not to enforce the Act's eight federal requirements against insurers who issue individual health insurance plans.

28.     If a State does not enforce the eight federally mandated market requirements, the Secretary of HHS must make a "determination" of such nonenforcement, at which point "the

Secretary [of HHS] *shall enforce* [the provisions of this part] insofar as they relate to the issuance, sale, renewal, and offering of health insurance coverage." 42 U.S.C. § 300gg-22(a)(2) (emphasis added); *see also* 45 C.F.R. § 150.203 ("*requiring* CMS enforcement" (emphasis added)).

29.     Federal enforcement entails the possibility of significant fines on noncompliant insurers.  The Secretary may fine violators up to $100 per day per individual affected by the insurer's noncompliance.  42 U.S.C. § 300gg-22(b)(2)(C); *see also* 45 C.F.R. § 150.315.

30.     If an insurer fails to pay a penalty after it has exhausted its administrative and judicial review, the Secretary "shall refer" the matter to the Attorney General for legal action.  42 U.S.C. § 300gg-22(b)(2)(F)(ii).

31.     Furthermore, the funds gained from enforcement actions are specifically earmarked to finance future HHS enforcement.  42 U.S.C. § 300gg-22(b)(2)(G) (providing that penalties "paid to the Secretary (or other officer) imposing the penalty . . . shall be available. . . for the purpose of enforcing the provisions with respect to which the penalty was imposed").

**B. The Grandfathering Exception to the Act's Eight Federally Mandated Market Requirements**

32.     The Affordable Care Act's grandfathering provision provides the lone exception to the Act's mandate that all individual health insurance plans comply with the Act's eight federally mandated market requirements.

33.     As interpreted by an HHS rule, the grandfathering provision exempts individual health insurance plans that were in existence on March 23, 2010 *and* have not been significantly modified.

a.     Under Section 1251 of the Act, individual health insurance plans already in existence on March 23, 2010 need not comply with the eight federally mandated

requirements. *See* 42 U.S.C. § 18011(1) ("Nothing in this Act . . . shall be construed to require that an individual terminate coverage . . . in which such individual was enrolled on March 23, 2010.").

b.   But HHS has issued a rule that removes from eligibility for grandfather status any plans in existence on March 23, 2010 that an insurer subsequently modified in certain ways. 45 C.F.R. § 147.140. Under the rule, for example, a plan loses grandfather status if an insurer makes "any increase . . . in a percentage cost-sharing requirement." 45 C.F.R. § 147.140(g)(1)(ii).

34.   With this rule in place, Defendant HHS has estimated that "the percentage of individual market policies losing grandfather status in a given year [will exceed] the 40 percent to 67 percent range." 75 Fed. Reg. 34538, 34553 (June 17, 2010).

## C. The Administrative Fix

35.   Because many individual health insurance plans neither qualified for grandfathering nor complied with the ACA's eight federal market requirements, insurance companies nationwide sent cancellation notices to their customers in the months before the federal requirements took effect on January 1, 2014.

36.   These cancellation notices resulted in widespread criticism that President Obama had violated his oft-repeated pledge that "if you like your health care plan, you can keep your health care plan." *See, e.g.*, Barack Obama, U.S. President, Remarks by the President in Health Insurance Reform Town Hall (Aug. 11, 2009), *available at* http://www.whitehouse.gov/the-press-office/remarks-president-town-hall-health-insurance-reform-portsmouth-new-hampshire (attached as Exh. 2).

37.     Congress began preparing to amend the Act in order to stop the cancellation of health insurance plans.  *See, e.g.,* Keep Your Health Plan Act of 2013, H.R. 3350, 113th Cong. (2013); Keeping the Affordable Care Act Promise Act, S. 1642, 113th Cong. (2013).  West Virginia and many other States support legislative solutions like these that could lawfully allow individuals to keep their health insurance plans.

38.     The President, however, sought to preempt any congressional action that would have addressed the problem legally and led to a permanent cure to the problem.  In fact, he formally threatened to veto a bill that would allow people to keep their individual health insurance plans.  Office of Mgmt. & Budget, Executive Office of the President, Statement of Administration Policy, H.R. 3350 – Keep Your Health Plan Act of 2013 (Nov. 14, 2013) (attached as Exh. 3).

39.     Instead, acting through Defendant HHS, the President unilaterally sought to "fix" the problem administratively for a limited period of time—long enough for him to avoid political accountability.

### a.  The President's Announcement of the Administrative Fix

40.     On November 14, 2013, the President held a press conference to announce that he and his Administration "would do everything we can to fix this problem."  Barack Obama, President, Statement by the President on the Affordable Care Act at 2 (Nov. 14, 2013), *available at*  http://www.whitehouse.gov/the-press-office/2013/11/14/statement-president-affordable-care-act (attached as Exh. 4) (hereinafter "Presidential Press Conference").  He stated:  "I completely get how upsetting this can be for a lot of Americans, particularly after assurances they heard from me that if they had a plan that they liked, they could keep it.  And to those Americans, I hear you loud and clear."  *Id.*

41.     The President explained his intent to take action through his administrative agencies to allow "insurers [to] extend current plans that would otherwise be canceled into 2014, and [allow] Americans whose plans have been cancelled [to] choose to re-enroll in the same kind of plan." *Id*.; *see also* Press Release, White House, Fact Sheet: New Administration Proposal to Help Consumers Facing Cancellations at 1 (Nov. 14, 2013) (citing HHS's "administrative authority"), *available at* http://www.whitehouse.gov/the-press-office/2013/11/14/fact-sheet-new-administration-proposal-help-consumers-facing-cancellatio (attached as Exh. 5) (hereinafter "Administrative Fix Fact Sheet").

