**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| STATE OF WEST VIRGINIA, | ) | |
| EX REL. PATRICK MORRISEY, | ) | |
| | ) | |
| Plaintiff, | ) | |
| v. | ) | Civil Action No.  1:14-cv-1287 (RBW) |
| | ) | |
| UNITED STATES DEPARTMENT OF | ) | |
| HEALTH AND HUMAN SERVICES, | ) | |
| | ) | |
| Defendant. | ) | |
| _____ | ) | |

**<u>DEFENDANT'S MEMORANDUM IN SUPPORT OF MOTION TO DISMISS</u>**

## TABLE OF CONTENTS

TABLE OF CONTENTS ............................................................................................................ i

TABLE OF AUTHORITIES ..................................................................................................... ii

INTRODUCTION ................................................................................................................... 1

BACKGROUND ...................................................................................................................... 4

I. Statutory and Regulatory Framework. ................................................................ 4

    A. The Affordable Care Act's Market Reforms. ........................................ 4

    B. HHS's Transitional Policy. ...................................................................... 7

II. West Virginia's Implementation of the Market Reforms. ................................. 9

III. Procedural History and Plaintiff's Claims. ...................................................... 10

STANDARD OF REVIEW ...................................................................................................... 11

SUMMARY OF ARGUMENT .................................................................................................. 11

ARGUMENT ......................................................................................................................... 13

I. West Virginia Lacks Article III Standing to Bring this Suit ........................... 13

    A. West Virginia Has Not Suffered Any Injury In Fact, Because the
        Transitional Policy Only Increased the Policy Options Available to the
        State ........................................................................................................ 13

    B. West Virginia's Claimed Injury of "Political Accountability" is Not
        Cognizable. ............................................................................................ 18

        1. "Political Accountability" Is Too Abstract to be an Injury-in-Fact
            Under Article III. ...................................................................... 18

        2. West Virginia's Claimed Injury from "Political Accountability" is
            Both Speculative and Unsupported. ........................................ 22

    C. West Virginia Cannot Establish Causation. ........................................ 26

    D. West Virginia's Injury Is Not Redressable. ........................................ 27

II. West Virginia Is Not Within the Zone of Interests to Advance Its APA Claims
    Challenging the Affordable Care Act. ............................................................... 29

CONCLUSION ...................................................................................................................... 31

# TABLE OF AUTHORITIES

**Cases**

*Allen v. Wright*,
  468 U.S. 737 (1984)...................................................................................... 19

*Arias v. DynCorp*,
  752 F.3d 1011 (D.C. Cir. 2014)...................................................................... 21

*Ass'n of Am. Physicians & Surgeons, Inc. v. Koskinen*,
  No. 14-2123, --- F.3d ---, 2014 WL 4667331  (7th Cir. Sept. 19, 2014)............................ 21, 30

*Bartlett v. Strickland*,
  556 U.S. 1 (2009).......................................................................................... 19

*Clapper v. Amnesty Int'l*,
  133 S. Ct. 1138 (2013)............................................................................ 22, 24, 27

*Coal. for Responsible Regulation, Inc. v. EPA*,
  684 F.3d 102 (D.C. Cir. 2012),.............................................................. 4, 13, 28, 29

*DaimlerChrysler Corp. v. Cuno*,
  547 U.S. 332 (2006)........................................................................................11

*Dep't of Treasury v. Fabe*,
  508 U.S. 491 (1993).................................................................................... 6, 14

*Fed. Election Comm'n v. Akins*,
  524 U.S. 11 (1998)........................................................................................ 18

*Holder v. Hall*,
  512 U.S. 874 (1994)...................................................................................... 19

*Lance v. Coffman*,
  549 U.S. 437 (2007)...................................................................................... 12

*Lexmark Int'l, Inc. v. Static Control Components, Inc.*,
  134 S. Ct. 1377 (2014).................................................................................. 30

*Lujan v. Defenders of Wildlife*,
  504 U.S. 555 (1992)..............................................................................11, 12, 22

*Massachusetts v. EPA*,
  549 U.S. 497 (2007)...................................................................................... 16

*Massachusetts v. Mellon*,
   262 U.S. 447 (1923) .................................................................................. 2, 19

*Nat'l Fed'n of Indep. Bus. v. Sebelius*,
   132 S. Ct. 2566 (2012) ............................................................................ 17, 22

*New Jersey v. Sargent*,
   269 U.S. 328 (1926) ...................................................................................... 19

*New York v. United States*,
   505 U.S. 144 (1992) ...................................................................................... 16

*Nw. Airlines, Inc. v. FAA*,
   795 F.2d 195 (D.C. Cir. 1986) ...................................................................... 22

*Oregon v. Mitchell*,
   400 U.S. 112 (1970) ...................................................................................... 16

*Pennsylvania v. Kleppe*,
   533 F.2d 668 (D.C. Cir. 1976) ...................................................................... 21

*Printz v. United States*,
   521 U.S. 898 (1997) ...................................................................................... 17

*Raines v. Byrd*,
   521 U.S. 811 (1997) ................................................................................. 20, 21

*State of Illinois v. City of Chicago*,
   137 F.3d 474 (7th Cir. 1998) ........................................................................ 21

*Texas v. ICC*,
   258 U.S. 158 (1922) ...................................................................................... 19

*United States v. West Virginia*,
   295 U.S. 463 (1935) ...................................................................................... 20

*Whitmore v. Arkansas*,
   495 U.S. 149 (1990) ...................................................................................... 24

*Winpisinger v. Watson*,
   628 F.2d 133 (D.C. Cir. 1980) ...................................................................... 25

*Wyoming v. Dep't of Interior*,
   674 F.3d 1220 (10th Cir. 2012) .................................................................... 21

**Statutes**

15 U.S.C. § 1011 ................................................................................................ 14

42 U.S.C. § 18011(a)(2) ...................................................................................... 5

42 U.S.C. § 300gg-22(a)(2) ........................................................................... 5, 6, 7

42 U.S.C. § 300gg-91(e) ...................................................................................... 5

42 U.S.C. ch. 6A ................................................................................................. 5

**Constitutional Provisions**

U.S. Const. art. II, § 3 ....................................................................................... 29

**Rules**

Federal Rule of Civil Procedure 12(b)(1) ............................................................11

**Regulations**

45 C.F.R. § 150.203 ............................................................................................. 6

45 C.F.R. §§ 150.301-341 .................................................................................... 7

78 Fed. Reg. 13406 (Feb. 27, 2013) ................................................................. 7, 9

## INTRODUCTION

Under the Patient Protection and Affordable Care Act (ACA), both states and the Federal Government have enforcement authority over issuers of health plans.  This lawsuit, brought by the State of West Virginia, does not challenge this dual enforcement regime as a structural matter. Instead, West Virginia takes issue with how the Federal Government has exercised its authority under this regime in a particular context.  Specifically, West Virginia seeks to invalidate a transitional relief policy, in which the Secretary of Health and Human Services (HHS) stated that, for a limited time period, HHS would not take federal enforcement action against certain health plan issuers offering policies that are not compliant with the ACA's 2014 insurance market reforms, but that the states could continue to exercise their enforcement discretion as they saw fit.  West Virginia claims that this Transitional Policy is unlawful, because HHS is allegedly under a mandatory duty to enforce the ACA's market reforms.  According to West Virginia, HHS's actions have harmed all states by placing the burden of enforcement squarely on them, thereby blurring "the lines of political accountability" and "creat[ing] . . . confusion as to which government is actually to blame for the ACA's policies."  Compl. (ECF No. 1) ¶ 71.

