## IN THE UNITED STATES DISTRICT COURT FOR
## THE DISTRICT OF COLUMBIA

**STATE OF WEST VIRGINIA,**
**EX REL. PATRICK MORRISEY**

        *Plaintiff,*

**v.**                                             **Civil Action No. 14-1287-RBW**

**UNITED STATES DEPARTMENT OF**
**HEALTH AND HUMAN SERVICES**

        *Defendant*.

### PLAINTIFF STATE OF WEST VIRGINIA'S
### OPPOSITION TO THE MOTION TO DISMISS

Patrick Morrisey (DC Bar 459399)
  *Attorney General of West Virginia*

s/ Elbert Lin
Elbert Lin (DC Bar 979723)
  *Solicitor General*
Misha Tseytlin (DC Bar 991031)
  *Deputy Attorney General*
Julie Marie Blake (DC Bar 998723)
  *Assistant Attorney General*

Office of the Attorney General
State Capitol Building 1, Room E-26
Charleston, WV 25305
Telephone: (304) 558-2021
Fax: (304) 558-0140
E-mail: elbert.lin@wvago.gov

*Counsel for Plaintiff the State of West Virginia*

November 14, 2014

# TABLE OF CONTENTS

TABLE OF CONTENTS................................................................................................................. i

TABLE OF AUTHORITIES ........................................................................................................ ii

INTRODUCTION ........................................................................................................................ 1

BACKGROUND .......................................................................................................................... 3

    I.    The ACA Mandates Enforcement Of Eight New Federal Market Requirements ............. 3

    II.   The ACA's Federal Market Requirements Cause The Cancelation Of Millions Of
Individual Health Insurance Plans ............................................................................................ 6

    III.  HHS Issues A Binding Rule Prohibiting Federal Enforcement Of The ACA's Market
Requirements Against Non-Compliant Individual Health Plans And Forces On States The Sole
Discretion Over Enforcement .................................................................................................... 7

    IV.  West Virginia Responds To The Rule And Its Subsequent Extension.............................. 9

    V.   West Virginia Files A Complaint Alleging That The Administrative Fix Violates The
ACA, The APA, And The Constitution .................................................................................... 11

STANDARD FOR MOTION TO DISMISS ............................................................................. 13

SUMMARY OF ARGUMENT .................................................................................................. 13

ARGUMENT .............................................................................................................................. 16

    I.    West Virginia Has Standing Because The Administrative Fix Forces On The State The
Exclusive Responsibility To Decide Whether Certain Federal Law Will Apply Within Its
Borders..................................................................................................................................... 16

        A.    Like Any Non-Federal Entity Assigned Sole Responsibility For The Enforcement Or
Non-Enforcement Of Federal Law, West Virginia Has Standing Standing To Seek To Free
Itself From That Responsibility ........................................................................................... 17

        B.    States That Are Forced To Assume Exclusive Responsbility For Federal Law Have
Particular Standing To Sue Because Of The Shift In Political Accountability From The
Federal Government To The State ........................................................................................ 20

           1. Controlling D.C. Circuit Precedent Recognizes This Basis For Standing.................... 20

           2. HHS's Arguments To The Contrary Are Unavailing .................................................. 25

    II.   West Virginia Is In The Relevant "Zone Of Interest" ...................................................... 33

CONCLUSION.......................................................................................................................... 36

# TABLE OF AUTHORITIES

## CASES[*]

*Affum v. United States,* 566 F.3d 1150 (D.C. Cir. 2009) ............................................... 17

*Alfred L. Snapp & Son, Inc. v. Puerto Rico, ex rel. Barez,*
458 U.S. 592, 102 S. Ct. 3260 (1982) ................................................................. 16, 21

*Am. Trucking Ass'n, Inc. v. Federal Motor Carrier Safety Admin.,*
724 F.3d 243 (D.C. Cir. 2013) ........................................................................... 17, 20

*Ass'n of Data Processing Serv. Organizations, Inc. v. Camp,*
397 U.S. 150, 90 S. Ct. 827 (1970) ............................................................................ 34

*Bond v. United States,* 131 S. Ct. 2355 (2011) ............................................................. 30

*CC Recovery, Inc. v. Cecil Cnty.,* Md., No. CIV, JKB-12-3786, 2014 WL 2767358 .................. 33

*\*Carter v. Carter Coal Co.,* 298 U.S. 238, 56 S. Ct. 855 (1936) .................................... 20

*Chabad Lubavitch of Litchfield Cnty., Inc. v. Litchfield Historic Dist. Comm'n,*
768 F.3d 183 (2d Cir. 2014) ...................................................................................... 33

*Chamber of Commerce of U.S. v. Reich,* 74 F.3d 1322 (D.C. Cir. 1996) ....................... 35

*Clinton v. City of N.Y.,* 524 U.S. 417, 118 S. Ct. 2091 (1998) ................................. 31, 32

*\*Cook v. FDA,* 733 F.3d 1 (D.C. Cir. 2013) .............................................................. 2, 5

*FERC v. Mississippi,* 456 U.S. 742, 102 S. Ct. 2126 (1982) ........................................... 5

*Foretich v. United States,* 351 F.3D 1198 (D.C. Cir. 2003) ......................................... 16

*Fraternal Order of Police v. United States,* 173 F.3d 898 (D.C. Cir. 1999) ................. 23

*Free Enter. Fund v. Pub. Co. Acounting Oversight Bd.,*
561 U.S. 477, 130 S. Ct. 3138 (2010) ...................................................................... 36

*Gillespie v. City of Indianapolis,* 185 F.3d 693 (7th Cir. 1999) .................................. 23

*Grand Council of Crees (of Quebec) v. FERC,* 198 F.3d 950 (D.C. Cir. 2000) ............... 34

*Hodel v. Virginia Surface Mining & Reclamation Association, Inc,*
452 U.S. 264, 101 S. Ct. 2352 (1981) ........................................................................ 5

*Howard R.L. Cook & Tommy Shaw Found ex rel. Black Employees of*

---

[*] Authorities on which the State of West Virginia chiefly relies are marked with asterisks.  *See* Local Rule 7(a).

*Library of Cong. Inc. v. Billington,* 737 F.3d 767 (D.C. Cir. 2013) ..............................................34

*Leedom v. Kyne*, 358 U.S. 184, 79 S. Ct. 180 (1958) ..................................................................36

*Lexmark Int'l, Inc. v. Static Control Components, Inc.*,
134 S. Ct. 1377, 188 L.Ed.2 392 (2014) ......................................................................15, 33

*\*Lomont v. O'Neill*, 285 F.3d 9 (D.C. Cir. 2002) ................................................................*Passim*

*Louisiana Energy & Power Auth. v. FERC*, 141 F.3d 364 (D.C. Cir. 1998)...............................26

*Lujan v. Defenders of Wildlife*, 504 U.S. 555, 112 S. Ct. 2130 (1992) ....................................2, 16

*Marymount Hosp., Inc. v. Sullivan*, 791 F. Supp. 878 (D.D.C. 1992).........................................25

*\*Massachusetts v. EPA*, 549 U.S. 497, 127 S. Ct. 1438 (2007) ............................................2, 5, 23

*Massachusetts v. Mellon,* 262 U.S. 447 (1923) ..........................................................................28

*Match-E-Be-Nash-She-Wish Band of Pottawatomi Indians v. Patchak*, 132 S. Ct. 2199 (2012) .35

*Muir v. Navy Federal Credit Union*, 529 F.3d 1100 (D.C. Cir. 2008) ..................................13, 23

*\*Nat'l Fed'n of Indep. Bus. v. Sebelius*, 132 S. Ct. 2566 (2012).................................................22

*New Jersey v. Sargent,* 269 U.S. 328 (1926) ..............................................................................28

*\*New York v. United States*, 505 U.S. 144, 112 S. Ct. 2408 (1992).....................................*Passim*

*Nguyen v. United States,* 539 U.S. 69, 123 S. Ct. 2130 (2003) ....................................................25

*\*Printz v. United States*, 521 U.S. 898, 117 S. Ct. 2365 (1997)................................21, 22, 27, 28

*Rodway v. U.S. Dep't of Agric.,* 514 F.2d 809 (D.C. Cir. 1975) .................................................33

*Texas v. United States*, 497 F.3d 491 (5th Cir. 2007)..................................................................25

*Utah v. Evans,* 536 U.S. 452, 122 S. Ct. 2191 (2002) .................................................................32

*Vill. of Arlington Heights v. Metro. Hous. Dev. Corp.*, 429 U.S. 252, 97 S. Ct. 555 (1977) ........16

*Warth v. Seldin*, 422 U.S. 490, 95 S.Ct. 2197 (1975) .................................................................13

*Washington Envtl. Council v. Bellon*, 732 F.3d 1131 (9th Cir. 2013)..........................................23

## CONSTITUTIONAL AND STATUTORY PROVISIONS

U.S. Const. Amend. X ..............................................................................................................30

5 U.S.C. § 553...........................................................................................................................11

5 U.S.C. § 706.......................................................................................................................11, 12

42 U.S.C. § 300gg .................................................................................................................4

42 U.S.C. § 300gg-1 .............................................................................................................4

42 U.S.C. § 300gg-2 .............................................................................................................4

42 U.S.C § 300gg-3 ..............................................................................................................4

42 U.S.C. § 300gg-4 .............................................................................................................4

42 U.S.C. § 300gg-5 .............................................................................................................4

42 U.S.C. § 300gg-6. ............................................................................................................4

42 U.S.C. § 300gg-8 .............................................................................................................4

42 U.S.C. § 300gg-22 .................................................................................................2, 4, 5, 11, 18

## REGULATORY MATERIALS

45 C.F.R. pt. 144 ................................................................................................................10