42.     Essentially, he was "going to extend" the "principle" of the ACA's grandfathering provision to those people whose individual health plans did not qualify under the grandfathering rule.  Presidential Press Conference, Exh. 4 at 2.

43.     The President acknowledged that "state insurance commissioners still have the power to decide what plans can and can't be sold in their states." *Id*.  But, he explained, "what we want to do is to be able to say to these folks, you know what, the Affordable Care Act is not going to be the reason why insurers have to cancel your plan." *Id*. at 4; Administrative Fix Fact Sheet, Exh. 5 at 2 ("Whether an individual can keep their current plan will also depend on their insurance company and State insurance commissioner – but today's action means that it will no longer be implementation of the law that is forcing them to buy a new plan.").

### b.  HHS Formalizes the Administrative Fix as a Binding Rule

44.     The same day as the President's press conference, HHS announced that it would suspend enforcement of these eight federal market requirements and that it would encourage States to facilitate insurers' issuance and consumers' renewal of plans not compliant with the federally mandated market requirements.

45.     In a letter addressed to all state insurance commissioners, HHS committed not to penalize the one-year renewal of individual non-grandfathered plans that, due to non-compliance with the eight federally mandated market requirements, are prohibited by the ACA from being renewed after January 1, 2014.  *See* Letter from Gary Cohen, Director, CCIIO, to Insurance Commissioners (Nov. 14, 2013), http://www.cms.gov/CCIIO/Resources/Letters/Downloads/commissioner-letter-11-14-2013.pdf (attached as Exh. 6) (hereinafter "Administrative Fix Letter").  The letter explained that HHS would not punish any such renewals made after January 1, 2014, and before October 1, 2014.  *Id.*

46.     HHS stated its intent to give health insurance issuers the discretion to "choose to continue coverage that would otherwise be terminated or cancelled," subject to two conditions. *Id.* at 1.  *First*, the plan had to be in effect on October 1, 2013.  *Second*, the insurance issuer has to send affected customers a notice containing information about the Act's health insurance exchanges and the federally mandated market requirements with which the plan is not complying.  *Id.* at 2.  A week later, CMS promulgated forms that insurers must use for this purpose.  Gary Cohen, Director, CCIIO, Insurance Standards Bulletin Series – INFORMATION (Nov. 21, 2013), http://www.cms.gov/CCIIO/Resources/Regulations-and-Guidance/Downloads/standard-notice-bulletin-11-21-2013.pdf (attached as Exh. 7) (hereinafter "Insurer Disclosure Rule").

47.     If these conditions are satisfied, HHS committed unequivocally that—for its purposes—an otherwise non-compliant individual health plan "will not be considered out of compliance with the [eight federal] market reforms."  Administrative Fix Letter, Exh. 6 at 1.

48.     In short, the letter informed the States that, notwithstanding its statutory mandate to enforce the eight federal market requirements, HHS will categorically refuse to enforce those

requirements.   Instead of enforcing the federal requirements if a State lacks the necessary authority or fails to substantially enforce a provision, 45 C.F.R. § 150.203, as the ACA requires, HHS has suspended its own enforcement entirely, provided the agency's conditions are met.

49.     The letter also expressly "encouraged" those "State agencies responsible for enforcing the specified market reforms" to "adopt the same transitional policy."  Administrative Fix Letter, Exh. 6 at 3.  HHS recognized that individuals and insurance companies with plans made unlawful by the ACA cannot benefit from the Administrative Fix unless their State also chooses, consistent with the Administrative Fix, not to enforce the federally mandated requirements and not to restrict the sale of such plans.

50.     Finally, the letter stated that HHS would consider whether to extend the Administrative Fix "beyond the specified time frame" to which it had already committed.  *Id.* at 1.

51.     On March 5, 2014, HHS extended the Administrative Fix by two years.  *See* Gary Cohen, Director, CCIIO, Insurance Standards Bulletin Series – Extension of Transitional Policy through October 1, 2016 (Mar. 5, 2014), http://www.cms.gov/CCIIO/Resources/ Regulations-and-Guidance/Downloads/transition-to-compliant-policies-03-06-2015.pdf (attached as Exh. 8). (hereinafter "Extension Rule").

52.     The agency committed to continue, for two additional years, not to penalize the renewal of individual plans that are not grandfathered and not compliant with the eight federally mandated market requirements.  *Id.* at 2.  Specifically, HHS will not punish any such renewals for policy years that begin by October 1, 2016.  *Id.*

53.     In short, provided that the two conditions originally announced are met, HHS promised not to act against individual health plans made unlawful by the ACA until just before the next presidential election.