West Virginia's allegations provide no basis for standing to challenge the Transitional Policy, and this suit must therefore be dismissed.  To begin with, West Virginia's actual policy preference is that the relevant provisions of the ACA *not* be enforced—at all.  Logically, getting even a small part of what one wants is better than getting nothing at all.  It is therefore puzzling that West Virginia's lawsuit is premised on an argument that HHS is *required* to enforce those provisions immediately and in every circumstance, and that for the Federal Government to do anything short of that harms the State.  The explanation for this seeming contradiction apparently lies in West Virginia's sheer conjecture that if this lawsuit is successful, Congress and the Executive Branch will come together—perhaps even under court order—to provide more

permanent and generalized relief from enforcement of the ACA's provisions through legislation. Such wishful thinking as to future political developments, however, is plainly insufficient to confer standing.

West Virginia's theory of harm is all the more puzzling because the federal transitional relief at issue actually affords states an *additional* policy option, permitting (but not requiring) the State to allow certain insurance issuers (and their policy-holders), should they so desire, to temporarily avoid enforcement of the ACA's 2014 market reforms within the State.  West Virginia has chosen to take advantage of this additional policy option, but now complains about the "political accountability" flowing from that additional flexibility.   But the Federal Government's providing states with enhanced flexibility has never been considered a harm to the states.  This obvious contradiction—where West Virginia claims injury while at the same time gaining the flexibility to achieve at least a small part of its expressed policy preference—reveals this case for what it really is: a political statement dressed up as a lawsuit.  Both before and after the announcement of HHS's Transitional Policy, West Virginia retained the same degree of enforcement discretion concerning the ACA's 2014 market reforms.  West Virginia's lawsuit is, in essence, a critique of the Federal Government's exercise of *its* enforcement discretion to provide temporary transitional relief.  West Virginia's lawsuit must therefore be dismissed for lack of subject-matter jurisdiction, because the State cannot establish its standing to bring suit.

*First*, West Virginia lacks any concrete, particularized injury-in-fact, as is required for standing.  The State's novel theory of "political accountability" is contrary to at least a century's worth of Supreme Court precedent, holding that states do not have standing to litigate "abstract questions of political power."  *Massachusetts v. Mellon*, 262 U.S. 447, 485 (1923).   Indeed, to the best of Defendant's knowledge, no court has ever recognized—much less accepted—West

Virginia's theory that an asserted harm to "political accountability" is sufficient to create standing.

The reasons why the State's amorphous theory of injury cannot be accepted, either as a general matter or in this case, are obvious.  The notion of "political accountability" is highly abstract and entirely without limit.  Almost any federal action (or inaction) can be characterized as affecting a state's "political accountability" in some way, based on the state's response (or non-response) to it.   Furthermore, evaluating a "political accountability" injury would necessarily require courts to make political judgments and predictions—a task that is at best speculative, and at worst entirely inappropriate for the Judiciary to perform.  Moreover, even assuming (contrary to settled law) that "political accountability" could be a cognizable injury to a state in some circumstances, West Virginia has failed to establish any such injury here, as its claims rest on a series of unsupported, speculative assumptions.  It is also hard to fathom how the State *qua State* could be harmed by any notion of "political accountability," as the State itself does not participate in elections.  And "political accountability" is, after all, the hallmark of a democracy.   As a matter of law, therefore, West Virginia's claimed injury of "political accountability" is insufficient to confer standing.

*Second*, West Virginia independently fails to establish standing due to a lack of causation. West Virginia voluntarily interjected itself into the ACA enforcement issue—even before the Transitional Policy's announcement—by permitting its citizens in 2013 to renew their health plans for 2014 early, specifically in order to avoid the effective date of the 2014 ACA market reforms that have now been subject to federal transitional relief.  West Virginia thus *voluntarily* made a dispositive decision reflecting its view that the 2014 ACA market reforms, at least for a time, should not be enforced within the State.  Then West Virginia decided affirmatively to take

advantage of the Transitional Policy and enable some of its insurance issuers and their policy-holders to maintain their old policies if they wanted to do so.  Whatever alleged political harms West Virginia may be suffering, therefore, are not caused by the Transitional Policy which the State voluntarily chose to embrace.

*Third*, West Virginia cannot establish redressability.  As noted, West Virginia has already made its decision to allow citizens to take advantage of the limited transitional relief the Secretary has offered.  West Virginia offers no reason to expect that a declaration from this Court would dissipate whatever political effects (if any) resulted from West Virginia's previous decisions.  If anything, invalidating the Transitional Policy at West Virginia's behest would cause the State to be viewed as responsible for *more* enforcement of the relevant ACA provisions by the Federal Government, contrary to West Virginia's own stated policy interests.  And with respect to West Virginia's theory of subsequent Congressional action, it would be wholly improper for this Court to order the Executive Branch to work with Congress to enact particular legislation, and of course it would be impossible to predict the outcome of such a process. Binding precedent in this circuit confirms that a party cannot establish redressability by relying on the possibility of subsequent Congressional action.  *See Coal. for Responsible Regulation, Inc. v. EPA*, 684 F.3d 102, 147 (D.C. Cir. 2012), *aff'd in part, rev'd in part on other grounds sub nom. Util. Air Regulatory Grp. v. EPA*, 134 S. Ct. 2427 (2014).

## BACKGROUND

## I.      STATUTORY AND REGULATORY FRAMEWORK.

### A.      The Affordable Care Act's Market Reforms.

Congress enacted the Patient Protection and Affordable Care Act on March 23, 2010. Pub. L. No. 111-148, *as amended by* Health Care and Education Reconciliation Act of 2010, Pub. L. No. 111–152 [hereafter "the ACA"].  In order to regulate the types of health insurance

policies being offered to the public, the ACA enacted certain "market reforms." These market reforms address a variety of topics, such as: fair health insurance premiums; guaranteed availability of coverage regardless of health status; guaranteed renewability of coverage; prohibitions on pre-existing condition exclusions; prohibition of discrimination based on health status; non-discrimination in providers; coverage of essential benefits and limitations on annual out-of-pocket spending; and participation in clinical trials. *See* 42 U.S.C. §§ 300gg – 300gg-6, 300gg-8.

In general, the ACA's market reforms apply across three different markets for health plans: the large group, small group, and individual markets. The large and small group markets typically include employer-sponsored plans, with the large-group market including companies with more than 100 employees, and the small-group market including companies with fewer than 100 employees. *See* 42 U.S.C. § 300gg-91(e). The individual market includes families or individuals obtaining health insurance on their own, outside of an employer or other sponsored plan. *Id.*

The ACA's various market reforms have had different effective dates, and certain ones became effective for plan years beginning after January 1, 2014. Several of these market reforms do not apply to "grandfathered" health plans, namely those health plans that were in place on March 23, 2010 and were not changed in specified ways. *See* 42 U.S.C. § 18011(a)(2).

The ACA enacted the market reforms as amendments to the Public Health Service Act (PHSA), 42 U.S.C. ch. 6A, which was first enacted in 1944, but did not provide for a Federal role in health insurance until amendments enacted in 1996. Under the current PHSA, states are the primary enforcers with respect to issuers of health insurance:

> [E]ach State may require that health insurance issuers that issue, sell, renew, or offer health insurance coverage in the State in the individual or group market meet the requirements of this part with respect to such issuers.

*Id.* § 300gg-22(a)(1). If CMS determines that a particular state has substantially failed to enforce the terms of the PHSA, however, the Secretary of HHS has authority to do so:

> In the case of a determination by the Secretary that a State has failed to substantially enforce a provision (or provisions) in this part with respect to health insurance issuers in the State, the Secretary shall enforce such provision (or provisions) . . . insofar as they relate to the issuance, sale, renewal, and offering of health insurance coverage in connection with group health plans or individual health insurance coverage in such State.