45 C.F.R. § 147.140 .............................................................................................................4

45 C.F.R. § 150.203 .............................................................................................................4

45 C.F.R. § 150.315 .............................................................................................................5

75 Fed. Reg. 34,538 (June 17, 2010) ..................................................................................4

78 Fed. Reg. 13,406 (Feb. 27, 2013) ..................................................................................4

79 Fed. Reg. 13,744 (Mar. 11, 2014) ...............................................................................10

79 Fed. Reg. 30,240 May 27, 2014) .................................................................................10

Pub. L. No. 111-148, 124 Stat. 119 (2010) .........................................................................3

Pub. L. No. 111-152, 124 Stat. 1029 (2010) .......................................................................3

## OTHER AUTHORITIES

Bagley, Professor Nicholas, *The Legality of Delaying Key Elements of the ACA*, 2014 New England J. Med. 370 (May 22, 2014) ...........................................................................2

Kontorovich, Professor Eugene, *The Obamacare 'Fix' Is Illegal*, Politico (Nov. 22, 2013) ........2

## INTRODUCTION

Despite the President's promise, the Affordable Care Act ("ACA") triggered the cancelation of the health insurance plans of millions of Americans.  The ACA includes a number of federal market reforms—such as a ban on discrimination on the basis of pre-existing conditions—that made those plans unlawful.  Under the statute, the States were given the option to enforce those federal requirements within their borders, but they had no ability to stop enforcement because the Federal Government was charged with the mandatory duty to step in if the States chose not to act.

When insurance companies sent millions of cancelation notices to their customers in late 2013, citing the ACA's mandatory federal requirements, the President and the Department of Health and Human Services ("HHS") decided to shift responsibility for the federal requirements entirely onto the States to escape accountability for these unpopular cancelations.   In correspondence specifically sent to the States, HHS enacted an illegal policy, widely known as the Administrative Fix.  Despite its mandatory duty, HHS committed not to enforce the ACA's market requirements for millions of health insurance plans and thereby left each State with the exclusive responsibility for the enforcement or non-enforcement of those federal requirements within its borders.  This Administrative Fix aimed to allow the President to avoid accountability for the fact that the ACA violated his oft-repeated, now-infamous pledge that "if you like your health care plan, you can keep your health care plan."

The State of West Virginia, one of the recipients of the correspondence from HHS and thus a direct object of the Administrative Fix, has been harmed by the Federal Government's illegal delegation of unilateral responsibility over federal law and has brought this lawsuit to free itself of that unlawful duty.  HHS contends that the State lacks standing.  But as West Virginia

alleged in its complaint, the State has two independently sufficient bases for standing.  *First*, like any other non-federal entity that has been assigned exclusive and unfettered responsibility over the enforcement or non-enforcement of federal law, West Virginia has standing to ask the federal courts to free it from that unwanted responsibility.  *Second*, as a State, West Virginia additionally has standing to seek to protect its sovereignty against being held politically accountable for federal policy.

HHS's Motion to Dismiss is yet another example of this Administration's continuing effort to avoid answering for the illegality of its repeated failure to faithfully execute politically or ideologically inconvenient federal laws.  There is simply no plausible legal defense for the Administrative Fix, a fact noted by law professors from across the political spectrum.[1]  The statute plainly states that if HHS makes a "determination" of nonenforcement by a State, "the Secretary [of HHS] *shall enforce* [the provisions of this part] insofar as they relate to the issuance, sale, renewal, and offering of health insurance coverage."  42 U.S.C. § 300gg-22(a)(2) (emphasis added).  HHS asserts that the law does not require the agency ever to make a determination, *see* MTD at 6, but both the D.C. Circuit and the Supreme Court have held that statutes with this sort of language impose a mandatory duty, *see Cook v. FDA*, 733 F.3d 1 (D.C. Cir. 2013); *Massachusetts v. EPA*, 549 U.S. 497, 127 S. Ct. 1438 (2007); *see also* MSJ at 15.

While this Administration has managed to hide some of its illegal conduct in other situations behind standing arguments, it cannot do so here.  In this case, even HHS is forced to admit that the State is the "object of the action . . . at issue," which ordinarily means there is

---

[1] *See* Professor Nicholas Bagley, *The Legality of Delaying Key Elements of the ACA*, 2014 New. England J. Med. 370 (May 22, 2014), http://www.nejm.org/doi/full/10.1056/NEJMp1402641; Professor Eugene Kontorovich, *The Obamacare 'Fix' Is Illegal*, Politico (Nov. 22, 2013), http://www.politico.com/magazine/story/2013/11/the-obamacare-fix-is-illegal-100254.html.

"little question" about standing. *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 561-62, 112 S. Ct. 2130, 2137 (1992). That rule of thumb holds true here. Nothing in Article III's text or the relevant precedents permits the Federal Government to violate the Constitution and federal law by forcing States to become exclusively responsible for an unpopular federal law and then to escape accounting for that lawless action when States ask the federal courts to free them from that unwanted duty.

## BACKGROUND[2]

### I.   The ACA Mandates Enforcement Of Eight New Federal Market Requirements.

The ACA dramatically changes the market for individual health insurance in many ways, including the imposition of eight new federal market requirements on health insurers. Pub. L. No. 111-148, 124 Stat. 119 (2010), as amended by the Health Care and Education Reconciliation Act of 2010, Pub. L. No. 111-152, 124 Stat. 1029 (2010) (codified as amended in scattered sections of the code). Under the ACA, health insurers providing individual health plans must comply with the following:

- policy premiums can vary only based on age, tobacco use, family size, and geography;

- insurers must accept every individual that applies for new coverage, regardless of medical history or health status;

- insurers must accept every individual that applies to renew coverage;

- insurers may not discriminate against consumers based on pre-existing conditions;

- insurers may not discriminate against consumers based on health status, receipt of health care, medical history, genetic information, evidence of insurability (including conditions arising out of acts of domestic violence), or disability;

- insurers cannot discriminate against any health care provider;

---

[2] Given the extensive overlap between the merits and standing arguments in this case, this background section is substantially similar to the background section in West Virginia's pending Motion for Summary Judgment.

- insurers cannot decline to pay for or discriminate against clinical trial expenses; and

- plans must cover "essential" minimum benefits with only limited cost-sharing, including ambulances, ER visits, hospitals, maternity care, mental health, prescription drugs, rehab services, lab services, child services, and oral and vision care.

42 U.S.C. §§ 300gg–300gg-6, 300gg-8; Compl. ¶ 21.

All individual health insurance plans begun or renewed after January 1, 2014, must comply with these requirements unless they qualify for the grandfathering exception, which exempts only those plans in existence on March 23, 2010 that have not been significantly modified thereafter.  42 U.S.C. §§ 300gg–300gg-6, 300gg-8; *id.* § 18011; *id.* § 18011(1); 45 C.F.R. § 147.140(g)(1)(ii); Compl. ¶¶ 20, 33.  Over time, fewer and fewer grandfathered plans will remain.  HHS has estimated that "the percentage of individual market policies losing grandfather status in a given year [will exceed] the 40 percent to 67 percent range."  75 Fed. Reg. 34,538, 34,553 (June 17, 2010); Compl ¶ 34.

The ACA specifies that the eight federal market requirements are to be enforced through a two-tiered regime.  Compl. ¶ 22.  *First*, each State has the initial option to voluntarily enforce the federal requirements by prohibiting the issuance of non-compliant individual health plans within its respective borders.  42 U.S.C. § 300gg-22(a)(1); Compl. ¶ 25.  *Second*, if a State chooses not to do so voluntarily, HHS *must* enforce the requirements.  42 U.S.C. § 300gg-22; *see also* 78 Fed. Reg. 13,406, 13,419 (Feb. 27, 2013).  Under the ACA, if HHS makes a "determination" of nonenforcement by a State, "the Secretary [of HHS] *shall enforce* [the provisions of this part] insofar as they relate to the issuance, sale, renewal, and offering of health insurance coverage."  42 U.S.C. § 300gg-22(a)(2) (emphasis added); *see also* 45 C.F.R. § 150.203; Compl. ¶ 28.  Both the D.C. Circuit and the Supreme Court have held that statutes

with this sort of language impose a mandatory duty.  *See Cook v. FDA*, 733 F.3d 1 (D.C. Cir. 2013); *Massachusetts v. EPA*, 549 U.S. 497, 127 S. Ct. 1438 (2007); *see also* MSJ at 15.[3]

This two-tiered regime resembles the "cooperative federalism" regimes that Congress has used in other federal laws, wherein Congress pre-empts state regulation but gives the States the opportunity to regulate (or continue regulating) under certain conditions.  Compl. ¶ 23.  For example, in *FERC v. Mississippi*, 456 U.S. 742, 102 S. Ct. 2126 (1982), a federal law "allowed the States to continue regulating in [an] area on the condition that they consider [certain] suggested federal standards."  *Id.* at 765, 102 S. Ct. at 2140 (emphasis omitted).  Otherwise, the federal law required the States to "simply stop[] regulating in the field."  *Id.* at 764, 102 S. Ct. at 2140.  More similar to this case, in *Hodel v. Virginia Surface Mining & Reclamation Association, Inc.*, 452 U.S. 264, 101 S. Ct. 2352 (1981), a federal law "allow[ed] the States, within limits established by federal minimum standards, to enact and administer their own regulatory programs."  *Id.* at 289, 101 S. Ct. at 2366-67.  If the States declined to enforce, the Federal Government would enact its own regulatory regime.  *Id.* at 272, 101 S. Ct. at 2358.  Under the ACA, the Federal Government has given the States the opportunity to enforce the new federal market requirements in the first instance, but will do so itself if the States decline.  Compl. ¶ 61.