54.     Like the Administrative Fix, this Extension Rule recognized that it is now the "option of the States" whether any individual health plans made unlawful by the ACA can be sold within their borders.   Indeed, HHS set forth specifically what actions States could take to allow their citizens to benefit from the extended Administrative Fix.  *See id*. at 2-3.

55.     HHS further stated in the Extension Rule that it would assess whether yet an "additional one-year extension" of the Administrative Fix is appropriate.  *Id.*

56.     Spokesmen for the President and HHS have repeatedly justified the Administrative Fix as an exercise of agency "enforcement discretion" under *Heckler v. Chaney*, 470 U.S. 821 (1985).  For example, a spokesperson for HHS stated: "[A]gencies charged with administering statues [*sic*] have inherent authority to exercise discretion to ensure that their statutes are enforced in a manner that achieves statutory goals and are consistent with other administrative policies.   Agencies may exercise this discretion in appropriate circumstances, including when implementing new or different regulatory regimes, and to ensure that transitional periods do not result in undue hardship."   Greg Sargent, *White House Defends Legality of Obamacare Fix,* Washington Post, Nov. 14, 2013, *available at* http://www.washingtonpost.com/ blogs/plum-line/wp/2013/11/14/white-house-defends-legality-of-obamacare-fix/   (attached   as Exh. 9).

### c.   A Binding Regulatory Framework

57.     The Administrative Fix is final agency action that sets out a substantive rule binding on the agency, which the agency specifically designed "as a norm or safe harbor by

which [private parties]" are expected to "shape their actions."  *General Electric Co. v. EPA*, 290 F.3d 377, 383 (D.C. Cir. 2002).

58.     The language and structure of the Administrative Fix's comprehensive change to the federal enforcement regime, as well as the Defendant's actions and statements, make clear that the Administrative Fix is binding upon HHS:

a.     The Administrative Fix represents the official positions and actions of HHS.  All documents relating to the Administrative Fix and its extension were signed by Gary Cohen, then-Director of CCIIO (a part of CMS, which is, in turn, a part of HHS).

b.     The agency documents use mandatory and decisive language reflecting the binding nature of the agency's commitment to its decision not to enforce the ACA's eight federal market requirements against individual health plans when its two conditions are satisfied.  *E.g.*, Administrative Fix Letter, Exh. 6 at 1 (noting that plans "*will not* be considered to be out of compliance" (emphasis added)); Insurer Disclosure Rule, Exh. 7 at 1 (same); Extension Rule, Exh. 8 at 1, 3 (same).

c.     The agency documents speak unequivocally about the ability of States and insurers to permit the sale of individual health plans made unlawful by the ACA, as well as the ability of consumers to purchase such plans, evidencing a commitment by HHS to honor those choices notwithstanding the plain terms of the ACA.  *E.g.*, Administrative Fix Letter, Exh. 6 at 1 (noting that "health insurers may choose to continue coverage that would otherwise be terminated or cancelled, and affected individuals . . . may choose to re-enroll"); Insurer Disclosure Rule, Exh. 7 at 1 (same); Extension Rule, Exh. 8 at 1 (same); *id.* at 2 (noting that certain large businesses "will have the option of renewing their current policies . . . without their policies being considered to be out of compliance"

and that insurers "may renew such policies"); *id.* (noting the "option of the States" to permit the sale of individual health plans made illegal by the ACA and that the States "may choose" and "can elect" to do so).

d.      HHS has set forth procedures and provided a specific disclosure statement that "*will be* considered to satisfy the requirement to notify policyholders of the discontinuation of their policies."  Insurer Disclosure Rule, Exh. 7 at 2 (emphasis added); *see also id.* at 2, 3.

e.      HHS has used language and taken actions that presume the Administrative Fix is being and will be followed by the agency.  *See* Extension Rule, Exh. 8 at 1 (observing that "policies subject to the transitional relief *are not considered* to be out of compliance" (emphasis added)); CCIIO, Options Available for Consumers for Cancelled Policies (Dec. 19, 2013), http://www.cms.gov/CCIIO/Resources/Regulations-and-Guidance/index.html (follow "Options Available for Consumers with Cancelled Policies" hyperlink) (attached as Exh. 10) (noting that "[s]ome states have adopted the transitional policy, enabling health insurance issuers to renew their existing [non-compliant] plans and policies"); Gary Cohen, Director, CCIIO, Frequently Asked Questions on Standard Notices for Transition to ACA Compliant Policies (Nov. 21, 2013), http://www.cms.gov/CCIIO/Resources/Regulations-and-Guidance/index.html (follow "Questions on Transition to ACA Compliant Policies" hyperlink) (attached as Exh. 11) (providing answers to FAQs about the Administrative Fix).

f.      HHS has separately adopted binding rule changes to accommodate the economic impacts of the Administrative Fix.  On March 11, 2014, HHS finalized a rule altering the reinsurance and risk corridors programs to mitigate the Administrative Fix's

potentially destabilizing effects and financial costs to insurers. *See* HHS Notice of Benefit and Payment Parameters for 2015, 79 Fed. Reg. 13744 (Mar. 11, 2014) (to be codified at 45 C.F.R. pt. 144, et al.).

g.    Then, on May 27, 2014, HHS finalized another rule amending the medical loss ratio program and further altering the risk corridors program based, again, on the potential financial impacts of the Administrative Fix. *See* Exchange and Insurance Market Standards for 2015 and Beyond, 79 Fed. Reg. 30240 (May 27, 2014) (to be codified at 45 C.F.R. pt. 144, et al.).

h.    Finally, States, members of Congress, and market observers have all uniformly understood the administrative fix to be a binding agency pronouncement. In particular, States have permitted the sale of non-compliant individual health plans within their borders based upon HHS's commitment, and insurance companies have extended such plans in those States.