*Id.* § 300gg-22(a)(2). Since well before the ACA, then, states and the Federal Government have had overlapping enforcement authority with respect to insurance regulation. *See generally Dep't of Treasury v. Fabe*, 508 U.S. 491, 499-500 (1993) (discussing the McCarran-Ferguson Act, passed by Congress in 1945, designed to "restore the supremacy of the States in the realm of insurance regulation"); *see also* Compl. ¶¶ 24-25.

Under the PHSA, HHS has authority to impose civil monetary penalties on issuers offering non-compliant policies. *See* Compl. ¶ 29; 42 U.S.C. § 300gg-22(b)(2). The Secretary's enforcement authority is triggered upon her determination that "a State has failed to substantially enforce a provision (or provisions) in this part with respect to health insurance issuers in the State," 42 U.S.C. § 300gg-22(a)(2), and the PHSA does not specify any circumstances under which such a determination *must* be made. *Cf.* 45 C.F.R. § 150.203 ("CMS enforces PHS Act requirements to the extent warranted (*as determined by CMS*) in any of the following circumstances[.]" (emphasis added)). Nor does the PHSA specify a particular type of enforcement that CMS must undertake or its timeframe.

The Secretary considers several factors when determining how to enforce the statute and what enforcement priorities should be, including any penalties that might be imposed on

regulated entities and their amount.  *See* 42 U.S.C. § 300gg-22(b)(2)(C)(ii).  In certain situations

the Secretary is prohibited from imposing any penalty at all.  *Id.* § 300gg-22(b)(2)(C)(iii).  The

maximum amount of any penalty is $100 per day for each individual affected by the issuer's

non-compliance.  *Id.* § 300gg-22(b)(2)(C)(i); *see also* 45 C.F.R. §§ 150.301-341.  The

Secretary's overall approach to enforcement, announced before the challenged Transitional

Policy, has been to work with issuers (and other interested parties) in a cooperative effort to

achieve compliance.  *See, e.g.*, *Patient Protection and Affordable Care Act; Health Insurance

Market Rules; Rate Review*, 78 Fed. Reg. 13406, 13419 (Feb. 27, 2013).

### B.      HHS's Transitional Policy.

Many of the ACA's market reforms were set to take effect for plan years beginning on or

after January 1, 2014.  *See* Compl. ¶ 20.  Leading up to that date, some individuals and small

businesses—*i.e.*, those in the individual and small-group markets—were notified by their health

insurance issuers that their coverage would soon be terminated.  *Id.* ¶ 35; *see also* Compl. Exh. 6

(ECF No. 1-10), Letter from Gary Cohen, Director, Center for Consumer Information and

Insurance Oversight (CCIIO), Centers for Medicare and Medicaid Services (CMS), Dep't of

Health and Human Servs., to State Insurance Commissioners (Nov. 14, 2013) at 1 [hereafter

Transitional Policy Letter].  It appeared to HHS that at least some of those terminations would be

caused by insurance policies not complying with the market reforms.  *See* Transitional Policy

Letter at 1.  Although affected individuals with cancelled coverage could obtain compliant

coverage through the ACA's new Health Insurance Marketplaces—where the cost of such

coverage could be offset by federal subsidies for lower income individuals—HHS was concerned

that, if compliant coverage cost more than an individual's prior coverage, that individual might

be dissuaded from obtaining compliant coverage, and would instead elect to have no insurance at

all and pay a tax penalty.  *Id.*

Based on this circumstance, HHS announced its Transitional Policy on November 14, 2013.  This policy was designed to allow non-compliant health coverage plans in the individual and small-group markets to continue for a period of time.  In a letter that HHS sent to state insurance commissioners, HHS announced that it would not enforce certain market reforms against insurance issuers offering non-compliant policies in those markets, provided that two conditions were met: (1) the non-compliant policy being offered must have been in effect on October 1, 2013; and (2) the issuer must inform affected consumers that their policy does not comply with certain market reforms, and that consumers have the option to instead purchase coverage that would be compliant, including coverage offered through a Health Insurance Marketplace with potential subsidies available.  *See* Compl. ¶ 46; Transitional Policy Letter at 2.  In the Transitional Policy Letter, HHS also encouraged, but in no instance required, state insurance commissioners to adopt the same approach to enforcement for those particular policies that met the criteria for transitional relief.  *See* Compl. ¶ 49; Transitional Policy Letter at 3.  For all other policies—*i.e.*, those not meeting the two conditions, and those outside the individual and small-group markets—the states or HHS would continue to enforce the requirements of the ACA and its implementing regulations.

As originally announced, the Transitional Policy applied to policies that were renewed for a policy year beginning between January 1, 2014 and October 1, 2014.  On March 5, 2014, however, HHS announced an extension of the Transitional Policy, stating that it would now apply to any qualifying policies renewed on or before October 1, 2016.  *See* Compl. ¶ 51; Compl. Exh. 8 (ECF No. 1-12), Bulletin from Gary Cohen, Director, CCIIO, CMS, Dep't of Health and Human Servs., *Extended Transition to Affordable Care Act-Compliant Policies* (Mar. 5, 2014) at 2.

HHS's Transitional Policy is consistent with its overall enforcement and implementation approach for the ACA, which focuses on assisting issuers and others to come into compliance rather than prematurely penalizing them.  *See, e.g.*, *Patient Protection and Affordable Care Act; Health Insurance Market Rules; Rate Review*, 78 Fed. Reg. 13406, 13419 (Feb. 27, 2013) ("As stated in previous Affordable Care Act guidance, our approach to implementation is marked by an emphasis on assisting (rather than imposing penalties on) issuers and others that are working diligently and in good faith to understand and comply with the law.").

## II.     WEST VIRGINIA'S IMPLEMENTATION OF THE MARKET REFORMS.

After receiving the Transitional Policy Letter in November 2013, the State of West Virginia initially decided not to adopt a similar policy, apparently based on West Virginia's belief that, through its own transitional efforts, the State had already mitigated concerns about enforcement of the ACA's market reforms in 2014:

> Insurance Commissioner Mike Riley announced today that West Virginia will not adopt the Center for Consumer Information and Insurance Oversight's (CCIIO) "single-year" re-enrollment proposal because the proactive steps taken in 2013 by our insurance marketplace have effectively mitigated the transition concerns expressed by President Barack Obama.

Compl. Exh. 13 (ECF No. 1-17), Press Release, W. Va. Ofc. of the Ins. Comm'r, *West Virginia Makes Announcement on CCIIO Re-enrollment Proposal* (Nov. 21, 2013).  Specifically, "West Virginia insurance carriers were given the option to permit early renewal for 2013 policyholders to extend current polices through all of 2014," *id.*, thus allowing individuals to renew their 2014 policies before the new market reforms' effective date of January 1, 2014.  In West Virginia's view, there was accordingly no need to adopt HHS's Transitional Policy.  *See id.* (quoting West Virginia's Insurance Commissioner as stating that "we have decided to maintain our current direction," because "[a]fter completing our analysis, we concluded that our insurance

marketplace and policyholders were given a transition period that is consistent with the existing law").

After HHS extended the Transitional Policy through October 1, 2016, West Virginia exercised its discretion to adopt a similar approach—and thereby permit eligible issuers who wanted to do so to offer non-compliant policies through October 1, 2016, under the terms outlined in the Transitional Policy.  *See* Compl. ¶¶ 82-83; *see also* Compl. Exh. 14 (ECF No. 1-18), Lydia Nuzum, *Non-Compliant Insurance Plans Get 3-Year Stay*, Charleston Gazette, 2014 WLNR 10711115 (Apr. 20, 2014).