Before the federal market requirements were scheduled by law to take effect on January 1, 2014, many States made public whether they intended to play an enforcement role.  Compl. ¶ 26.  Some States, including West Virginia, intended to enforce part or all of the eight federal

---

[3] Federal enforcement brings stiff fines for non-complying insurers of up to $100 per day per plan member.  42 U.S.C. § 300gg-22(b)(2)(C); 45 C.F.R. § 150.315; Compl. ¶ 29.  If an insurer fails to pay a penalty after it has exhausted its review options, HHS "shall refer" the matter to the Attorney General for legal action.  42 U.S.C. § 300gg-22(b)(2)(F)(i); Compl. ¶ 30.  The ACA earmarks funds collected from federal enforcement actions to finance future HHS enforcement. 42 U.S.C. § 300gg-22(b)(2)(G); Compl. ¶ 31.

requirements.   Compl. Exh. 1.   Others stated that they would not enforce the federal

requirements, triggering HHS's mandatory enforcement burden.   *Id.*

## II.   The ACA's Federal Market Requirements Cause The Cancelation Of Millions Of Individual Health Insurance Plans.

In late 2013, it became clear that millions of individual health plans had been or would be

required to be canceled as a result of the ACA's new federal market requirements.   Compl. ¶ 35;

*e.g.*, Avik Roy, *The Obamacare Exchange Scorecard: Around 100,000 Enrollees And Five*

*Million Cancellations*, Forbes.com (Nov. 11, 2013) (MSJ Exh. B).   At the time, many individual

health insurance plans were not grandfathered and did not comply with at least some of the new

federal requirements.   Compl. ¶ 35.   In anticipation of the January 1, 2014, effective date for the

new federal requirements, insurers sent millions of notices informing customers that such plans

would soon be canceled.   *Id.*

These cancelation notices caused widespread public outcry.   President Obama was

roundly criticized for violating his oft-repeated pledge that, under the ACA, "if you like your

health care plan, you can keep your health care plan."   Compl. ¶ 36, Exh. 2;   *see, e.g.*, Barack

Obama, U.S. President, Remarks by the President in Health Insurance Reform Town Hall (Aug.

11, 2009) (MSJ Exh. C).   Non-partisan fact checkers famously dubbed the President's promise

the "lie of the year."   Angie Drobnic Holan, *Lie of the Year: 'If you like your health care plan,*

*you can keep it,'* PolitiFact.com (Dec. 12, 2013) (MSJ Exh. D).   Even the President's own party

has "cried foul."   *Id*.   Former House Financial Services Committee Chairman Barney Frank

recently said that the President "should never have said . . . that if you like your current health

care plan, you can keep it.   That wasn't true."   Zach Carter, *Barney Frank 'Appalled' By Obama*

*Administration: 'They Just Lied To People,'* Huffington Post (Aug. 1, 2014) (MSJ Exh. E); *see*

*also* Clarence Page, *The truth? Obama told a whopper*, Chicago Tribune (Nov. 6, 2013) (MSJ

Exh. F) ("[Obama] would have to be delusional to think he was telling the truth.").

III.    **HHS Issues a Binding Rule Prohibiting Federal Enforcement Of The ACA's Market Requirements Against Non-Compliant Individual Health Plans And Forces On States The Sole Discretion Over Enforcement.**

On November 14, 2013, President Obama held a press conference to announce a

unilateral executive action intended to absolve his Administration in general, and the ACA in

particular, of political responsibility for the canceled plans.   Compl. ¶¶ 40, 43.   Recognizing

"how upsetting this can be for a lot of Americans, particularly after assurances they heard from

me that if they had a plan that they liked, they could keep it," the President explained that he and

his Administration would take steps to "fix" the problem of canceled health insurance plans.

Compl. ¶ 40, Exh. 4 at *2 (hereinafter "Presidential Press Conference").   His solution was to

direct HHS to allow "insurers [to] extend current plans that would otherwise be canceled into

2014, and [allow] Americans whose plans have been cancelled [to] choose to re-enroll in the

same kind of plan."  Compl. ¶¶ 41, Exhs. 4, 5 at 1 (hereinafter "Administrative Fix Fact Sheet")

(citing HHS's "administrative authority").   In other words, HHS was not to enforce the new

federal market requirements against issuers of non-compliant individual health insurance plans.

The President admitted that "state insurance commissioners still have the power to decide what

plans can and can't be sold in their states," but also acknowledged that he sought to shift blame

away from the federal government and the ACA.   Compl. ¶ 43, Exh. 4 at *2.   "[W]hat we want

to do is to be able to say to folks" whose individual health insurance plans were canceled, the

President explained, is that "*the Affordable Care Act* is not going to be the reason why insurers

have to cancel your plan."   Compl. ¶ 43, Exh. 4 at 4 (emphasis added).

What the President essentially said is that these "folks" should now blame their state

governments for any cancelled plans.   Before the President's "fix," the States had no ability to

affect the ultimate enforcement of the eight new federal market requirements.  Compl. ¶ 62.
While a State could voluntarily choose to enforce the federal requirements, its decision whether
to do so had no impact on whether the federal requirements would be enforced at all.  As
described above, if a State chose not to enforce the federal requirements, HHS was required by
statute to do so.  *Id.*  But after the President's "fix," the States were the *only* entities left with the
power to enforce the federal requirements, and each State's enforcement decision became
*dispositive* of whether those requirements would be enforced.  Compl. ¶ 63.  The blame for any
cancelations of plans for failure to meet the new federal market requirements—or alternatively,
for permitting the sale of unlawful plans—would now fall exclusively to the States.  Compl. ¶
64.

 The day of the President's speech, HHS formalized the President's directive as a binding
rule, notwithstanding the contrary statutory text and without allowing for notice-and-comment
rulemaking.  Compl. ¶ 44.  In a letter addressed *to the States*, the Director of the Center for
Consumer Information and Insurance Oversight within HHS explained that the so-called
"Administrative Fix" would prohibit HHS from enforcing the new federal market requirements
through October 1, 2014, and potentially "beyond [that] specified time frame."  Compl. ¶ 45.
Exh. 6 at 1 (hereinafter "Administrative Fix Letter").  For the purpose of federal enforcement,
HHS committed to allow health issuers to "choose to continue coverage that would otherwise be
terminated or cancelled" provided that: (1) the plan was in effect on October 1, 2013; and (2) the
insurer notified affected customers about the Act's health insurance exchanges and the federal
market requirements with which their plan does not comply.  Compl ¶ 46, Exh. 6 at 1–2.  If an
insurer satisfied these two preconditions, the letter explained, an otherwise non-compliant
individual health plan "will not be considered [by HHS as] out of compliance with the [eight

federal] market reforms."  Compl. ¶ 47, Exh. 6 at 1.  The letter also "encouraged" those "State agencies responsible for enforcing the specified market reforms" to "adopt the same transitional policy."  Compl. ¶ 49, Exh. 6 at 3.

At the same time, the President specifically rejected the prospect of working with Congress to reach a permanent and lawful change to the law.  To stop the ACA's cancelation of health insurance plans, Congress had separately begun preparing to amend the ACA.  Compl. ¶ 37; *see, e.g.,* Keep Your Health Plan Act of 2013, H.R. 3350, 113th Cong. (2013); Keeping the Affordable Care Act Promise Act, S. 1642, 113th Cong. (2013).  But the day that the President committed to his unilateral Administrative Fix, he also formally threatened to veto a legislative proposal to allow people to keep their individual health insurance plans as long as they desired.  Compl. ¶ 38, Exh. 3.

## IV.     West Virginia Responds To The Rule And Its Subsequent Extension.

On November 21, 2013, the West Virginia Insurance Commissioner, Michael D. Riley, stated in response to the Administrative Fix that he would continue to enforce the ACA's new market requirements.  Compl. ¶ 80, Exh. 13.  He explained that the "abrupt" Administrative Fix "comes at a time when West Virginia employers, citizens and insurance carriers have already made extensive changes to comply with the new law."  *Id.*  "In order to avoid further confusion, provide market stability, mitigate potential rate impacts[,] . . . and regulate the West Virginia insurance market in accordance with the existing law," the Commissioner "decided to maintain [the State's] current direction."  *Id.*

On December 26, 2013, the State of West Virginia and nine other States wrote a letter to HHS, explaining that the Administrative Fix is "flatly illegal under federal constitutional and statutory law."  Compl. ¶¶ 78–79, Exh. 12 at 1.  The letter explained the signatory States' "support [for] allowing citizens to keep their health insurance coverage."  Compl. ¶ 79, Exh. 12

at 1.  But, the letter continued, "the only way to fix this problem-ridden law is to enact changes lawfully: through congressional action."  *Id.*

Notwithstanding this letter, HHS has continued to rely exclusively upon the Administrative Fix, repeatedly treating the Fix as a binding rule.  Since adopting the Fix, HHS has taken steps to implement the Fix, including issuing a specific disclosure statement that "*will be* considered to satisfy the [Fix's] requirement to notify policyholders of the discontinuation of their policies."  Compl. ¶ 58, Exh. 7 at 2 (hereinafter "Insurer Disclosure Rule") (emphasis added).  The agency has refused to enforce the ACA's new federal market requirements on any insurance company that has complied with the two preconditions and renewed one of the millions of non-compliant individual health insurance plans.  Furthermore, HHS has adopted two separate rules designed to mitigate the financial impact of the Fix on insurers—rules that would not have been necessary or coherent if HHS did not consider the Fix a binding rule.  Compl. ¶ 58; *see, e.g.*, HHS Notice of Benefit and Payment Parameters for 2015, 79 Fed. Reg. 13,744 (Mar. 11, 2014) (to be codified at 45 C.F.R. pt. 144, et al.); Exchange and Insurance Market Standards for 2015 and Beyond, 79 Fed. Reg. 30,240 (May 27, 2014) (to be codified at 45 C.F.R. pt. 144, et al.).