59.    Despite HHS's clear intent that the Administrative Fix function as a binding rule, HHS did not provide any notice to the public or opportunity to comment before finalizing the Administrative Fix.

### d. Turning States from Optional Enforcers Within a Cooperative Federalism Regime Into Federal Policymakers

60.    The Administrative Fix fundamentally changes the States' enforcement role with respect to individual health plans and the eight federally mandated market requirements.

61.    Prior to HHS's adopting the Administrative Fix, the States' enforcement of the eight federal market requirements took place within a "cooperative federalism" scheme. Under that congressionally mandated regime, the States had the option of enforcing the federally

mandated requirements against non-compliant individual health plans, but if the States did not do so, HHS had a mandatory obligation to enforce the requirements.

62.     Thus, under the regime provided by the ACA, the States lacked the authority to determine whether individual health plans made unlawful by the ACA would be sold within their borders.  Whatever a State decided to do, the sale of non-compliant plans would be punished— either by the State or by HHS.

63.     The Administrative Fix changed both the federal and state enforcement roles.  As HHS has expressly recognized in communications to the state insurance commissioners, the Administrative Fix leaves the enforcement of the eight federally mandated market requirements with respect to non-compliant individual health plans entirely to "the option of the States." Extension Rule, Exh. 8 at 2.

a.     Under the Administrative Fix, HHS bound itself, notwithstanding its statutory mandate, not to punish the sale of non-compliant individual health plans, so long as certain conditions unrelated to the ACA's market requirements are met.

b.     This abdication of responsibility at the federal level shifts the enforcement burden entirely to the States.

c.     Although each State has the same decision to make about enforcement that it had before the Administrative Fix, the effect of that decision is fundamentally different. Before the Administrative Fix, a State's enforcement decision could not change whether non-compliant individual health plans could be sold within the State.  But after the Administrative Fix, each State's decision is *dispositive* on that question.  If a State chooses not to enforce the eight federally mandated requirements, those plans that satisfy

HHS's conditions will be permitted to be sold.  If a State chooses to enforce the federally mandated requirements, however, none will be sold.

        d.     The Administrative Fix gives States the exclusive authority—and burden—to decide whether non-compliant individual health plans that satisfy HHS's two conditions will be sold in their States.  No federal executive agency or officer will prohibit such sales.

64.     By changing the States' enforcement roles, the Administrative Fix forces States to become federal policymakers.  States now fully *control* the extent to which the eight *federally mandated* market requirements will be enforced within their respective States.

65.     This is not a situation in which the federal government has chosen not to regulate health insurance, leaving the States free to regulate (or not) according to *state law* as they see fit.

66.     Instead, the ACA prohibits certain individual health plans as a matter of *federal law*, and the Administrative Fix has now pushed onto the States the sole responsibility for determining the effect to give that *federal law*.

### D.  Injury to the State of West Virginia from the Administrative Fix

67.     By fundamentally changing the cooperative federalism regime created by the ACA for enforcement of the eight federally mandated market requirements against non-compliant individual health plans, the Administrative Fix has harmed all States, including the State of West Virginia.

68.     *First*, the State has been injured by the Administrative Fix by being forced to become the sole and exclusive enforcer of federal law within its borders.

69.     *Second*, the Administrative Fix reduced the political accountability of the federal government at the expense of the States.

70.     Prior to the Administrative Fix, there was no question that the federal government was responsible for the ACA's policy consequences.   The federal government—through Congress and the President—adopted the ACA and its eight federal market requirements.   Under the cooperative federalism regime provided by the ACA, the States had no authority to decide that individual health plans made unlawful by the ACA could be sold—unpunished—within their borders.   While the States could defer punitive enforcement to the federal government by refusing to participate, the ACA gave the States no policymaking discretion over the ultimate enforcement of federal law.

71.     Under the Administrative Fix, the lines of political accountability are far less certain.   By granting the States dispositive authority over the enforcement of the eight federal requirements and turning the States into federal policymakers, the Administrative Fix creates—at a minimum—confusion as to which government is actually to blame for the ACA's policies. That confusion exists regardless of whether the States choose to actually enforce the eight federal requirements or not: in either circumstance, the States will be held at least partly accountable by their citizens for having made a *federal* policy choice.