## III.   PROCEDURAL HISTORY AND PLAINTIFF'S CLAIMS.

The State of West Virginia, through its Attorney General Patrick Morrisey, filed this lawsuit on July 29, 2014.  West Virginia's Complaint expressly acknowledges the State's belief that issuers *should* be able to provide, and individuals *should* be able to obtain, non-compliant insurance policies, and thus the ACA's market reforms should not be enforced against them.  *See, e.g.*, Compl. ¶¶ 6, 11, 37, 79.  Accordingly, West Virginia has decided not to enforce the ACA's market reforms.  *Id.* ¶¶ 82-83.  Nonetheless, West Virginia now attacks HHS for allowing some of West Virginia's citizens to continue to maintain their pre-existing non-compliant policies on a time- and scope-limited basis if certain conditions are met.

West Virginia claims that HHS's Transitional Policy has resulted in harm to the State based on its allegation that, under the Transitional Policy, each state is now compelled to make a *dispositive* choice about whether to enforce the federal market reforms within their state.  Compl. ¶¶ 63-64.  Because, in West Virginia's view, the Transitional Policy makes states the dispositive decision-makers (instead of optional enforcers), "the lines of political accountability are far less certain," *id.* ¶ 71, which the State claims "diminishes the sovereignty of West Virginia and all

other States by interfering with the relationship between state officials and their constituents[.]" *Id.* ¶ 76.

West Virginia's Complaint contains four Counts for relief, each presenting a separate legal theory as to why the Transitional Policy is unlawful:  as arbitrary and capricious because it is contrary to the ACA's enforcement scheme (Count I); for failing to comply with notice and comment requirements of the Administrative Procedure Act (APA) (Count II); as an unlawful delegation of federal authority to the states (Count III); and as a violation of the Tenth Amendment (Count IV).  *See* Compl. ¶¶ 92-126.

In terms of requested relief, West Virginia seeks a declaration that the Transitional Policy is unlawful for the four reasons discussed above, as well as a remand of this case to HHS "to permit the Administration promptly to work with Congress to address the fact that the ACA rendered millions of Americans' health insurance plans unlawful[.]"  Compl. at 32.

## STANDARD OF REVIEW

Defendant moves to dismiss this lawsuit for lack of subject-matter jurisdiction, pursuant to Federal Rule of Civil Procedure 12(b)(1).  West Virginia bears the burden of showing subject-matter jurisdiction.  *See Lujan v. Defenders of Wildlife*, 504 U.S. 555, 561 (1992).  Indeed, it is "presume[d] that federal courts lack jurisdiction unless the contrary appears affirmatively from the record." *DaimlerChrysler Corp. v. Cuno*, 547 U.S. 332, 342 n.3 (2006) (internal quotation marks omitted).

## SUMMARY OF ARGUMENT

Under Article III of the United States Constitution, for West Virginia to establish its constitutional standing to sue, it must satisfy three elements:

First, the plaintiff must have suffered an "injury in fact"—an invasion of a legally protected interest which is (a) concrete and particularized, and (b) actual or imminent, not conjectural or hypothetical. Second, there must be a causal

connection between the injury and the conduct complained of—the injury has to be fairly traceable to the challenged action of the defendant, and not the result of the independent action of some third party not before the court. Third, it must be likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision.

*Lujan*, 504 U.S. at 560-61 (internal quotation marks, citations, and modifications omitted). These three elements are frequently summarized as "injury in fact, causation, and redressability." *Lance v. Coffman*, 549 U.S. 437, 439 (2007) (per curiam). Here, West Virginia fails to satisfy any, much less all, of these three elements.

*First*, West Virginia has not suffered a cognizable injury-in-fact. West Virginia admits that its goal is total non-enforcement (indeed elimination) of all of the ACA's market reforms. Accordingly, West Virginia suffers no injury when the Federal Government decides to provide a transitional period under limited circumstances for enforcement of some of those reforms. Based on the State's own policy objectives, HHS's grant of additional policy flexibility has not actually *harmed* West Virginia, but instead has only *benefitted* the State. Thus, West Virginia can hardly claim an injury sufficient to allow it to bring suit.

Moreover, the "political accountability" injury that West Virginia posits is too vague and abstract to be cognizable, and finds no support in precedent as a basis for standing. Indeed, West Virginia's theory of standing lacks any outer limit whatsoever, and is irrelevant to the interests of the State *qua State*. Furthermore, even if the purported injury of "political accountability" were cognizable in some circumstances, it would not provide standing for West Virginia here. West Virginia's claimed injury rests on a series of unsupported assumptions about how, and to whom, citizens will assign political blame for certain state and federal actions (or inactions). Such tenuous assumptions are insufficient to establish a cognizable injury-in-fact.

*Second*, West Virginia's Complaint independently fails for lack of causation. West Virginia asserts that the Transitional Policy required it to make a dispositive decision about

whether the federal market reforms would be enforced within the State.  *See, e.g.*, Compl. ¶ 63(d).  But by its own terms, the Transitional Policy did not require West Virginia (or any other state) to do anything.  And even if it did, West Virginia had already voluntarily chosen to make decisions about the market reforms' applicability and enforceability within the State—*i.e.*, by deciding to permit early plan renewals in 2013 to allow policy-holders to avoid the January 1, 2014 effective date of the market reforms, and then by embracing the Transitional Policy's extension to 2016.  Any political fallout is therefore attributable to West Virginia's voluntary decisions, not to HHS.

*Third*, West Virginia's alleged injury is not redressable.  There is simply no support for the implicit premise underlying this lawsuit—that a declaration of the Transitional Policy's legality would somehow erase any adverse political effects West Virginia might have suffered from its past decisions, even if those effects could be demonstrated (which they cannot be).  If anything, achieving success in this lawsuit would only cause further political harm to West Virginia based on West Virginia's own stated policy preferences.  Finally, West Virginia also cannot establish redressability by relying on a "remand" so that Congress and the President can address the issue through legislation.  That requested relief is not only improper, but its outcome is also entirely speculative and thus insufficient to establish standing, as recently confirmed by the D.C. Circuit.  *See Coal. for Responsible Regulation,* 684 F.3d at 147.

## ARGUMENT

## I.    WEST VIRGINIA LACKS ARTICLE III STANDING TO BRING THIS SUIT.

### A.    West Virginia Has Not Suffered Any Injury In Fact, Because the Transitional Policy Only Increased the Policy Options Available to the State.

Although West Virginia's assertions of harm are wholly inadequate as a legal basis for standing, as discussed in the sections below, as an initial matter they are also belied by the actual

effect of the Transitional Policy, which was to offer each state some additional flexibility with respect to the enforcement of the ACA's 2014 market reforms within that state. West Virginia seized that flexibility here, based on its stated policy preference that the ACA's market reforms not be enforced at all. Thus, West Virginia cannot plausibly claim that the Transitional Policy has resulted in any harm to it: the Court would have to accept the notion that the State is harmed by its ability to achieve a small part of its desired goal, at least temporarily.

As West Virginia acknowledges, states and the Federal Government have long shared enforcement authority over the regulation of insurance, with states playing the primary role. *See* Compl. ¶¶ 24-25; *see also* McCarran-Ferguson Act, 15 U.S.C. § 1011 ("Congress hereby declares that the continued regulation and taxation by the several States of the business of insurance is in the public interest, and that silence on the part of the Congress shall not be construed to impose any barrier to the regulation or taxation of such business by the several States."); *Fabe*, 508 U.S. at 499-500. The State's power to make enforcement and regulatory decisions with respect to health insurance can thus hardly be described as something new or unique to the Transitional Policy. And as West Virginia itself admits, the State is confronted with the same enforcement options both before and after the Transitional Policy. *See* Compl. ¶ 25 ("[F]ederal law grants the States the initial opportunity to voluntarily enforce the ACA's eight federal market requirements against the issuers of individual insurance plans[.]"); *id.* ¶ 63(c) (noting that "each State has the same decision to make about enforcement that it had before" the Transitional Policy (which the State pejoratively refers to as "the Administrative Fix")).