Most recently, HHS committed to follow the Administrative Fix for two more years, prompting the West Virginia Insurance Commissioner to change his position on enforcement.  Compl. ¶ 58.  In March 2014, HHS extended the Administrative Fix through October 1, 2016, promising to withhold federal enforcement of the new federal market requirements until one month before the next Presidential election.  Compl. ¶¶ 51, 52, Exh. 8 (hereinafter "Extension Rule").  Faced with a much longer period of non-enforcement by the federal government, West Virginia Insurance Commissioner Riley changed course in April 2014 and announced that his

office would also not enforce the ACA's federal market requirements.  Compl. ¶¶ 82–83, Exh. 14.

## V.     West Virginia Files A Complaint Alleging That The Administrative Fix Violates The ACA, The APA, And The Constitution.

On July 29, 2014, West Virginia filed a four-count complaint against the Department of Health and Human Services, seeking relief from the Administrative Fix.  The First Count alleges that the Administrative Fix violated both the ACA and the Administrative Procedure Act ("APA").  Compl. ¶¶ 92–97.  As explained, the ACA provides that "the Secretary [of HHS] shall enforce [the provisions of this part] insofar as they relate to the issuance, sale, renewal, and offering of health insurance coverage" whenever the Secretary determines that a State is not enforcing those requirements.  42 U.S.C. § 300gg-22(a)(2); Compl. ¶ 95.  The ACA does not provide HHS the discretion to refuse to make a determination that a state is not enforcing the market requirements.  Compl. ¶ 95.  The Administrative Fix's categorical suspension of enforcement is thus contrary to the ACA.  Compl. ¶¶ 93–97.  It is also, therefore, a violation of the APA, which requires executive actions to be consistent with the authorizing statute and bars actions that are "arbitrary capricious, an abuse of discretion, or otherwise in accordance with the law."  5 U.S.C. § 706(2)(a); Compl. ¶ 93.  The First Count accordingly alleges that West Virginia is entitled to relief "under the APA and the Constitution and laws of the United States." Compl. ¶ 97.

The Second Count alleges a violation of the notice and comment requirements of the APA.  Compl. ¶¶ 98–104.  Before an agency promulgates a "rule," it is required by the APA to provide a "[g]eneral notice of proposed rule-making" and give "interested persons an opportunity to participate in the rule-making through submission of written data, views or arguments."  5 U.S.C. § 553(b)-(c); *see* Compl. ¶¶ 100–01.  The Administrative Fix is a final rule within the

meaning of the APA, but HHS failed to follow the notice and comment procedures. Compl. ¶¶ 102-03. The Second Count accordingly alleges that West Virginia is entitled to relief under the APA. Compl. ¶ 104.

The Third Count alleges an unlawful delegation of the federal executive and legislative powers to the States. Compl. ¶¶ 105–16. The Constitution places significant limits on the ability of the President and Congress to delegate federal executive and legislative power. Compl. ¶¶ 107–14. The Administrative Fix, however, leaves entirely to the States' discretion whether to enforce the ACA's eight federal market requirements within their borders. Compl. ¶ 109. That violates the Constitution and is not "in accordance with the law." 5 U.S.C. § 706(2)(a). The Third Count accordingly alleges that West Virginia is entitled to relief "under the APA and the Constitution and laws of the United States." Compl. ¶ 116.

The Fourth Count alleges that the Administrative Fix violated state sovereignty under the Tenth Amendment. Compl. ¶¶ 117–26. The Supreme Court has held that the Tenth Amendment bars the federal government from commandeering the States to administer federal programs and thereby shifting to the States the political accountability for federal law. Compl. ¶¶ 119-21, 124. The Administrative Fix violated this prohibition when it conveyed on the States the sole authority to decide whether to enforce federal law. Compl. ¶ 122-23, 125. This, too, is a violation of the Constitution and not "in accordance with the law." 5 U.S.C. § 706(2)(a). The Fourth Count accordingly also alleges that West Virginia is entitled to relief "under the APA and the Constitution and laws of the United States." Compl. ¶ 126.

For these violations, the complaint seeks four kinds of relief. *First*, West Virginia asks for a declaration that the Administrative Fix is unlawful. Compl. at 32. *Second*, West Virginia requests that the Court remand to HHS, which would allow the Administration to work with

Congress to properly address the ACA's negative effect on health insurance plans held by millions of Americans. *Id.  Third*, West Virginia seeks costs and attorneys' fees under any applicable statute or authority. *Id.  Fourth*, West Virginia requests any other relief, including equitable injunctive relief, that the Court deems appropriate. *Id.* at 33.

On September 16, 2014, the State filed its Motion for Summary Judgment. In that filing, West Virginia thoroughly explained the clear unlawfulness of the Administrative Fix and fully articulated the State's standing to bring this suit to free itself from the exclusive responsibility it has been given over federal law. On November 3, 2014 this Court stayed further briefing on the State's Motion. Dkt. 7.

## STANDARD FOR MOTION TO DISMISS

"To establish constitutional standing, a plaintiff must show an injury in fact that is fairly traceable to the challenged conduct and that will likely be redressed by a favorable decision on the merits." *Muir v. Navy Federal Credit Union*, 529 F.3d 1100, 1105 (D.C. Cir. 2008). "[T]he court must be careful not to decide the questions on the merits for or against the plaintiff, and must therefore assume that on the merits the plaintiffs would be successful in their claims." *Id.* (quoting *City of Waukesha v. EPA*, 320 F.3d 228, 235 (D.C. Cir. 2003)). The Court "must accept as true all material allegations of the complaint and must construe the complaint in favor of the complaining party." *Warth v. Seldin*, 422 U.S. 490, 501, 95 S. Ct. 2197, 2206 (1975).

## SUMMARY OF ARGUMENT

HHS admits that the States were the direct objects of the Administrative Fix, which gave the States exclusive and unfettered discretion over the enforcement or non-enforcement of the ACA's federal market requirements. Before the Administrative Fix, and under the ACA as it is

written, each State had the option of enforcing the federal market requirements, but no State could *stop* enforcement because the ACA required the Federal Government to enforce the federal market requirements if any State did not.   Through the Fix, however, HHS abdicated its enforcement duty for a large category of the individual health insurance market.   Now, as HHS itself describes it, States are "no longer limited to deciding who (the state or HHS) w[ill] be responsible for enforcing the market reforms."   MTD at 15.   Instead, they have been given the exclusive and unilateral responsibility within their borders to decide whether federal law will be enforced at all.

West Virginia has alleged two independently sufficient bases for its standing to challenge the Administrative Fix, both of which flow from the unlawful assignment to the State of exclusive responsibility for federal law:

*First*, like any non-federal entity placed in this position—whether a sovereign State or not—West Virginia has standing to challenge this unlawful delegation of federal authority.   Any such entity faces two harmful choices: expend resources to enforce the federal law and suffer the consequences of being the regulator; or risk the consequences that come from failing to enforce the federal law.   In its Motion to Dismiss, HHS does not even attempt to respond to this basis for West Virginia's standing, and with good reason: it would be bizarre to argue that a non-federal entity granted exclusive responsibility for the enforcement or non-enforcement of federal law would not be able to bring suit to free itself from that responsibility.

*Second*, as a sovereign State, West Virginia additionally has standing to protect its sovereign interest against being held politically accountable for federal policy.   Under the State's reading of the Supreme Court's anti-commandeering cases, the Administrative Fix violates the Tenth Amendment because its grant of exclusive enforcement responsibility to the States

improperly shifted political accountability from the Federal Government to the States.   And while HHS may disagree with that reading of those cases on the merits, the alleged Tenth Amendment violation is a sufficiently colorable anti-commandeering claim under D.C. Circuit precedent to support standing to challenge the Administrative Fix.   Specifically, in *Lomont v. O'Neill*, 285 F.3d 9 (D.C. Cir. 2002), the D.C. Circuit held that certain police chiefs had *standing* to challenge certain federal regulations in light of their claimed Tenth Amendment injury, even though the court then rejected the claim on the *merits* because the regulations did not "command the States' officers."   285 F.3d at 13-14 (quotations omitted).   Because the shift of political accountability here is far more severe than that alleged in *Lomont*, West Virginia must have standing.   HHS does not even acknowledge this case, let alone explain how its narrow theory of state standing is consistent with this and other binding precedents.

HHS closed its Motion to Dismiss with a brief argument that this Court should dismiss West Virginia's first two counts for lack of subject matter jurisdiction because they arise under the APA and "West Virginia is not within the zone of interests to advance" these claims.   MTD at 29.   This argument is doubly foreclosed.   To begin, the argument is improper in a jurisdictional motion to dismiss because the Supreme Court has recently held that the "zone of interest" test is not an issue of subject matter jurisdiction.   *Lexmark Int'l, Inc. v. Static Control Components, Inc.*, 134 S. Ct. 1377, 1386-87 n.4, 188 L. Ed. 2d 392 n.4 (2014).   Moreover, the State is squarely within the requisite "zone of interest" because it is seeking to vindicate the ACA's scheme of cooperative federalism, which HHS destroyed through the Administrative Fix.