72.     Indeed, the President's self-described purpose in adopting the Administrative Fix was to shift political accountability away from the federal government to the States.   He said: "[W]hat we want to do is to be able to say to these folks, you know what, the Affordable Care Act is not going to be the reason why insurers have to cancel your plan."   Presidential Press Conference, Exh. 4 at 4.   He specifically noted that after adopting the Administrative Fix, it would be the "state insurance commissioners [that] still have the power to decide what plans can and can't be sold in their states."   *Id*. at 2; *see also* Administrative Fix Fact Sheet, Exh. 5 at 2 ("Whether an individual can keep their current plan will also depend on their insurance company

and State insurance commissioner – but today's action means that it will no longer be implementation of the law that is forcing them to buy a new plan.").

73.     Consistent with the President's goal of blurring political accountability, HHS formalized the Administrative Fix by sending to *all state insurance commissioners* a letter that made clear that the burden was on the States to decide whether to "adopt the same transitional policy." Administrative Fix Letter, Exh. 6 at 3.

74.     Similarly, in the Extension Rule, HHS repeatedly stated that enforcement was now "the option of the States" and also described in detail the actions that *States* could (and would need to) take to allow their citizens to benefit from the extended Administrative Fix. Extension Rule, Exh. 8 at 2.

75.     The States are clearly the targets of the Administrative Fix.

76.     This blurred political accountability diminishes the sovereignty of West Virginia and all other States by interfering with the relationship between state officials and their constituents, inhibiting the ability of elections to properly hold government and public officials accountable, and harming the reputation and dignity of the States and their officials and agencies. *See Gregory v. Ashcroft*, 501 U.S. 452, 460 (1991) ("Through the structure of its government, and the character of those who exercise government authority, a State defines itself as a sovereign.").

77.     This injury to state sovereignty occurs no matter what choice West Virginia or any other State makes in response to the Administrative Fix.

78.     Eleven States, through their attorneys general, explained to HHS the unlawfulness of the Administrative Fix in a letter dated December 26, 2013, commenting on a proposed rule altering the reinsurance and risk corridors programs to mitigate the Administrative Fix's

potentially destabilizing effects and financial costs to insurers.  *See* Letter from Patrick Morrisey, West Virginia Attorney General *et al.*, to Kathleen Sebelius, Secretary, HHS (Dec. 26, 2013) (attached as Exh. 12).  HHS has never responded to this letter or the allegations therein.

79.     These States all agreed that their citizens should be able to keep their health insurance plans if they like them.  The States objected to the Administrative Fix, however, because it "is flatly illegal under federal constitutional and statutory law."  *Id*. at 1.  The States explained: "We support allowing citizens to keep their health insurance coverage, but the only way to fix this problem-ridden law is to enact changes lawfully: through congressional action."  *Id*. at 1.

**E.  The State of West Virginia Responds to the Administrative Fix**

80.     On November 21, 2013, the West Virginia Insurance Commissioner, Michael D. Riley, publicly stated that he would not take the steps encouraged by HHS to accommodate the Administrative Fix.  Press Release, West Virginia Offices of the Insurance Commissioner, West Virginia Makes Announcement on CCIIO Re-enrollment Proposal (Nov. 21, 2013) (attached as Exh. 13).

81.     The Insurance Commissioner explained that the "abrupt" Administrative Fix "comes at a time when West Virginia employers, citizens and insurance carriers have already made extensive changes to comply with the new law."  *Id.*  "In order to avoid further confusion, provide market stability, mitigate potential rate impacts of the CCIIO proposal, and regulate the West Virginia insurance market in accordance with the existing law," the Commissioner further explained, "we have decided to maintain our current direction."  *Id.*

82.     On April 10, 2014, the Insurance Commissioner responded to HHS's extension of the Administrative Fix.  *See, e.g.,* Lydia Nuzum, *Non-Compliant Insurance Plans Get 3-Year*

*Stay,* Charleston Gazette, 2014 WLNR 10711115, Apr. 19, 2014, *available at* http://www.wvgazette.com/article/20140419/GZ01/140419179 (attached as Exh. 14).

83.     The Commissioner chose then to take the steps encouraged by HHS under the Extension Rule.  He committed not to restrict the renewal of certain non-compliant plans for policy years that end by October 2017.  The Commissioner explained that it is now "up to the carriers as to whether they want to offer non-compliant plans through that much longer period." *Id.*

## F.  The Federal Executive Branch's Pattern of Unlawfully and Unilaterally Amending or Suspending the Enforcement of Federal Statutes

84.     The Administrative Fix is part of a larger pattern and practice by this Administration, which shows that the Administration is capable of reinstituting the Administrative Fix even if it expires before judicial review runs its course.

85.     On several occasions in different contexts, federal officials have stated that they will not enforce a federal statute at all or will suspend it for a selected category of people, often if certain conditions are met.  For example, according to then-Secretary Kathleen Sebelius, the Administration has "implemented a number of changes in the way the [ACA] was written." *Hearing on the President's Fiscal Year 2015 Budget Proposal with U.S. Department of Health and Human Services Secretary Kathleen Sebelius Before the H. Comm. on Ways and Means*, 113th Cong. (2014).

86.     These actions are often justified on the same basis as the Administrative Fix—as "enforcement discretion" under *Heckler v. Chaney*, 470 U.S. 821 (1985), even though *Heckler* provides no such authority.  And like the Administrative Fix, many of these actions also purport to be "temporary" or "transitional" with time frames potentially shorter than the time necessary

for full judicial review.  Many were also an attempt to short-circuit Congress by precluding a legislative fix.