In an effort to establish standing, West Virginia thus tries to characterize the Transitional Policy as unique—as altering the *effect* of each state's enforcement decision (at least with respect to a limited group of insurance issuers, subject to the Transitional Policy's conditions and for a

limited period of time).   *See* Compl. ¶ 63(c).   Specifically, West Virginia argues that the

Transitional Policy required that each state make a *dispositive* decision about whether to enforce

the federal market reforms within their state:

> Before the Administrative Fix, a State's enforcement decision could not change
> whether non-compliant individual health plans could be sold within the State. But
> after the Administrative Fix, each State's decision is dispositive on that question.
> If a State chooses not to enforce the eight federally mandated requirements, those
> plans that satisfy HHS's conditions will be permitted to be sold. If a State chooses
> to enforce the federally mandated requirements, however, none will be sold.

*Id.*

This formulation is plainly incorrect, however, because states *were* able to have a

dispositive effect on the implementation of the 2014 market reforms within their borders even

before the Transitional Policy was announced.   If a state chose to enforce the market reforms,

then the state itself would effectively prohibit non-compliant policies from continuing to be sold

within the state.   *Cf.* Compl. ¶ 61 (recognizing that even before the Transitional Policy "the

States had the option of enforcing the federally mandated requirements against non-compliant

individual health plans").[1]   The same is true even after the Transitional Policy's announcement

for those states choosing not to exercise the option made available in the Transitional Policy.

Properly stated, then, the only effect of the Transitional Policy was to give states

(including West Virginia) an *additional* policy option: states were no longer limited to deciding

who (the state or HHS) would be responsible for enforcing the market reforms; instead, under the

Transitional Policy, each state could now, if it chose to do so, make a decision that would

actually *allow* a limited group of non-compliant policies to be sold within the state under

---

[1] Additionally, states could effectively delay the implementation date of the 2014 market
reforms by allowing early renewal in 2013 of policies that would be effective for most of 2014,
as West Virginia did here.  *See* Section I.C, *infra*.

specified conditions.  Thus, the effect of HHS's Transitional Policy was to *increase* the number of policy options available to each state (including West Virginia).

West Virginia's assertions of harm are thus belied by the reality of the situation.  HHS's Transitional Policy increased the number of policy options available to West Virginia (at least for a temporary period), and West Virginia seized on that additional flexibility in order to achieve (at least in small part) its stated policy preference of having the ACA market reforms at issue not enforced at all.  Regardless of what label West Virginia seeks to attach to its alleged injury— whether it be "political accountability" or something else—it is clear that West Virginia, under its own terms, has *benefitted* by the added flexibility.

West Virginia's theory—that the State has been injured through the creation of this additional policy option, even though the State concededly had full discretion whether to implement that option and chose to do so here—stands in stark contrast to the rare instances in which the Supreme Court has recognized states' standing to sue the Federal Government.  For example, in *Massachusetts v. EPA*, 549 U.S. 497, 522-23 (2007), the Court held that the state could challenge EPA's failure to regulate greenhouse gas emissions because "rising seas," caused in part by these emissions, would injure Massachusetts "in its capacity as a landowner" and "have already begun to swallow Massachusetts' coastal land."  A state likewise may challenge a measure that commands the state to take action, *e.g.*, *New York v. United States*, 505 U.S. 144 (1992) (federal law required state to take title to nuclear waste or enact federally-approved regulations), or that prohibits specified state action, *e.g.*, *Oregon v. Mitchell*, 400 U.S. 112 (1970) (federal law prohibited the use of literacy tests or durational residency requirements in state elections).

West Virginia's lawsuit has none of these features.  West Virginia tries to fit its lawsuit into the mold of "commandeering" cases, such as *New York v. United States* (cited above) and *Printz v. United States*, 521 U.S. 898 (1997) (holding that Federal Government could not "commandeer" state officials to implement federal statutory scheme).  *See* Compl. ¶¶ 119-125. But those cases involve situations where the Federal Government is allegedly *commanding* the state to take a particular action, or to obtain a particular result.  That is not the case here. Similarly, in Spending Clause challenges, the Federal Government is allegedly *coercing* the state to take a particular action or enact a particular program, without giving the state any realistic alternative.  *See, e.g.*, *Nat'l Fed'n of Indep. Bus. (NFIB) v. Sebelius*, 132 S. Ct. 2566, 2604 (2012) (plurality opinion of Roberts, C.J.) ("In this case, the financial 'inducement' Congress has chosen is much more than 'relatively mild encouragement'—it is a gun to the head.").[2]

Here, by contrast, West Virginia does not (and cannot) contend that the Federal Government's transitional relief has *commanded* West Virginia to perform *any* action.  Indeed, West Virginia expressly admits that it retains a fully discretionary choice here—whether to facilitate the availability of the limited transitional relief to eligible issuers and policyholders, whether to enforce the market reforms, or whether to do nothing at all.  *See, e.g.*, Compl. ¶ 63(c). And West Virginia also admits that the Transitional Policy now allows the State to achieve (at least in some small measure) its stated policy preference of non-enforcement of the ACA's 2014 market reforms.  *See* Compl. ¶ 6.  Accordingly, because the sole effect of the Transitional Policy was to give West Virginia an *additional* policy option—one that West Virginia actively prefers and has exercised—West Virginia cannot possibly have suffered any injury here.

---

[2] *NFIB* is the only case in which a court has found coercion in a spending program, and that finding was based on the Court's view that the states were effectively being required to adopt a whole new spending program or lose federal funding for their pre-existing Medicaid programs.  *See NFIB*, 132 S. Ct. at 2604-07.

**B.      West Virginia's Claimed Injury of "Political Accountability" is Not Cognizable.**

Because West Virginia is wholly unable to demonstrate the type of concrete, tangible injury necessary for a state to have standing to sue the Federal Government, West Virginia tries to fill this void through a novel and convoluted theory of "political accountability."   This unsupported theory of standing fails for several independent reasons.

**1.      "Political Accountability" Is Too Abstract to be an Injury-in-Fact Under Article III.**

West Virginia's claimed injury is insufficient to establish standing under settled precedent.  The Complaint here purports to allege two injuries:  "*First*, the State has been injured by the Administrative Fix by being forced to become the sole and exclusive enforcer of federal law within its borders"; and "*Second*, the Administrative Fix reduced the political accountability of the federal government at the expense of the States."  Compl. ¶¶ 68-69.  It is unclear what the difference is between the two identified injuries.  In the Complaint, West Virginia's allegations of harm all relate to unwarranted "political accountability" for federal law.  *See* Compl. ¶¶ 67-79.  West Virginia does not articulate any other harm flowing specifically from West Virginia allegedly being "the sole and exclusive enforcer of federal law within its borders."  Compl. ¶ 68.  Thus, West Virginia appears to have alleged only one type of injury—the injury of "political accountability."

But the notion of "political accountability" is simply too vague and abstract to establish standing.  The "injury in fact" requirement is designed to "assure that courts will not pass upon abstract, intellectual problems, but adjudicate concrete, living contests between adversaries."  *Fed. Election Comm'n v. Akins*, 524 U.S. 11, 20 (1998) (internal quotation marks and modifications omitted).  Any claimed injury must therefore be appropriate for judicial evaluation

and resolution.  *See Allen v. Wright*, 468 U.S. 737, 752 (1984) ("Is the injury too abstract, or otherwise not appropriate, to be considered judicially cognizable?").

Here, West Virginia's claimed "political accountability" injury is not cognizable for numerous reasons.  For starters, the injury is expressly political, thereby taking it outside the appropriate bounds of Article III.  In order to accept (and then redress) an injury of "political accountability," courts—even assuming they could understand the parameters of the asserted injury—would be required to evaluate and resolve abstract questions of political theory.  Such questions are not the province of the Judiciary.  *See Holder v. Hall*, 512 U.S. 874, 922 (1994) (discussing how requiring "courts to evaluate abstract principles of political theory" is "far outside the normal bounds of judicial competence"); *Bartlett v. Strickland*, 556 U.S. 1, 17 (2009) (declining to endorse a claim that would require the judiciary "to make predictions or adopt premises that even experienced polling analysts and political experts could not assess with certainty").