**ARGUMENT**

I.    **West Virginia Has Standing Because The Administrative Fix Forces On The State The Exclusive Responsibility to Decide Whether Certain Federal Law Will Apply Within Its Borders.**

It is well settled that the "irreducible constitutional minimum of standing contains three elements." *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560, 112 S. Ct. 2130, 2136 (1992) (citations omitted).  The plaintiff must have suffered "an injury in fact," there must be a "causal connection between the injury and the conduct complained of," and the injury must be "redress[able] by a favorable decision."  *Id.* at 560-61, 112 S. Ct. at 2136 (internal quotations omitted).  The injury can vary widely.  While "economic injury" is generally sufficient, no showing of economic harm is necessary.  *Vill. of Arlington Heights v. Metro. Hous. Dev. Corp.*, 429 U.S. 252, 262-63, 97 S. Ct. 555, 562 (1977).  Instead, injuries such as those to sovereign interests and reputations can also suffice.  *See, e.g.*, *Alfred L. Snapp & Son, Inc. v. Puerto Rico, ex rel., Barez*, 458 U.S. 592, 601, 102 S. Ct. 3260, 3265-66 (1982); *Foretich v. United States*, 351 F.3d 1198, 1211 (D.C. Cir. 2003).

There is "little question" that West Virginia can satisfy these requirements, because the State is one of only 51 "objects" of the Administrative Fix.  *Lujan*, 504 U.S. at 561-62, 112 S. Ct. at 2137.  When a plaintiff is the "object of the [government] action (or forgone action) at issue," there is generally "little question that the action or inaction has caused him injury, and that a judgment preventing or requiring the action will redress it."  *Id.*  Here, West Virginia (and the other 49 States and the District of Columbia) are clearly the objects of the Fix.  The letter formalizing the Fix was sent specifically and only to the 51 state insurance commissioners.  Moreover, HHS admits that the "*only* effect" of the Administrative Fix "was to give states (including West Virginia) an additional policy option."  MTD at 15 (emphasis altered); *see also id.* (explaining that "the effect" of the Administrative Fix "was to *increase* the number of policy

options available to each state"); *id.* (describing the Fix as "creati[ng] [an] additional policy option"); *id* at 17 (asserting that "the sole effect" of the Fix "was to give West Virginia an *additional* policy option").  In similar circumstances, the D.C. Circuit has found plaintiffs to be objects of a challenged government action with "self-evident" standing.  *See, e.g.*, *American Trucking Ass'n, Inc. v. Federal Motor Carrier Safety Admin.*, 724 F.3d 243, 247 (D.C. Cir. 2013) (treating a truck driver as the object of a rule that "permit[ted] truck drivers to drive or work more hours" even though the rule did not "require[] [the driver] to log those hours"); *Affum v. United States*, 566 F.3d 1150, 1158 (D.C. Cir. 2009) (concluding that a plaintiff was the object of an action when it received a letter that informed it that it was disqualified from the Food Stamp Program).

As an object of the Fix's "additional policy option," West Virginia has at least two independently sufficient bases for standing.  *First*, as HHS concedes, the Administrative Fix gives each State the exclusive and unfettered discretion to decide whether certain federally "non-compliant policies" may be sold within the State.  MTD at 15.  Like *any* non-federal entity forced to assume such unilateral responsibility over the enforcement or non-enforcement of federal law, the State is harmed by having to exercise that decision-making authority and has standing to bring arguments that would free itself of the responsibility.  *Second*, because West Virginia is a State, it also has standing to attempt to protect its sovereignty against the political accountability that comes with being unilaterally responsible for the enforcement or non-enforcement of federal law.

### A. Like Any Non-Federal Entity Assigned Sole Responsibility For The Enforcement Or Non-Enforcement Of Federal Law, West Virginia Has Standing To Seek To Free Itself From That Responsibility.

In its complaint, West Virginia first alleges that it has standing because the Administrative Fix "forced [it] to become the sole and exclusive enforcer of federal law within

its borders." Compl. ¶ 68.  As the State explained in its Motion for Summary Judgment, and as HHS now concedes, the Administrative Fix delegates to the State exclusive and unfettered discretion within its borders over the enforcement or non-enforcement of federal law with respect to a significant category of individual health plans.  MSJ at 29, 36–38.  Before the Administrative Fix, and under the ACA as it is written, the ACA's market requirements would have been enforced throughout the country no matter what any State chose to do.  Each State (including West Virginia) had the option of enforcing the federal market requirements within its borders in lieu of the Federal Government, but no State had the power to *stop* enforcement because the ACA required the Federal Government to enforce the federal market requirements if any State did not.  42 U.S.C. § 300gg-22(a)(2).  Through the Fix, however, HHS abdicated its enforcement duty for a large category of the individual health insurance market, forcing onto the States the unilateral power to decide whether federal law will be enforced within their borders.  As HHS admits in its Motion to Dismiss, "each state could now, if it chose to do so, make a decision that would actually *allow* a limited group of non-compliant policies to be sold within the state."  MTD at 15 (emphasis in original).  States are "no longer limited to deciding who (the state or HHS) w[ill] be responsible for enforcing the market reforms," *id.*; they now unilaterally decide whether the market reforms will be enforced at all.

This delegation of unchecked authority over the enforcement or non-enforcement of federal law causes West Virginia injury that would be redressed by judgment in the State's favor.  The Fix forces the State to one of two paths, either of which imposes constitutionally cognizable harm.  If West Virginia chooses to enforce federal law, it will be required to expend financial resources and will risk the displeasure of those individuals who lose their health insurance plans.  *See, e.g.*, Compl., Exh. 4 at *4 ("what we want to do is to be able to say to these folks, you know

18

what, the Affordable Care Act is not going to be the reason why insurers have to cancel your plan"). If West Virginia continues on its present course and refuses to enforce the ACA's market requirements, it will suffer blame from those who believe the ACA forwards important policy ends and who wish to see the law fully enforced. Were the Fix to be declared invalid and accordingly withdrawn by HHS, the State would be relieved of this no-win injury because responsibility for the federal law would be returned to the Federal Government, where it belongs.

This theory of standing is neither remarkable nor unique to the State. *Any* non-federal entity delegated similarly exclusive responsibility over federal law would likewise have standing to seek to free itself from that responsibility. Suppose that Congress enacted a statute that provided that the National Cattlemen's Beef Association would become exclusively responsible for all meat inspections in the United States, unsupervised by the Federal Government and with full discretion to determine whether to enforce federal food safety standards. Under this scheme, the Association would find itself with two choices: expend its resources to enforce federal standards and suffer the ire of beef companies that do not want to be regulated; or risk being subjected to public criticism when failure to enforce leads to public health problems, such as an outbreak of mad cow disease. If the Federal Government gave the Association this sort of "policy option[]," it would be unthinkable to hold that the Association has not suffered a sufficient injury to challenge the lawfulness of the delegation in a federal court. In its Motion to Dismiss, HHS tellingly does not even address this first basis for West Virginia's standing. It claims to find it "unclear what the difference is between [West Virginia's] two identified injuries." MTD at 18. But the difference is plain. Unlike the State's second basis for standing, this basis has nothing to do with political accountability or West Virginia's sovereignty. This is a basis for standing that applies to any non-federal entity.

The real reason for HHS's silence is obvious: it cannot plausibly argue that a non-federal entity that has been delegated exclusive responsibility over certain federal law does not have standing to seek relief from that unwanted obligation.   While such complete delegation is exceedingly uncommon—because, among other reasons, it is clearly unconstitutional—in the rare case where Congress has attempted such a delegation, the delegee's standing to challenge the law was not contested.  Specifically, in *Carter v. Carter Coal Co.*, 298 U.S. 238, 56 S. Ct. 855 (1936), Congress enacted a statute that forced coal producers to join an industry "code" under which certain code members would make regulatory decisions for the industry as a whole. The Supreme Court struck down the law as unconstitutional "delegation in its most obnoxious form" without questioning whether the plaintiffs had suffered sufficient injury from the delegation to bring the suit. *Id.* at 311, 56 S. Ct. at 873; *cf. Lomont v. O'Neill*, 285 F.3d 9, 13 (D.C. Cir. 2002) (relying in a standing analysis on the fact that "[n]either the majority opinion [in a Supreme Court case] nor the opinions of the five Justices who wrote separately questioned the [plaintiffs'] standing to sue").   Faced with this precedent and the "self-evident" nature of the injury to the "object" of an unlawful delegation, HHS's reluctance to address this basis for West Virginia's standing is hardly surprising.  *American Trucking Ass'n*, 724 F.3d at 247.

**B.      States That Are Forced To Assume Exclusive Responsibility For Federal Law Have Particular Standing To Sue Because Of The Shift In Political Accountability From The Federal Government To The State.**

**1.      Controlling D.C. Circuit Precedent Recognizes This Basis for Standing.**

As a sovereign State, West Virginia also has a unique and narrower ground upon which this Court could hold that the State has standing to challenge the Fix.  When the non-federal entity granted exclusive and unfettered responsibility over certain federal law is a State, the State additionally has standing to protect its sovereign interest against being held politically

accountable for federal policy.  *See Alfred L. Snapp*, 458 U.S. at 601, 102 S. Ct. at 3265-66 (recognizing injury to sovereign interests can provide State standing).   West Virginia thus pleaded in its complaint that it was separately injured because "the Administrative Fix reduced the political accountability of the federal government at the expense of the States."  Compl. ¶ 69.