### a.  Suspended Enforcement of Federal Statute

87.     In June 2012, the Homeland Security Secretary halted deportations for all undocumented immigrants who meet certain age, educational, and other conditions. Memorandum from Janet Napolitano, Secretary of Homeland Security, to David Aguilar, Acting Commissioner, U.S. Customs and Border Protection, *et al.* (June 15, 2012) *available at* http://www.dhs.gov/xlibrary/assets/s1-exercising-prosecutorial-discretion-individuals-who-came-to-us-as-children

.pdf (attached as Exh. 15).

88.     According to HHS, the same enforcement discretion at work in this immigration policy is at work in the Administrative Fix.  When the President announced the Administrative Fix, an HHS spokesperson stated: "HHS .  .  . will be using its enforcement discretion to allow for this transition.  Enforcement discretion can be used generally in transitions, as well as a bridge towards legislation.  This is something that has been used, for example, with the deferred action for childhood arrivals policy, pending immigration reform."  Transcript, White House Background Briefing on Plan to Allow Insurers to Continue Offering Canceled Plans (Nov. 14, 2013) *available at* http://www.washingtonpost.com/politics/transcript-white-house-background-briefing-on-plan-to-allow-insurers-to-continue-offering-canceled-plans/2013/11/14/1c961e4e-4d59-11e3-ac54-aa84301ced81_story.html (attached as Exh. 16).

### b.  Unilateral Changes to Federal Statutes

89.     *First*, on July 12, 2012, the Administration claimed the authority to suspend the federally mandated work requirement set forth in the Personal Responsibility and Work

Opportunity Reconciliation Act of 1996, PL 104–193, Aug. 22, 1996.  The statute specifically provides that waivers "shall not affect the applicability" of the mandatory work requirement.  42 U.S.C. § 615(a)(2)(B).  But the Administration notified States of the HHS Secretary's "willingness to exercise her waiver authority" to eliminate the law's work participation requirement if the States meet a series of agency-imposed requirements, such as creating a set of performance measures.  Office of Family Assistance, TANF-ACF-IM-2012-03 (Guidance concerning waiver and expenditure authority under Section 1115) (July 12, 2012) *available at* http://www.acf.hhs.gov/programs/ofa/resource/policy/im-ofa/2012/im201203/im201203 (attached as Exh. 17).

90. *Second*, on October 2, 2013, the Administration finalized a rule that purported to grant premium subsidies to congressional employees who purchase health insurance "through an appropriate [Exchange] as determined by the Director" of the Office of Personnel Management. 5 C.F.R. § 890.201(d).  This action plainly contradicts Section 1312(d)(3)(D) of the ACA, which states: "[T]he only health plans that the Federal Government may make available to Members of Congress and congressional staff . . . shall be health plans that are created under this Act . . . or offered through an Exchange established under this Act."  42 U.S.C. § 18032(d)(3)(D).  And under federal law, premium subsidies are available to Members of Congress and their staffs only through the Federal Employees Health Benefits Program, not through the ACA's Exchanges. *See generally* 5 U.S.C. §§ 8901-8914.  No federal law permits large employers, including the federal government, to subsidize employee coverage purchased through an Exchange.

91. *Third*, on February 27, 2014, HHS announced that due to "technical issues," certain Exchanges may deem individuals eligible for retroactive federal subsidies to help offset the price of insurance—even if that insurance was purchased *outside* of an Exchange.  CMS,

CMS Bulletin to Marketplaces on Availability of Retroactive Advance Payments of the PTC and CSRs in 2014 Due to Exceptional Circumstances (Feb. 27, 2014) (attached as Exh. 18).  Yet the ACA clearly states that federal subsidies shall be awarded only to those individuals enrolled in an insurance plan "through an Exchange."  26 U.S.C. § 36B(b)(2)(a); 42 U.S.C. § 18071(b)(1).

## CLAIMS FOR RELIEF

### COUNT ONE:

### Violation of the Affordable Care Act and the Administrative Procedure Act

92.    The State of West Virginia incorporates by reference the allegations of the preceding paragraphs.

93.    All rules and executive actions must be consistent with their authorizing statutes and cannot be "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law."  5 U.S.C. § 706(2)(A).

94.    The Administrative Fix violates and is contrary to the Affordable Care Act, and is arbitrary, capricious, and an abuse of HHS's discretion.  42 U.S.C. §§ 300gg–300gg-6, 300gg-8.

95.    The Act plainly states that if a State does not enforce the eight federally mandated market requirements, and the Secretary makes a finding of that nonenforcement, "the Secretary [of HHS] *shall enforce* [the provisions of this part] insofar as they relate to the issuance, sale, renewal, and offering of health insurance coverage."  42 U.S.C. § 300gg-22(a)(2) (emphasis added).  The Act does not provide HHS any discretion (rulemaking or otherwise) to refuse categorically to make a finding that the State has failed to enforce the eight federal market requirements, and thereby suspend the ACA's eight federal market requirements or to convey responsibility for these federally mandated requirements to the States.  *See Massachusetts v. EPA.*, 549 U.S. 497, 527, 534 (2007).