Moreover, West Virginia's alleged injury of political accountability concerns an abstract, self-perceived loss of political power.  For over a century, however, the Supreme Court has made clear that states lack standing to litigate abstract policy disputes with the Federal Government.  Going back at least to *Massachusetts v. Mellon*, the Court held that it could not adjudicate "abstract questions of political power, of sovereignty, of government."  262 U.S. 447, 485 (1923); *see also New Jersey v. Sargent*, 269 U.S. 328, 337 (1926) (allegations that provisions of federal law "go beyond the power of Congress and impinge on that of the state . . . do not suffice as a basis for invoking an exercise of judicial power"); *Texas v. ICC*, 258 U.S. 158, 162-63 (1922) (state's claim of infringement upon state sovereignty was merely "an abstract question of legislative power," not a justiciable case or controversy).  The Court even held as much in a prior

dispute involving West Virginia.  *See United States v. West Virginia*, 295 U.S. 463, 473-74 (1935) (holding that "differences of opinion" between the United States and West Virginia about the scope of Congress's power was not a cognizable case or controversy).

West Virginia's lawsuit here falls squarely within this line of cases.  West Virginia is seeking to litigate an abstract question of a purely political dimension:  the State disagrees with any requirement that issuers of health plans must comply with the ACA's market reforms, but the State also apparently disagrees with the Secretary's decision to allow a transition to some of those reforms for a limited period under narrowly defined circumstances.  These disagreements are purely abstract, without any concrete, particularized injuries flowing to West Virginia.[3] Indeed, West Virginia's claimed injury of "political accountability" could be asserted by any state in response to almost any federal decision that, as here, leaves the state with the discretion to act in any number of ways, or even not to act at all.

What West Virginia is seeking, therefore, is a revolutionary expansion of state standing, far beyond those situations recognized by settled precedent.  In West Virginia's view, a state may establish standing any time a federal policy *affects* a state's decision-making, even when the policy requires no action by the state and preserves the state's own discretionary decision-making authority.  But finding state standing based on possible political reactions rather than imposition of legal commands or obligations would eviscerate the injury-in-fact requirement. *Every* federal action (or inaction) may alter, at least in some manner, the backdrop against which

---

[3] As framed by West Virginia, all fifty states suffer an identical injury as a result of the Transitional Policy.  *See* Compl. ¶ 76 ("This blurred political accountability diminishes the sovereignty of West Virginia *and all other States*[.]" (emphasis added)).  West Virginia's claimed injury is thus an abstract loss of political power, shared by all states equally, which is not a judicially cognizable injury.  *See Raines v. Byrd*, 521 U.S. 811, 821 (1997) (holding that members of Congress lacked standing where the "claim of standing is based on a loss of political power," which "necessarily damages all Members of Congress and both Houses of Congress equally").

states must craft their own policies.  West Virginia's theory therefore necessarily fails.  *See State of Ill. v. City of Chicago*, 137 F.3d 474, 477-78 (7th Cir. 1998) (Easterbrook, J.) (rejecting state standing because "[a] role as lawmaker does not confer a role as litigant in federal court" (citing *Raines v. Byrd*, 521 U.S. 811, 821 (1997) (holding that members of Congress lack standing where the "claim of standing is based on a loss of political power"))).[4]

Even in contexts where the claimed harm to states was more concrete, such as the loss of tax revenue, courts have consistently rejected state standing on the basis that not all federal policies ought to be subject to challenge:

> [T]he unavoidable economic repercussions of virtually all federal policies, and the nature of the federal union as embodying a division of national and state powers, suggest to us that impairment of state tax revenues should not, in general, be recognized as sufficient injury in fact to support state standing.

*Pennsylvania v. Kleppe*, 533 F.2d 668, 672 (D.C. Cir. 1976); *see also Arias v. DynCorp*, 752 F.3d 1011, 1015 (D.C. Cir. 2014); *Wyoming v. Dep't of Interior*, 674 F.3d 1220, 1234 (10th Cir. 2012); *cf. Ass'n of Am. Physicians & Surgeons, Inc. (AAPS) v. Koskinen*, 14-2123, --- F.3d ---, 2014 WL 4667331 at *1 (7th Cir. Sept. 19, 2014) (rejecting standing to challenge the IRS's delay in enforcement of an ACA-related provision, because accepting plaintiffs' theory would allow them to "litigate about *any* tax policy").

Ultimately, if states could manufacture standing in the way West Virginia attempts here, every policy dispute could become an issue for decision by the courts.  But the standing requirement prevents litigation that is, at bottom, a political statement or dispute.  If West Virginia's policy preferences (or the preferences of its citizens) conflict with federal policy as

---

[4] Cases like *Printz* and *New York* rely on the concept of "political accountability" in a completely different manner, as part of the Tenth Amendment analysis on the merits.  *See* Compl. ¶¶ 124-25.  Nothing in those opinions suggests that a state has standing to sue any time it feels the Federal Government has exerted political influence on the state, or has done something as to which the state's reaction might be considered by the electorate at some future time.

embodied in statutes, regulations, or sub-regulatory policies, West Virginia may seek relief in the political arena, but not in the federal courts.

Finally, West Virginia's theory of "political accountability" fails for yet one more reason. This lawsuit is brought by the State *qua State*.  *See* Compl. ¶ 12.  But the State does not compete in elections.  Thus, even assuming blurred lines of "political accountability," West Virginia does not explain how that accountability negatively affects the State itself.  Indeed, West Virginia's theory of "political accountability" as injury seems contrary to the very idea of a democratic system of governance, in which sovereign entities can and should be held responsible for their choices.  *Cf. NFIB*, 132 S. Ct. at 2603 ("The States are separate and independent sovereigns. Sometimes they have to act like it.").  For all of these reasons, the asserted injury of "political accountability" is insufficient to establish the State of West Virginia's standing to sue.

> **2.      West Virginia's Claimed Injury from "Political Accountability" is Both Speculative and Unsupported.**

Even assuming, contrary to settled law, that "political accountability" could be a cognizable injury in some circumstances, West Virginia has failed to establish such injury here. *See Lujan*, 504 U.S. at 560 (to constitute an injury-in-fact for standing purposes, the injury must be "actual or imminent, not conjectural or hypothetical").  The State's claimed injury here is highly speculative, resting on a series of assumptions that West Virginia has not even attempted to support.

Article III requires that an injury be "certainly impending," and therefore it cannot "rel[y] on a highly attenuated chain of possibilities[.]"  *Clapper v. Amnesty Int'l*, 133 S. Ct. 1138, 1148 (2013); *see also Nw. Airlines, Inc. v. FAA*, 795 F.2d 195, 201 (D.C. Cir. 1986) ("The injury requirement will not be satisfied simply because a chain of events can be hypothesized in which the action challenged eventually leads to actual injury.").  But West Virginia, in claiming that its

"political accountability" has been adversely affected by the Transitional Policy, is asking this

Court to accept a series of hypothetical and unsupported assumptions.

In perhaps the clearest statement of its claimed injury, West Virginia describes the

adverse effect on its political accountability as follows:

> Under the Administrative Fix, the lines of political accountability are far less certain. By granting the States dispositive authority over the enforcement of the eight federal requirements and turning the States into federal policymakers, the Administrative Fix creates—at a minimum—confusion as to which government is actually to blame for the ACA's policies. That confusion exists regardless of whether the States choose to actually enforce the eight federal requirements or not: in either circumstance, the States will be held at least partly accountable by their citizens for having made a *federal* policy choice.