This narrower standing argument is consistent with D.C. Circuit precedent and follows from the Supreme Court's anti-commandeering cases, which recognize that a sufficiently serious shift of political accountability for federal policies from the Federal Government to the States violates the Tenth Amendment.  In *New York v. United States*, 505 U.S. 144, 112 S. Ct. 2408 (1992), the Supreme Court held that a federal law that required States to either regulate radioactive waste according to federal standards or take title over the waste "infring[ed] upon the core of state sovereignty reserved by the Tenth Amendment."   505 U.S. at 177, 112 S. Ct. at 2429.  Similarly, in *Printz v. United States*, 521 U.S. 898, 117 S. Ct. 2365 (1997), the Court held that a federal law requiring state and local enforcement officers to conduct background checks on prospective gun buyers infringed upon "[r]esidual state sovereignty . . . rendered express by the Tenth Amendmen[t]."   521 U.S. at 919, 117 S. Ct. at 2376.  In both cases, the Supreme Court explained the constitutional violation of state sovereignty in terms of shifting political accountability for federal policies from the Federal Government to the States.  The Constitution, the Supreme Court stressed, "contemplates that a State's government will represent and remain accountable to its own citizens."  *Id.* at 920, 117 S. Ct. at 2377.  But under the federal laws struck down in those cases, it was "state officials . . . [who] will bear the brunt of public disapproval, while the federal officials who devised the regulatory program may remain insulated from the electoral ramifications of their decision."  *New York*, 505 U.S. at 169, 112 S. Ct. at 2424.  Emphasizing its *structural* concern with improperly allocated political accountability, the

Supreme Court specifically held that unlawful commandeering occurs even when "the States are not forced to absorb the costs of implementing a federal program," *Printz*, 521 U.S. at 930, 117 S. Ct. at 2382, and when State officials "consent" to accept from the Federal Government "shift[ed] responsibility" for federal policy, *New York*, 505 U.S. at 182-83, 112 S. Ct. at 2432 (quotations omitted).[4]

While the precise question whether a shift of political accountability from the Federal Government to the States amounts to impermissible commandeering is to be decided on the *merits* in each case, the D.C. Circuit has held based on these cases that a State always has *standing* to challenge a federal statute or regulation that the State can colorably claim violates its Tenth Amendment rights.   Most relevant is the D.C. Circuit's 2002 decision in *Lomont v. O'Neill*.   There, a Bureau of Alcohol, Tobacco and Firearms ("ATF") regulation provided that a person seeking permission to transfer a firearm had to obtain a certificate from "the local chief of police, sheriff of the county, head of the State police, State or local district attorney or prosecutor, or such other person whose certificate may in a particular case be acceptable to the Director" of the ATF.  258 F.3d at 12 (quoting relevant federal regulations).  Two local chiefs of police challenged this regulation, arguing that it violated the Tenth Amendment.   The D.C. Circuit expressly found first that the police chiefs had *standing* in light of their claimed Tenth Amendment injury, noting that no Justice of the Supreme Court had even "questioned" standing in *Printz.  Id.* at 13.  Then, the court rejected the claim on the *merits* based on its conclusion that the law merely permitted "state or local governments [to] voluntarily decide to assist in

---

[4] *See also Nat'l Fed'n of Indep. Bus. v. Sebelius*, 132 S. Ct. 2566, 2602 (2012) (Roberts, C.J., joined by Breyer and Kagan, JJ.) ("Permitting the Federal Government to force the States to implement a federal program . . . threaten[s] the political accountability key to our federal system."); *id.* at 2660 (Scalia, Kennedy, Thomas, Alito, JJ., dissenting) ("When Congress compels the States to do its bidding, it blurs the lines of political accountability.").

administering federal laws." *Id.* at 14.  Put another way, even though the D.C. Circuit did not

find a Tenth Amendment violation because the police chiefs only had a voluntary and minor role

in the federal program, it easily found that the chiefs were allowed to challenge the program in

federal court.  *Accord Fraternal Order of Police v. United States*, 173 F.3d 898, 904-07 (D.C.

Cir. 1999); *Gillespie v. City of Indianapolis*, 185 F.3d 693, 703-04 (7th Cir. 1999) (abrogated on

other grounds by *United States v. Skoien*, 587 F.3d 803, 807 (7th Cir. 2009)).

The *Lomont* case has never been questioned and, indeed, is bolstered by more recent D.C.

Circuit and Supreme Court cases.  The implicit recognition in *Lomont* of the difference between

a plaintiff's standing and the strength of his merits claim has been expressly acknowledged by

the D.C. Circuit in numerous cases.  *See, e.g.*, *Muir*, 529 F.3d at 1105 ("[T]he court must be

careful not to decide the questions on the merits for or against the plaintiff, and must therefore

assume that on the merits the plaintiffs would be successful on their claims.") (quoting *City of

Waukesha*, 320 F.3d at 235).  Moreover, the *Lomont* court's solicitude toward standing based on

harm to a State's rights under the Tenth Amendment is consistent with the Supreme Court's

recent holding that States "are not normal litigants for the purposes of invoking federal

jurisdiction" and are afforded "special solicitude" for purposes of standing.  *Massachusetts v.

EPA*, 549 U.S. 497, 518-20, 127 S. Ct. 1438, 1454-55 (2007); *see also Washington Envtl.

Council v. Bellon*, 732 F.3d 1131, 1145 (9th Cir. 2013) (collecting cases that apply

*Massachusetts v. EPA*).

In light of *Lomont*, there can be no doubt that West Virginia has standing here to

challenge the Administrative Fix to protect its sovereignty.  The State has alleged that the Fix

impermissibly shifts political accountability for the enforcement or non-enforcement of the

ACA's federal market requirements from the Federal Government to the States, including to

West Virginia.  Compl. ¶¶ 70–76.  Before the Administrative Fix, political accountability for the enforcement or non-enforcement of the federal market requirements rested where it must belong under our constitutional system: with the "the federal officials who devised the regulatory program," *New York*, 505 U.S. at 169, 112 S. Ct. at 2424, who had a mandatory statutory duty to ensure enforcement of the program, Compl. ¶¶ 27–31.  After the Fix, however, "it may be state officials who will bear the brunt of public disapproval," *New York*, 505 U.S. at 169, 112 S. Ct. at 2424, because HHS has declared it will no longer enforce the ACA's federal market requirements, making the States exclusively responsible for deciding whether to enforce federal law or not.  Indeed, the President admitted that a shift of political accountability was the entire purpose of the Administrative Fix, explaining "what we want to do is to be able to say to folks . . . [that] the Affordable Care Act is not going to be the reason why insurers have to cancel your plan."  Compl. ¶¶ 43, Exh. 4 at *4.

West Virginia must have standing, since the shift of political accountability here is far more severe than that alleged in *Lomont*.  In that case, the local officials had a completely optional ministerial role within a federal program.  If they chose not to issue the certificates in question, the Director of ATF was permitted under the statute to accept certificates from any "other person whose certificate may in a particular case be acceptable."  285 F.3d at 12 (quoting relevant federal regulations).  But in this case, the Federal Government has forced onto the States the unilateral and exclusive responsibility to determine whether certain federal laws will be enforced at all.  If the local officials in *Lomont* had standing based on their claimed Tenth Amendment violation, it follows necessarily that West Virginia has standing based on its far more serious alleged violation of state sovereignty.

As in *Lomont*, the merits of West Virginia's Tenth Amendment claim are not yet at issue. The only question at this time is whether the alleged violation supports standing to challenge the Administrative Fix.   In fact, this Court may ultimately decide that it can avoid deciding the constitutional issue because the Administrative Fix so clearly violates the ACA and the APA. *See, e.g.*, *Nguyen v. United States*, 539 U.S. 69, 76 n.9, 123 S. Ct. 2130, 2135 n.9 (2003) ("We find it unnecessary to discuss the constitutional questions because the statutory violation is clear."); *Texas v. United States*, 497 F.3d 491, 499 (5th Cir. 2007) ("To avoid resolution of any constitutional issues, it is sufficient to consider whether the Procedures are authorized by [statutes] under the *Chevron* test."); *Marymount Hosp., Inc. v. Sullivan*, 791 F. Supp. 878, 885 (D.D.C. 1992) ("If . . . the Secretary's action in this case were arbitrary and capricious, there would be no need to address the alleged constitutional violation since there would be a statutory violation.").

## 2.   **HHS's Arguments To The Contrary Are Unavailing.**

In its Motion to Dismiss, HHS offers a scattershot of arguments in response to this basis for West Virginia's standing, *see* MTD at 13-29, but none has merit.   Several of the arguments are foreclosed by *Lomont*, which HHS does not even attempt to address.   Indeed, HHS fails to cite a single case holding that a State alleging a violation of the anti-commandeering doctrine lacks the standing to bring its lawsuit at all.   Its remaining arguments are directly contrary to Supreme Court precedent or rely on mischaracterizations of West Virginia's alleged injury.

a.   Although HHS admits that the Administrative Fix gave States (including West Virginia) an unfettered "policy option," it contends that West Virginia lacks standing because this case does not fit "the mold of 'commandeering' cases."   MTD at 15, 17.   According to HHS, "those cases involve situations where the Federal Government is allegedly *commanding* the state to take a particular action, or to obtain a particular result."   *Id.* at 17.   But here, HHS argues,

West Virginia "retains a fully discretionary choice" to enforce or not enforce certain federal law. *Id.*

This argument is squarely foreclosed by *Lomont*. HHS's disagreement with West Virginia over whether the Fix's grant of a "policy option" rises to a constitutional violation is an argument *on the merits* of West Virginia's Tenth Amendment claim. But whether the State or HHS ultimately has the better of these arguments does not determine West Virginia's *standing* to bring this lawsuit. That is the lesson of *Lomont*. In fact, the police chief plaintiffs in *Lomont* were confronted on the merits with the very same argument that HHS advances here, and yet the D.C. Circuit found that they had standing. *See Lomont*, 285 F.3d at 14 (agreeing with the district court that "the certification regulations do not command the States' officers") (internal quotations omitted). At bottom, "[a] party need not *prove* that the agency action it attacks is unlawful . . . to have standing to level that attack." *Louisiana Energy & Power Auth. v. FERC*, 141 F.3d 364, 368 (D.C. Cir. 1998) (emphasis in original).

b.   HHS also makes a series of arguments attacking West Virginia's claim that a shift in political accountability from the Federal Government to the State amounts to a constitutionally cognizable injury sufficient for standing. HHS variously expresses this point by asserting that West Virginia's theory is "expressly political," MTD at 19, would require the Court to decide "an abstract question of a purely political dimension," *id.* at 20, involves "speculation" about the knowledge and reactions of West Virginia's citizens about the ACA and the Fix, *id.* at 22–26, and would bring "every policy dispute" into Federal court, *id.* at 21.