96.     The case-by-case enforcement discretion contemplated in *Heckler v. Chaney*, 470 U.S. 821 (1985), is not applicable both because federal law provides that HHS "shall" enforce the eight market conditions where states decline to do so and because the Administrative Fix is not a case-specific decision to decline enforcement.

97.     The State of West Virginia is therefore entitled to relief under the APA and the Constitution and laws of the United States.

## COUNT TWO:

### Violation of the Notice and Comment Requirements
### of the Administrative Procedure Act

98.     The State of West Virginia incorporates by reference the allegations of the preceding paragraphs.

99.     The APA requires that all new or modified legislative rules go through statutorily specified notice-and-comment procedures.  *See Am. Min. Cong. v. Mine Safety & Health Admin.*, 995 F.2d 1106, 1112 (D.C. Cir. 1993).

100.    The APA provides that before an agency promulgates a "rule," it must provide a "[g]eneral notice of proposed rule-making" and give "interested persons an opportunity to participate in the rule-making through submission of written data, views, or arguments."  5 U.S.C. § 553(b)-(c).  As part of the notice-and-comment process, an agency must respond to "relevant" and "significant" public comments, *Home Box Office, Inc. v. FCC*, 567 F.2d 9, 35 & n.58 (D.C. Cir. 1977), and to those comments "which, if true, . . . would require a change in [the] proposed rule," *La. Fed. Land Bank Ass'n v. Farm Credit Admin.*, 336 F.3d 1075, 1080 (D.C. Cir. 2003) (internal quotations and citations omitted).

101.    The notice-and-comment requirement is a vital part of the APA's structure because it "assures that the agency will have before it the facts and information relevant to a

particular administrative problem, as well as suggestions for alternative solutions." *Guardian Fed. Sav. & Loan Ass'n v. Fed. Sav. & Loan Ins. Corp.*, 589 F.2d 658, 662 (D.C. Cir. 1978).

102.    The Administrative Fix constitutes final agency action that is binding on its face and in application, and was thus subject to the APA's notice-and-comment procedures.

103.    The Administrative Fix failed to comply with the APA's notice and comment procedures.

104.    The State of West Virginia is therefore entitled to relief under 5 U.S.C. §§ 702, 706(2)(A), (C), (D).

## COUNT THREE:

### Unlawful Delegation of Executive and Legislative Responsibility to the States
### Art. I-II of the U.S. Constitution, ACA

105.    The State of West Virginia incorporates by reference the allegations of the preceding paragraphs.

106.    The Administrative Fix unlawfully delegates federal executive and legislative responsibility to the States.

107.    *First*, Article II vests "[t]he executive Power . . . in a President of the United States of America," who must *himself* "take Care that the Laws be faithfully executed."  U.S. Const. art. II, § 1, cl. 1; *id.*, § 3.  While subordinate federal officers may help him execute the laws, the President may not convey his responsibilities on non-federal entities with no meaningful presidential control.

108.    *Second*, Article I, § 1 of the Constitution vests "[a]ll legislative Powers herein granted . . . in a Congress of the United States."  This provision "permits no delegation of [Congress's legislative] powers."  *Whitman v. Am. Trucking Associations*, 531 U.S. 457, 472 (2001).  As a result, when decision-making authority is conferred on a federal agency, there must

be "an intelligible principle to which the person or body authorized to [act] is directed to conform." *J.W. Hampton, Jr., & Co. v. United States*, 276 U.S. 394, 409 (1928).

109.     The Administrative Fix, however, leaves entirely to the States' discretion whether to enforce the ACA's eight federal market requirements within their respective borders.  There is no principle limiting that discretion.

110.     Moreover, the Vesting Clause also prohibits any delegation of regulatory power, whether or not guided by an intelligible principle, to entities outside of federal agencies.  Any such entities "must be limited to an advisory or subordinate role in the [federal] regulatory process." *Ass'n of Am. Railroads v. U.S. Dep't of Transp.*, 721 F.3d 666, 671-73 (D.C. Cir. 2013), *cert. granted*, 82 U.S.L.W. 3533 (U.S. June 23, 2014) (No. 13–1080).

111.     Under the Administrative Fix, however, the States are not merely acting in a subordinate or advisory role to federal regulators.  They have improperly been given regulatory power because HHS has specifically provided that it will refuse to honor its obligation to enforce the federally mandated requirements where the States do not do so.

112.     *Third*, under established principles of statutory construction, "federal agency officials . . . may not subdelegate [any share in federal decision-making and enforcement authority] to outside entities—private or sovereign—absent affirmative evidence of authority to do so." *U.S. Telecom Ass'n v. F.C.C.*, 359 F.3d 554, 566 (D.C. Cir. 2004).  An agency delegates its authority when it shifts to another party "the entire determination of whether a specific statutory requirement . . . has been satisfied," *id.* at 567, or where the agency abdicates its "final reviewing authority," *Nat'l Park & Conservation Ass'n v. Stanton*, 54 F. Supp. 2d 7, 19 (D.D.C. 1999).