Compl. ¶ 71.

Breaking down that paragraph reveals the number of unsupported (and unsupportable)

assumptions embedded within West Virginia's theory of harm. At a minimum, West Virginia's

theory of "political accountability" rests on accepting all of the following assumptions:

1. That citizens of West Virginia are aware of and concerned about whether the ACA's market reforms will be enforced and by whom; and

2. That the State's reaction to the issue of who enforces the market reforms, either before or after the Transitional Policy, will translate into changes in voting in state elections; and

3. That citizens of West Virginia will view the State as the sole enforcer of the market reforms, notwithstanding the ACA's actual enforcement scheme in which state enforcement action is optional, HHS's public announcements regarding the federal Transitional Policy, and the limited and temporary nature of the Transitional Policy itself; and

4. That if West Virginia chose to enforce the market reforms post-Transitional Policy, citizens would blame West Virginia *more* than if West Virginia had chosen to enforce them absent the Transitional Policy; and

5. That if West Virginia chose *not* to enforce the market reforms post-Transitional Policy, West Virginia would have been worse off in terms of political accountability, despite having effectuated at least some part of its stated policy preference of allowing individuals to renew non-compliant insurance plans.

Each of these assumptions is entirely speculative, and when combined all the more so.  West Virginia's claimed injury is purely hypothetical, and accepting it as injury-in-fact would take the Court "into the area of speculation and conjecture, and beyond the bounds of [its] jurisdiction." *Whitmore v. Arkansas*, 495 U.S. 149, 158 (1990).[5]

Notably, West Virginia's Complaint does not even attempt to support the validity of the assumptions set out above.  West Virginia does not allege any facts about its citizens' political preferences or whether its citizens care about the Transitional Policy, much less that West Virginia has, in fact, been politically harmed as a result of the Transitional Policy.  The complete absence of factual allegations as to these issues is fatal.  Moreover, even a brief examination of West Virginia's assumptions—particularly when coupled with the evidence attached to West Virginia's own Complaint—demonstrates that West Virginia's claimed injury is not just speculative, but highly improbable.

For example, West Virginia does not provide any basis for assuming that either the Transitional Policy or the State's response to it (if any) would affect citizens' independent judgments and political beliefs.  *Cf. Clapper*, 133 S. Ct. at 1150 ("We decline to abandon our usual reluctance to endorse standing theories that rest on speculation about the decisions of independent actors.").  Available evidence suggests that few West Virginians are even affected by the ACA's individual and small group market reforms.  *See* Compl. Exh. 14 (ECF No. 1-18) at 2 (discussing how West Virginia has a very small individual market); *see also* Brandon Merritt, Health Policy Analyst, W. Va. Ctr. on Budget & Policy, *If You Like Your Health Plan You Can Keep It . . . Seriously* (Nov. 8, 2013), *available at* http://www.wvpolicy.org/if-you-like-your-

---

[5] These assumptions also highlight that the Court cannot decide whether the State has been injured by "political accountability" without making political predictions, which is why this sort of injury is not cognizable in the first place.  *See* Section I.B.1, *supra*.

health-plan-you-can-keep-it-seriously (stating that less than two percent of insured West Virginians obtain their insurance through the individual marketplace, and even fewer would be affected by the market reforms).  Certainly there is no indication (or even an allegation) that West Virginians are so affected by the State's response (or lack of response) to the Transitional Policy that it would alter their votes.  *Cf. Winpisinger v. Watson*, 628 F.2d 133, 139 (D.C. Cir. 1980) (declining to accept "a number of very speculative inferences and assumptions" about "voter support of a candidate," due to "[t]he endless number of diverse factors potentially contributing to the outcome of state presidential primary elections, caucuses and conventions").

Furthermore, West Virginia's theory that it will be harmed because the State, rather than the Federal Government, will be held accountable for enforcement (or non-enforcement) of the ACA's market reforms is particularly implausible given the very public nature of the Federal Government's actions here.  *See, e.g.*, Compl. ¶¶ 40-58, 88; Compl. Exhs. 4, 9, 14, 16 (ECF Nos. 1-8, 1-13, 1-18, 1-20).  Additionally, West Virginia's claim that it is being held (or will be held) politically accountable as the "exclusive" enforcer of federal law is entirely speculative and at odds with the statute itself; anyone with knowledge of the ACA's enforcement scheme knows that characterization is untrue.  And anyone who is aware of the Transitional Policy at all would know that the Federal Government, not the State, is responsible for it.

Finally, West Virginia's theory of standing incorrectly speculates that its "political accountability" is worse with the Transitional Policy than without it.  As discussed above (*see* Section I.A), however, the Transitional Policy has no effect on any state that is inclined to enforce the market reforms.  Both before and after the Transitional Policy, states were able to prohibit non-compliant policies from being sold within their state.  And for a state like West Virginia that has chosen *not* to enforce the market reforms in the limited circumstances covered

by the Transitional Policy, by West Virginia's own terms that would only *benefit* the State—because the Transitional Policy allows West Virginia to achieve at least some modicum of its desired policy outcome.  *See, e.g.*, Compl. ¶ 6 ("The State of West Virginia believes that its citizens should be able to keep their individual health insurance plans if they like them."); *id.* ¶ 11 ("[C]onsumers should be able to keep their health plans[.]").

For all of the reasons discussed above, West Virginia has not alleged a cognizable injury-in-fact.  At a minimum, this Court could not evaluate the asserted likelihood of the State's political accountability injury without engaging in the type of political (rather than legal) analysis that courts are ill-equipped to perform.  Thus, West Virginia has not established a cognizable injury-in-fact permitting it to bring this suit.

### C.     West Virginia Cannot Establish Causation.

West Virginia argues that the Transitional Policy has harmed the State by forcing it to make certain enforcement decisions.  As West Virginia itself admits, however, the State's enforcement options are exactly the same as they were before the Transitional Policy.  *See* Compl. ¶¶ 25, 63(c).

Furthermore, even if the Court accepted West Virginia's claim that the Transitional Policy changed the enforcement scheme by making West Virginia the "dispositive" enforcer of ACA market reforms (and it did not), West Virginia still fails to establish causation.  As set forth in the documents attached to West Virginia's Complaint, West Virginia had already *made* at least one decision on the market reforms' enforcement even before the Transitional Policy was announced. Specifically, West Virginia allowed early renewal in 2013 of individual policies (including policies that would not comply with the 2014 ACA market reforms), thereby allowing individuals to continue to obtain non-compliant coverage for 2014.  *See* Background, Part II, *supra*; Compl. Exh. 13 (discussing why West Virginia initially did not adopt the Transitional

Policy because it had already provided individual consumers the option of early renewal of their old policies).

West Virginia cannot complain about the Transitional Policy allegedly forcing it to make a "dispositive" decision on the 2014 market reforms, therefore, given that West Virginia *voluntarily* made such a dispositive decision—to permit its citizens to keep individual policies (at least temporarily) that did not comply with those market reforms—even before the Transitional Policy was announced.  And after the Transitional Policy was extended to 2016, the State affirmatively—and voluntarily—chose to let eligible issuers and policy holders take advantage of the temporary relief offered by the Secretary.  Nothing in the Transitional Policy obligated the State to take any action at all, one way or the other.  West Virginia's decision was thus purely voluntary, and any political harms flowing from that voluntary decision cannot provide a basis for challenging the Transitional Policy.  *Cf. Clapper*, 133 S. Ct. at 1152 (denying standing because "respondents' self-inflicted injuries are not fairly traceable to the Government's purported activities").