Again, most of these arguments boil down to a simple disagreement with West Virginia *on the merits* as to the scope of the anti-commandeering doctrine. Under West Virginia's reading of *New York* and *Printz*, the Federal Government would violate a State's Tenth

Amendment rights whenever it places upon a State the exclusive and unfettered responsibility for the enforcement or non-enforcement of a federal law.  In West Virginia's view, those cases support the proposition that such a drastic action always and by operation of law impermissibly and dramatically shifts political accountability from the Federal Government to the State in violation of the Tenth Amendment.  In each case, the Supreme Court found an unconstitutional shift in political accountability as a matter of law, regardless of the specific knowledge or opinions of the State's populous about the particular federal policy at issue.  It made no difference whether most citizens knew or cared about the disposal of radioactive waste at issue in *New York*, or whether the notoriety of the challenged federal law in *Printz*—the Brady Act—had any impact on the blame leveled by citizens toward non-federal officials.  So, too, it should not matter how many people know about the ACA's market requirements or the Administrative Fix, or what polling would reveal about the view of West Virginian on these federal enactments.

In contrast, HHS appears to take a far narrower view of the anti-commandeering doctrine.  As noted above, HHS asserts that those cases support a Tenth Amendment violation only where the Federal Government is "*commanding* [a] state to take a particular action, or to obtain a particular result."  MTD at 17 (emphasis in original).  Despite the Supreme Court's repeated references in *New York* and *Printz* to political accountability and misplaced blame, HHS's view seems to be that the anti-commandeering doctrine has nothing at all to do with those concepts, which it characterizes as "abstract questions of political theory" that are "not the province of the Judiciary."  *Id.* at 19.  HHS belittles the notion that the Federal Government could commit a constitutional violation against "all states equally," *id.* at 20 n.3, though that is precisely what the Supreme Court found that Congress had done in both *New York* and *Printz*.

On the merits, this Court can determine whether the State or HHS has the more persuasive reading of *New York* and *Printz*, if the Court does not decide this case on statutory grounds first.  Do those cases hold, as the State contends, that a shift in political accountability from the Federal Government to the States can amount to a constitutional violation?  Or is HHS correct that political accountability is "simply too vague and abstract" for courts to evaluate?

But as explained above, HHS has no answer to *Lomont*, which makes clear that West Virginia has standing regardless of these stark disagreements about the merits.  HHS cites not a single case holding that a State lacks standing where it has asserted a colorable anti-commandeering claim.  Instead, HHS quotes from several Supreme Court cases that all pre-date *New York* and *Printz* by at least 50 years, none of which have anything to do with the anti-commandeering doctrine.  MTD at 19–20.  For example, it cites *Massachusetts v. Mellon*, 262 U.S. 447 (1923), a case where a State attempted to challenge federal expenditures as exceeding the Federal Government's spending power, and *New Jersey v. Sargent*, 269 U.S. 328 (1926), which involved a claim that certain federal regulations frustrated state regulation over its waterways.  In addition, HHS quotes *United States v. West Virginia*, 295 U.S. 463 (1935), a case where the Supreme Court dismissed a lawsuit by the United States against the State as premature.  None of these cases involved the shifting of political accountability for federal policies from the Federal Government to the States, nor did the States in those cases assert any violation of the anti-commandeering doctrine.

*Lomont* is also the response to HHS's assertion that recognizing West Virginia's standing will lead to a slippery slope that requires the adjudication of "every policy dispute."  MTD at 18, 21.  The D.C. Circuit has determined that a Tenth Amendment claim like that advanced by the police chiefs in *Lomont* is sufficiently colorable to support standing.  Because the violation of

state sovereignty alleged here is at least as serious as that in *Lomont*, this Court will not be going any further than the D.C. Circuit has already concluded is appropriate.

c. HHS next contends that because West Virginia favors the repeal of the ACA's market requirements, the State does not have standing because it has "benefitted" from the Administrative Fix.  MTD at 16.  According to HHS, the Administrative Fix has enabled the State "to achieve (at least in small part) its stated policy preference of having the ACA market reforms at issue not enforced at all."  *Id.*  West Virginia cannot claim that it has been harmed, HHS argues, because "getting even a small part of what one wants is better than getting nothing at all."  *Id.* at 1; *accord id.* at 14.

This argument is directly foreclosed by the Supreme Court's reasoning in *New York*. There, the Supreme Court observed that the "public officials representing the State of New York lent their support to the Act's enactment," including the take title provision at issue in the case. *New York*, 505 U.S. at 181, 112 S. Ct. at 2431.  Nevertheless, the Supreme Court held that the challenged law harmed New York's sovereignty, explaining that "[t]he Constitution does not protect the sovereignty of States for the benefit of the States or state governments as abstract political entities, or even for the benefit of the public officials governing the States."  *Id.*  A State's sovereignty can be violated regardless of whether the State—acting through its officials—welcomes the federal intrusion as a policy matter.  Put another way, the States have no authority to "consent" to violation of their own Tenth Amendment rights.  *New York*, 505 U.S. at 182, 112 S. Ct. at 2431.  Thus, even if West Virginia had asked HHS to enact the Administrative Fix—which, to be clear, the State did not do—the Fix would still cause the State injury by violating its Tenth Amendment rights.

d.  HHS also argues that West Virginia cannot have suffered harm from an unlawful shift in political accountability because "the State does not compete in elections."  MTD at 22.  But this argument, too, cannot be squared with the Supreme Court's decision in *New York*.  The plaintiffs there were "the State of New York and the two counties," and there was no question that those entities were injured by the Federal Government's attempt to shift political accountability, even though the State and the counties themselves were not on any ballots.  505 U.S. at 154, 169, 112 S. Ct. at 2417, 2424.  At bottom, an alleged injury from a shift in political accountability from the Federal Government to the States is just a claim that the Federal Government has violated the Tenth Amendment, which speaks of the rights "reserved *to the States*."  U.S. Const. Amend. X (emphasis added).  It makes perfect sense, therefore, to speak of a State suffering such an injury, though there are other parties that can also raise violations of the Tenth Amendment.  *Bond v. United States*, 131 S.Ct. 2355, 2364 (2011)  ("The federal balance is, in part, an end in itself, to ensure that States function as political entities in their own right.").

e.  Toward the end of its Motion, HHS makes two meritless arguments relating to the "causation" requirement for standing.  The first argument is that the Administrative Fix has not "harmed the State" because "the State's enforcement options are exactly the same as they were before" the Fix.  MTD at 26.  This argument does not relate to causation, however, but rather to whether the State has suffered an injury-in-fact.  In addition, this argument is plainly belied by HHS's own repeated admission that the Administrative Fix "*increase[d]* the number of policy options available to each state (including West Virginia)."  *Id.* at 16 (emphasis in original).

The second argument is that West Virginia cannot establish causation because the Administrative Fix did not "obligate[] the State to take any action at all, one way or the other." *Id.* at 27.  But this argument entirely ignores the injury-in-fact actually asserted by the State.  The

State has not claimed harmed from having to take any particular action.  Rather, West Virginia has alleged harm from being given exclusive and unfettered discretion over the enforcement or non-enforcement of federal law, and from the ensuing shift in political accountability from the Federal Government to the States.  In short, the injury-in-fact at issue is the "additional policy option" that HHS itself admits was the "only effect" of and "creat[ed]" by the Administrative Fix.  *Id.* at 15-16 (emphasis omitted).  *That* injury-in-fact is clearly caused by and traceable to the Fix.  *See Clinton v. City of N.Y.*, 524 U.S. 417, 433 n.22, 118 S. Ct. 2091, 2101 n.22 (1998) ("traceability . . . easily satisfied" when the federal policy creates the alleged harm).

f.  Finally, HHS contends that West Virginia cannot establish "redressability" because the State has not chosen to enforce the ACA's federal market requirements, and because the State has primarily sought declaratory relief in this lawsuit.  MTD at 27–29.  Both arguments are unavailing.

HHS's reliance on West Virginia's decision not to enforce the federal market requirements again misconceives the State's alleged injury.  The injury is from the mere existence of the "additional policy option" created by the Administrative Fix and the resulting shift in political accountability from the Federal Government to the State.  Compl. ¶¶ 69–77.  *This* harm obtains regardless of what decision the State has made with respect to the option and would plainly be redressed as soon as the Administrative Fix is withdrawn.

As for HHS's other argument, case law clearly establishes that a party can seek declaratory relief without undermining redressability.  Among other relief, West Virginia seeks a declaration that the Administrative Fix is illegal and a remand to the agency to permit it to take steps to cure this illegality, which may include working with Congress to lawfully protect the right of Americans to keep their health insurance plans.  Compl. at 32–33.  While HHS asserts

31

that such a declaration is insufficient to satisfy the "redressability" requirement, it cites no authority to support its novel claim.  To the contrary, the Supreme Court has observed that a "declaratory judgment" that a federal action is unlawful, directed at the issuing federal parties, "easily satisfie[s]" "redressability."  *Clinton*, 524 U.S. at 433 n.22, 118 S. Ct. at 2101 n.22.  This is because there is at least a "significant" possibility that HHS—in the face of a declaration from a federal court that the Administrative Fix is unlawful and a remand to the agency specifically to address this illegality—would find some other lawful method to comply with the law.  *See Utah v. Evans*, 536 U.S. 452, 464, 122 S. Ct. 2191, 2199 (2002).  And though the Administration may have other options, West Virginia certainly hopes that the Administration would respond to such a declaration by working with Congress to come up with a lawful method to honor the President's promise that "if you like your health care plan, you can keep your health care plan."