113.    Far from providing such an express grant of sub-delegation authority, the ACA creates a cooperative federalism scheme, under which the federal government alone has mandatory enforcement authority if the States do not enforce the law.

114.    *Fourth,* the separation of powers requires all federal enforcement officials to be appointed by federal processes and subject to removal by the President.   "[A]nyone who 'exercis(es) significant authority' . . . or who performs a significant governmental duty . . . 'pursuant to the laws of the United States is an officer of the United States and therefore must be appointed pursuant to the Appointments Clause.'"  *Buckley v. Valeo*, 424 U.S. 1 (1976) (per curiam); *see* U.S. Const. art. II, § 2, cl. 2.  Likewise, "the Constitution has been understood to empower the President to keep [federal] officers accountable—by removing them from office, if necessary."  *Free Enter. Fund v. Pub. Co. Accounting Oversight Bd.*, 130 S. Ct. 3138, 3146 (2010).

115.    The Administrative Fix, however, purports to force States to exercise significant authority or perform a significant federal governmental duty pursuant to the laws of the United States without being subject to federal appointment or removal.

116.    The State of West Virginia is therefore entitled to relief under the APA and the Constitution and laws of the United States.

## COUNT FOUR:

### Violation of State Sovereignty Under the Tenth Amendment

117.    The State of West Virginia incorporates by reference the allegations of the preceding paragraphs.

118.    The Tenth Amendment prohibits federal commandeering of States and their officials.

119.    In *New York v. United States*, the Court determined that "[t]he Federal Government may not compel the States to enact or administer a federal regulatory program." 505 U.S. 144, 188 (1992).   And in *Printz v. United States*, the Court held that the federal government "cannot circumvent that prohibition by conscripting the State's officers directly." 521 U.S. 898, 935 (1997).

120.    "States are not mere political subdivisions of the United States.   State governments are neither regional offices nor administrative agencies of the Federal Government. The positions occupied by state officials appear nowhere on the Federal Government's most detailed organizational chart." *New York*, 505 U.S. at 189.

121.    The prohibition on commandeering applies equally to the Executive Branch as it does to Congress. *See Printz*, 521 U.S. at 925 (noting that "the Federal Government may not compel the States to implement, by legislation or executive action, federal regulatory programs").

122.    The Administrative Fix runs afoul of the Tenth Amendment because it is an attempt by the Executive Branch to make States part of the federal government.   It confers on the States the sole authority to determine the extent to which certain federal laws will be enforced within their borders.

123.    The Administrative Fix turns States into federal policymakers—which the federal government has previously conceded constitutes unlawful commandeering. *See Printz*, 521 U.S. at 927 (noting the United States's argument that the "constitutional line is crossed" when "Congress compels the States to make law in their sovereign capacities").

124.    Moreover, the Supreme Court has stressed that the touchstone of the anti-commandeering doctrine is whether the federal government has put States "in the position of

taking the blame for [the federal program's] burdensomeness and for its defects." *New York*, 505 U.S. at 168; *see also NFIB*, 123 S. Ct. at 2602 ("Permitting the Federal Government to force the States to implement a federal program would threaten the political accountability key to our federal system.").

125.    That is precisely the point of the Administrative Fix: to shift political accountability for the ACA's eight federally mandated market requirements and their enforcement to the States.

126.    The State of West Virginia is therefore entitled to relief under the APA and the Constitution and laws of the United States.

## <u>PRAYER FOR RELIEF</u>

Wherefore, the State of West Virginia is asks this Court to enter an order and judgment:

A.    Declaring that the Administrative Fix is unlawful because it: (1) was issued in violation of the ACA and the APA; (2) was issued in violation of the notice-and-comment requirements of the APA, 5 U.S.C. §§ 701-706; (3) constitutes unlawful delegation of federal executive and legislative responsibilities; and (4) interferes with state sovereignty in violation of the Tenth Amendment and broader constitutional principles of federalism and dual sovereignty;

B.    Remanding this case to HHS, to permit the Administration promptly to work with Congress to address the fact that the ACA rendered millions of Americans' health insurance plans unlawful, *see, e.g.*, *Rodway v. U.S. Dept. of Agriculture*, 514 F.2d 809, 813–18 (D.C. Cir. 1975);

C.    Awarding the State costs and attorneys' fees pursuant to any applicable statute or authority; and

D.      Awarding the State such additional relief, including equitable injunctive relief, as the Court deems appropriate.


Dated: July 29, 2014                          Respectfully submitted,


                                              Patrick Morrisey (DC Bar 459399)
                                                *Attorney General of West Virginia*

                                              s/ Elbert Lin_____
                                              Elbert Lin (DC Bar 979723)
                                                *Solicitor General*
                                              Misha Tseytlin (DC Bar 991031)
                                                *Deputy Attorney General*
                                              Julie Marie Blake (DC Bar 998723)
                                                *Assistant Attorney General*

                                              Office of the Attorney General
                                              State Capitol Building 1, Room E-26
                                              Charleston, WV 25305
                                              Telephone: (304) 558-2021
                                              Fax: (304) 558-0140
                                              E-mail: elbert.lin@wvago.gov

                                              **Counsel for Plaintiff the State of West Virginia**