### D.      West Virginia's Injury Is Not Redressable.

Even apart from the above defects, West Virginia's purported injury of "political accountability" also fails the third requirement for standing—that the injury be "redressable by a favorable ruling."  *Clapper*, 133 S. Ct. at 1147 (internal quotation marks omitted).  Here, West Virginia's Complaint seeks two forms of relief:  (1) a declaration that the Transitional Policy is unlawful; and (2) a "remand" of the case to HHS, "to permit the Administration promptly to work with Congress to address the fact that the ACA rendered millions of Americans' health insurance plans unlawful[.]"  Compl. at 32.  Neither of these requested forms of relief would redress the State's only asserted injury, *i.e.*, its allegedly enhanced "political accountability" stemming from the Transitional Policy.  As noted, West Virginia's decision on enforcement in the

face of the Transitional Policy has already been made.  West Virginia does not explain why any alleged "political accountability" harms would dissipate as a result of a judicial ruling here.

Additionally, to the extent that West Virginia seeks by this lawsuit to compel HHS to enforce the federal market reforms, West Virginia would be the direct cause of *additional* enforcement of the 2014 market reforms within its borders, contrary to its own stated policy preferences, and presumably contrary to the interests of those issuers and policyholders in West Virginia who were eligible for the Transitional Policy relief and chose to keep their old plans.[6] Even under West Virginia's own terms, therefore, an order declaring the Transitional Policy invalid would only cause further harm to the State's claimed injury of "political accountability." *See Coal. for Responsible Regulation*, 684 F.3d at 146 (rejecting standing based on a lack of redressability because "[i]f anything, [granting the requested relief] would significantly exacerbate Petitioners' injuries").

Finally, remanding the case to HHS to "permit" the Executive to work with Congress is not a proper remedy; it is something that Executive officials and Congress are already free to do. If, however, this suit aims to "require the Obama administration to fix any problems with the law by working with Congress," as West Virginia's Attorney General has announced, *see* note 6, *supra*, then West Virginia cannot obtain what it seeks.  Any order by this Court that would *require* the Executive Branch to work with Congress (or vice versa) would obviously exceed this

---

[6] It is unclear whether West Virginia is actually seeking to prevent the Transitional Policy's application going forward.  In other public statements, West Virginia has disavowed the notion that this lawsuit is designed to compel HHS to enforce the ACA's market requirements. *See* Patrick Morrisey, Attorney General, National Review Online, *Why I Sued the President* (Aug. 21, 2014), *available at* http://www.nationalreview.com/article/385900/why-i-sued-president-patrick-morrisey ("It is important to point out that our goal is not to put individual health-insurance policies at risk. . . . Our suit asks the court to require the Obama administration to fix any problems with the law by working with Congress[.]").  If that is correct, then West Virginia's request for declaratory relief has no purpose, and cannot be relied on to establish redressability.

Court's authority and violate core separation-of-powers principles.  *See* U.S. Const. art. II, § 3 (vesting the President with the authority to recommend legislation to Congress).

Even if the Court could order such negotiations over particular legislation—and it cannot—it is entirely speculative what the outcome of those negotiations would be, and whether the outcome would be what the State desires, much less that it would have any effect on the State's alleged "political accountability."  As the D.C. Circuit recently held, reliance on the prospect that a judicial decision might prompt future legislative action is insufficient to establish redressability:

> We have serious doubts as to whether, for standing purposes, it is ever "likely" that Congress will enact legislation at all.  After all, a proposed bill must make it through committees in both the House of Representatives and the Senate and garner a majority of votes in both chambers—overcoming, perhaps, a filibuster in the Senate.  If passed, the bill must then be signed into law by the President, or go back to Congress so that it may attempt to override his veto.  As a generation of schoolchildren knows, "by that time, it's very unlikely that a bill will become a law.  It's not easy to become a law."

*Coal. for Responsible Regulation,* 684 F.3d at 147.  That logic is particularly applicable here, and squarely forecloses West Virginia's ability to claim redressability based on a theoretical possibility of future Congressional and Executive Branch action that would lead to the policy result that West Virginia favors.

## II.     WEST VIRGINIA IS NOT WITHIN THE ZONE OF INTERESTS TO ADVANCE ITS APA CLAIMS CHALLENGING THE AFFORDABLE CARE ACT.

Even assuming West Virginia could establish Article III standing for its claims (and it cannot), West Virginia's APA claims (Counts I-II) must nonetheless be dismissed because West Virginia is not within the zone of interests protected or regulated by the ACA.

"Whether a plaintiff comes within 'the zone of interests' is an issue that requires us to determine, using traditional tools of statutory interpretation, whether a legislatively conferred cause of action encompasses a particular plaintiff's claim." *Lexmark Int'l, Inc. v. Static Control*

*Components, Inc.*, 134 S. Ct. 1377, 1387 (2014).  In the context of the APA, a plaintiff's suit

must be dismissed "when a plaintiff's interests are so marginally related to or inconsistent with

the purposes implicit in the statute that it cannot reasonably be assumed that Congress authorized

that plaintiff to sue." *Id.* at 1389 (internal quotation marks omitted).

Here, West Virginia's apparent interest in this litigation is not to enforce the ACA's

market reforms, but rather to prompt legislative action *to undo* them:

> The State of West Virginia believes that its citizens should be able to keep their
> individual health insurance plans if they like them.  But the State also believes
> that no President is above the law and that this Administration's actions set a
> dangerous precedent.  The changes in the law necessary to ensure that the State's
> citizens and all Americans can keep their desired plans must be obtained properly
> through the democratic process and in accordance with the legislative procedures
> set forth in the Constitution.

Compl. ¶ 6.  This interest in dismantling the ACA is plainly "inconsistent with the purposes

implicit" in the ACA.  *Lexmark*, 134 S. Ct. at 1389.

Indeed, in very similar circumstances, the Seventh Circuit held just a few weeks ago that

plaintiffs were not within the zone of interests to bring claims, much like the current ones, that

were contrary to the ACA's purposes:

> Plaintiffs would be the wrong persons to litigate even if they had standing.  Only
> persons seeking to advance the interests protected by the mandatory-insurance
> portions of the Affordable Care Act would have a plausible claim to relief.  *See
> Lexmark International, Inc. v. Static Control Components, Inc.*, --- U.S. ----, 134
> S. Ct. 1377, 188 L.Ed.2d 392 (2014) (discussing the zone-of-interests
> requirement).  Yet plaintiffs, who do not accept insured patients, *want to reduce
> rather than increase the number of persons who carry health insurance*.
> Someone else would be a much more appropriate champion of the contention that
> the IRS has not done what it should to accomplish the statute's goal of universal
> coverage.

*AAPS*, 2014 WL 4667331 at *2 (emphasis added).  Similarly here, West Virginia wants to *reduce*

(in fact, entirely eliminate) the enforcement of the ACA's market reform requirements.  As the

Seventh Circuit concluded, "[s]omeone else would be a much more appropriate champion" to

argue that HHS "has not done what it should to accomplish the statute's goal" of appropriately enforcing the ACA's market reforms. *Id.* West Virginia is therefore outside the zone of interests, and at an absolute minimum its APA claims must be dismissed.

## CONCLUSION

For the foregoing reasons, Defendant's motion to dismiss for lack of subject-matter jurisdiction should be granted.

Dated: October 17, 2014

Respectfully submitted,

JOYCE R. BRANDA
Acting Assistant Attorney General

SHEILA LIEBER
Deputy Branch Director

*/s/ Daniel Schwei*
DANIEL SCHWEI
Trial Attorney (N.Y. Bar)
United States Department of Justice
Civil Division, Federal Programs Branch
20 Massachusetts Ave. NW
Washington, DC 20530
Tel.:    (202) 305-8693
Fax:     (202) 616-8470
Email:  daniel.s.schwei@usdoj.gov

Mailing Address:
Post Office Box 883
Washington, D.C. 20044

Courier Address:
20 Massachusetts Avenue N.W.
Washington, D.C. 20001

*Counsel for Defendant*