But to the extent this Court determines that declaratory relief is insufficient to force HHS to comply with the law and the U.S. Constitution, there is still no redressability problem because the State has also requested "such additional relief, including equitable injunctive relief, as the Court deems appropriate."  Compl. at 33.  If HHS were to represent that it would simply ignore a declaratory judgment from this Court that the Fix is unlawful, and would continue to impose harm upon West Virginia by requiring it to be exclusively responsible for certain federal law, this Court could redress the injury to the State by issuing an injunction or other similar equitable relief.  West Virginia has not primarily requested such relief out of a desire to best protect the millions of Americans who relied upon the President's promise that they could keep their health insurance plans.  Instead, West Virginia has principally sought the narrower relief of remand without vacatur, a remedy that the Federal Government itself often asks for in cases where

32

immediate vacatur of the rule in question would cause disproportionate harm.  *Rodway v. U.S. Dep't of Agric.*, 514 F.2d 809, 817-18 (D.C. Cir. 1975).

## II.    West Virginia Is In The Relevant "Zone Of Interest"

In the final two pages of its Motion to Dismiss, HHS offers a throw-away argument that West Virginia's first two counts should be dismissed because they arise under the APA and "West Virginia is not within the zone of interests to advance" these claims.  MTD at 29.  As HHS's half-hearted articulation of this theory suggests, this argument cannot withstand scrutiny.

As a threshold matter, this argument is improper in the context of this jurisdictional motion to dismiss.  The Supreme Court recently made clear that the "zone of interests" inquiry "does not implicate subject-matter jurisdiction," but rather is a "tool for determining who may invoke [a] cause of action."  *Lexmark Int'l, Inc. v. Static Control Components, Inc.*, 134 S. Ct. 1377, 1386, 1388 n.4, 1388-89 (2014) (internal quotations omitted).  "Thus, whether a plaintiff's interests fall within the zone of interests protected by a statute is not a question under Rule 12(b)(1) of whether subject-matter jurisdiction exists but, instead, is a question under Rule 12(b)(6) of whether the plaintiff has failed to state a claim for relief."  *CC Recovery, Inc. v. Cecil Cnty., Md.*, -- F. Supp. 2d --, 2014 WL 2767358, at *3 (D. Md. June 17, 2014); *accord Chabad Lubavitch of Litchfield Cnty., Inc. v. Litchfield Historic Dist. Comm'n*, 768 F.3d 183, 201 (2d Cir. 2014) ("As the Supreme Court has made clear, determination whether a claim satisfies these requirements goes not to the court's jurisdiction . . . but instead to whether the plaintiff has adequately pled a claim.").  Here, HHS has only moved to dismiss under Rule 12(b)(1) (MTD at 11), and has made no arguments under Rule 12(b)(6).  HHS's "zone of interest" arguments must be denied on this basis alone.

Even assuming that HHS has properly made under Rule 12(b)(6) its argument that West Virginia falls outside of the requisite "zone of interest," that argument fails.  A plaintiff has a

33

valid claim under the APA so long as the plaintiff's interests fall "*arguably* within the zone of interests to be protected or regulated by" the substantive statute at issue—here, the ACA. *Association of Data Processing Service Organizations, Inc. v. Camp*, 397 U.S. 150, 153, 90 S. Ct. 827, 830 (1970) (emphasis added).  This test is "a low bar."  *Howard R.L. Cook & Tommy Shaw Found. ex rel. Black Employees of Library of Cong., Inc. v. Billington*, 737 F.3d 767, 771 (D.C. Cir. 2013).  "[A] plaintiff who is not itself the subject of the agency action is outside the zone of interests only if its interests are 'so marginally related to or inconsistent with the purposes implicit in the statute that it cannot reasonably be assumed that Congress intended to permit the suit.'"  *Grand Council of Crees (of Quebec) v. FERC*, 198 F.3d 950, 955 (D.C. Cir. 2000) (quoting *Clarke v. Sec. Indus. Ass'n*, 479 U.S. 388, 399, 107 S. Ct. 750, 757 (1987)).

West Virginia easily clears this "low bar" because it is the subject of the challenged action and because this lawsuit seeks to vindicate the ACA's cooperative federalism regime, under which States are given an optional enforcement role that is backstopped by mandatory federal enforcement.  *See supra* at 5–6.  Through the Administrative Fix, HHS has entirely transformed that cooperative regime into one where States have exclusive responsibility over the enforcement or non-enforcement of the ACA's market requirements with respect to millions of health insurance plans.  As a party that Congress specially named in the ACA's cooperative federalism regime, the State most certainly has an arguable interest in ensuring that HHS does not destroy that cooperative regime by abdicating its mandatory enforcement responsibility under the statute.

HHS's only argument is its assertion that West Virginia's real interest in this litigation "is not to enforce the ACA's market reforms, but rather to prompt legislative action *to undo* them." MTD at 30.  HHS, however, does not cite a single case from the Supreme Court or the D.C.

Circuit that even suggests looking to a plaintiff's subjective motivations in a "zone of interest" inquiry.  For good reason.  Cases from those controlling tribunals have ordinarily looked to the injury sought to be redressed to determine the plaintiff's interest in a lawsuit.  *See, e.g.*, *Match-E-Be-Nash-She-Wish Band of Pottawatomi Indians v. Patchak*, 132 S. Ct. 2199, 2210 (2012); *Camp*, 397 U.S. at 153-54, 90 S. Ct. at 830; *Billington*, 737 F.3d at 771-72.[5]  Here, the injury sought to be redressed is HHS's abdication of its mandatory enforcement duty under the ACA and its destruction of the cooperative federalism regime.  Moreover, the Supreme Court has stressed that the zone of interests inquiry is "not meant to be especially demanding."  *Match-E-Be-Nash-She-Wish Band of Pottawatomi Indians*, 132 S. Ct. at 2210 (internal quotations omitted).  So to the extent that West Virginia has articulated competing interests, "the benefit of any doubt goes to" the State.  *Id.*

Finally, even if this Court believes that Congress did not intend to give anyone the statutory right to bring a lawsuit to enforce the ACA's cooperative federalism regime, the Court should not dismiss Counts One, Three, or Four.  Count One alleges that HHS acted contrary to the plain text of the ACA.  At the very minimum, the State can assert this claim as a "non-statutory cause of action" for reviewing *ultra vires* executive action because "'judicial review is available to one who has been injured by an act of a government official which is in excess of his express or implied powers.'"  *Chamber of Commerce of U.S. v. Reich*, 74 F.3d 1322, 1327 (D.C. Cir. 1996) (quoting *Harmon v. Brucker*, 355 U.S. 579, 581-82, 78 S. Ct. 433, 434-35 (1958)); *see also Leedom v. Kyne*, 358 U.S. 184, 79 S. Ct. 180 (1958).  In addition, the zone-of-interest test provides no possible basis to dismiss Counts Three, or Four, which allege constitutional violations, and arise under both the APA and the cases that recognize "an implied private right of

---

[5] HHS cites only to dicta from a Seventh Circuit decision to support its intimation that subjective motivations can be relevant to the "zone of interest" analysis.  *See* MTD at 30-31.

action directly under the Constitution to challenge governmental action." *Free Enter. Fund v. Pub. Co. Accounting Oversight Bd.*, 561 U.S. 477, 491 n.2, 130 S. Ct. 3138, 3151 n.2 (2010) (internal quotations omitted).

## CONCLUSION

HHS's motion to dismiss should be denied.

Respectfully submitted,


Patrick Morrisey (DC Bar 459399)
  *Attorney General of West Virginia*

s/ Elbert Lin
Elbert Lin (DC Bar 979723)
  *Solicitor General*
Misha Tseytlin (DC Bar 991031)
  *Deputy Attorney General*
Julie Marie Blake (DC Bar 998723)
  *Assistant Attorney General*

Office of the Attorney General
State Capitol Building 1, Room E-26
Charleston, WV 25305
Telephone: (304) 558-2021
Fax: (304) 558-0140
E-mail: elbert.lin@wvago.gov

**Counsel for Plaintiff the State of West Virginia**


Dated: November 14, 2014

**IN THE UNITED STATES DISTRICT COURT FOR
THE DISTRICT OF COLUMBIA**

**STATE OF WEST VIRGINIA,
EX REL. PATRICK MORRISEY**

          *Plaintiff*,

**v.**                                              **Civil Action No. 14-1287-RBW**

**UNITED STATES DEPARTMENT OF
HEALTH AND HUMAN SERVICES**

          *Defendant*.

## CERTIFICATE OF SERVICE

    I, Elbert Lin, hereby certify that on November 14, 2014, I caused true and correct copies of the foregoing document with the Clerk of Court for the United States District Court for the District of Columbia using the Court's CM/ECF system.   I also certify that I caused the foregoing document to be served on the following counsel by CM/ECF:

> Daniel Schwei
> Trial Attorney
> United States Department of Justice
> Civil Division, Federal Programs Branch
> 20 Massachusetts Ave. NW, Room 7340
> Washington, DC 20530
> Tel.: (202) 305-8693
> Fax: (202) 616-8470
> Email: daniel.s.schwei@usdoj.gov

> *Counsel for Defendant*

                              s/ Elbert Lin
                              Elbert Lin