**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

STATE OF WEST VIRGINIA,            )
EX REL. PATRICK MORRISEY,          )
                                   )
                    Plaintiff,     )
v.                                 )          Civil Action No.  1:14-cv-1287 (RBW)
                                   )
UNITED STATES DEPARTMENT OF        )
HEALTH AND HUMAN SERVICES,         )
                                   )
                    Defendant.     )
_____)


**<u>DEFENDANT'S REPLY MEMORANDUM IN SUPPORT OF MOTION TO DISMISS</u>**

## TABLE OF CONTENTS

TABLE OF CONTENTS ................................................................................................. i

TABLE OF AUTHORITIES ........................................................................................... ii

INTRODUCTION ........................................................................................................... 1

ARGUMENT ................................................................................................................... 3

I.      West Virginia Lacks Article III Standing Because It Has Not Established a
        Cognizable Injury In Fact. .................................................................................... 3

        A.      West Virginia Cannot Establish Any Injury Because It Has Only
                Benefitted From the Transitional Policy. ................................................... 3

        B.      West Virginia's Claimed Injury of "Political Accountability" Is Not
                Cognizable as a Matter of Law. ................................................................. 4

                1.      West Virginia's Theory of Standing is Wholly Unsupported and
                        Contrary to Governing Precedent. ................................................. 4

                2.      West Virginia Does Not Meaningfully Respond to the Other Strong
                        Reasons Why Political Accountability Cannot Be a Cognizable
                        Injury. ............................................................................................11

        C.      Even Assuming Political Accountability Could Constitute an Injury in
                Some Circumstances, West Virginia Has Not Established It Here. ...................... 13

        D.      West Virginia's Asserted "Unlawful Delegation" Injury is Not Cognizable. ....... 14

        E.      West Virginia Cannot Establish Standing as the "Object" of the
                Transitional Policy, Nor Based on Any "Special Solicitude" for State
                Standing. ................................................................................................. 17

        F.      The Amicus Curiae's Arguments are Meritless. ...................................... 18

II.     West Virginia Has Not Established Causation. .................................................... 20

III.    West Virginia Has Failed to Establish Redressability. ........................................ 21

IV.     West Virginia's APA Claims are Not Within the Zone of Interests of the
        Affordable Care Act. ........................................................................................... 23

CONCLUSION ............................................................................................................... 25

# TABLE OF AUTHORITIES

**Cases**

*Allen v. Wright,*
    468 U.S. 737 (1984) ................................................................................................................ 7

*Am. Portland Cement Alliance v. EPA,*
    101 F.3d 772 (D.C. Cir. 1996) ............................................................................................. 17

*Ass'n of Am. Physicians & Surgeons, Inc. (AAPS) v. Koskinen,*
    768 F.3d 640 (7th Cir. 2014) ............................................................................................... 25

*Bond v. United States,*
    131 S. Ct. 2355 (2011) ................................................................................................. 6, 7, 20

*Buckley v. Valeo,*
    424 U.S. 1 (1976) ................................................................................................... 16, 19, 24

*California v. United States,*
    438 U.S. 645 (1978) ............................................................................................................. 25

*Carter v. Carter Coal Co.,*
    298 U.S. 238 (1936) ............................................................................................................. 17

*Clapper v. Amnesty Int'l,*
    133 S. Ct. 1138 (2013) ............................................................................................. 20, 21, 22

*Clarke v. Sec. Indus. Ass'n,*
    479 U.S. 388 (1987) ............................................................................................................. 25

*Comm. for Monetary Reform v. Bd. of Governors of Fed. Reserve Sys.,*
    766 F.2d 538 (D.C. Cir. 1985) ............................................................................................. 17

*Ctr. for Biological Diversity v. Dep't of Interior,*
    563 F.3d 466 (D.C. Cir. 2009) ....................................................................................... 17, 18

*Del. Dep't of Natural Res. & Envtl. Control v. FERC,*
    558 F.3d 575 (D.C. Cir. 2009) ............................................................................................. 18

*Illinois v. City of Chicago,*
    137 F.3d 474 (7th Cir. 1998) ............................................................................................... 20

*Leedom v. Kyne,*
    358 U.S. 184 (1958) ............................................................................................................. 25

*Lewis v. Casey,*
    518 U.S. 343 (1996) ........................................................................................ 16

*Lomont v. O'Neill,*
    285 F.3d 9 (D.C. Cir. 2002) ......................................................................... 7, 8

*Lomont v. Summers,*
    135 F. Supp. 2d 23 (D.D.C. 2001) ................................................................. 8

*Lujan v. Defenders of Wildlife,*
    504 U.S. 555 (1992) ................................................................................ 11, 17

*Massachusetts v. EPA,*
    549 U.S. 497 (2007) ................................................................................ 10, 18

*Massachusetts v. Mellon,*
    262 U.S. 447 (1923) ....................................................................... 1, 6, 9, 10

*Maynard v. District of Columbia,*
    579 F. Supp. 2d 137 (D.D.C. 2008) ............................................................. 24

*Nat'l Air Traffic Controllers Ass'n v. Fed. Serv. Impasses Panel,*
    437 F.3d 1256 (D.C. Cir. 2006) .................................................................... 25

*New Jersey v. Sargent,*
    269 U.S. 328 (1926) ................................................................................ 10, 21

*New York v. United States,*
    505 U.S. 144 (1992) ......................................................................... 3, 5, 12, 13

*Oregon v. Legal Servs. Corp.,*
    552 F.3d 965 (9th Cir. 2009) ........................................................................ 10

*Printz v. United States,*
    521 U.S. 898 (1997) ................................................................................... 5, 6

*Raines v. Byrd,*
    521 U.S. 811 (1997) ............................................................................ 1, 6, 10

*Renne v. Geary,*
    501 U.S. 312 (1991) ................................................................................ 13, 14

*Ridge v. Verity,*
    715 F. Supp. 1308 (W.D. Pa. 1989) ............................................................. 13

*Sierra Club v. EPA*,
  292 F.3d 895 (D.C. Cir. 2002)........................................................................................11

*South Dakota v. Dole*,
  483 U.S. 203 (1987)......................................................................................................9

*State Nat'l Bank of Big Spring v. Lew*,
  958 F. Supp. 2d 127 (D.D.C. 2013) ........................................................................17, 18

*Summers v. Earth Island Inst.*,
  555 U.S. 488 (2009)......................................................................................................18

*Texas v. EPA*,
  726 F.3d 180 (D.C. Cir. 2013)...................................................................................20, 21

*United States v. Lopez*,
  514 U.S. 549 (1995)........................................................................................................6

*Virginia ex rel. Cuccinelli v. Sebelius*,
  656 F.3d 253 (4th Cir. 2011) ..........................................................................................6

*Walker v. Cheney*,
  230 F. Supp. 2d 51 (D.D.C. 2002) ...............................................................................10

*Woods v. Interstate Realty Co.*,
  337 U.S. 535 (1949).....................................................................................................25

**Statutes**

42 U.S.C. § 300gg-22 ..............................................................................................15, 24

**Rules**

Fed. R. Civ. P. 8(a)(1) ..................................................................................................13

## INTRODUCTION

The State of West Virginia's opposition memorandum (ECF No. 20) confirms that this lawsuit is based on an abstract policy dispute with the Federal Government, and must therefore be dismissed for lack of standing.  Indeed, West Virginia fails to satisfy any of the three elements necessary for Article III standing.

*First*, with respect to injury-in-fact, West Virginia still fails to reconcile the fundamental contradiction of this lawsuit: that the challenged Transitional Policy has actually *benefitted* West Virginia by allowing the State to achieve its preferred policy outcome (at least in the circumstances covered by the Transitional Policy).  The State's sole response reads far too much into the *merits* reasoning of various Tenth Amendment cases, which obviously say nothing about the *standing* issues raised by this motion to dismiss.  This defect—relying on abstract merits reasoning to support the existence of a concrete, cognizable injury-in-fact—permeates West Virginia's opposition.

As for the specific injuries offered by West Virginia, the claimed injury of "political accountability" is contrary to almost a century of Supreme Court precedent holding that a state does not have standing to sue the Federal Government simply because the state perceives an affront to its sovereignty.  *See Massachusetts v. Mellon*, 262 U.S. 447, 482 (1923).  West Virginia fails to meaningfully address this precedent, and cannot point to even a *single decision* recognizing that "political accountability" is a cognizable injury-in-fact under Article III.  This defect is fatal to West Virginia's argument.  States have been attempting to litigate policy disputes with the Federal Government for over a century, and the complete absence of precedent supporting a "political accountability" injury confirms that no such injury exists.  *See Raines v. Byrd*, 521 U.S. 811, 826 (1997).  This Court should not be the first in our Constitution's 220-year

history to recognize a state's standing to sue based on such an injury, which would open up virtually every federal policy to judicial challenge.

West Virginia also attempts to construct a second injury based on the Transitional Policy's purportedly "unlawful delegation" of enforcement authority to West Virginia. But the harms associated with this injury—blame to the State from its citizens—are the same ones as "political accountability," and thus there is no meaningful difference between the two injuries. Furthermore, even if there were some difference, this injury would fail on its own terms.

*Second*, West Virginia has not established causation. The State wholly ignores HHS's argument that West Virginia voluntarily made a dispositive enforcement choice even before the Transitional Policy's announcement, and thus any "accountability" harms are attributable to that voluntary choice, not the Transitional Policy. *See* Def.'s Br. (ECF No. 13-1) at 26-27. The responses West Virginia does offer are legally incorrect, and not applicable to the present factual situation—where West Virginia *has* made voluntary enforcement choices under the Transitional Policy. West Virginia must therefore allege some concrete injuries flowing specifically from the Transitional Policy (and not the dual state-federal enforcement regime generally), which is precisely what West Virginia fails to do in its Complaint.

*Third*, West Virginia has not established redressability. West Virginia still provides no reason to believe that a judicial ruling here would dissipate any "political accountability" harms it is suffering. In fact, a judicial declaration that the Transitional Policy is invalid would only result in an earlier date at which all individuals would be obligated to obtain coverage that complies with the ACA's market reforms—a result that is antithetical to West Virginia's asserted interests. Furthermore, the State's only theory of redressability still hinges on there being a *legislative* change dismantling the Affordable Care Act (ACA), which West Virginia concedes is

too speculative to justify Article III standing, and is, in any event, not relief that this or any other court can afford.  For all of these reasons, West Virginia lacks Article III standing, and its Complaint must be dismissed for lack of subject-matter jurisdiction.

## ARGUMENT

I. **WEST VIRGINIA LACKS ARTICLE III STANDING BECAUSE IT HAS NOT ESTABLISHED A COGNIZABLE INJURY IN FACT.**

    A. **West Virginia Cannot Establish Any Injury Because It Has Only Benefitted From the Transitional Policy.**

West Virginia's lawsuit challenging the Transitional Policy is based on a fundamental contradiction: West Virginia actually *benefits* from the very thing it complains of, namely "the power to *stop* enforcement" of the ACA's market reforms (at least temporarily, in the narrowly defined circumstances covered by the Transitional Policy).  W. Va.'s Br. at 18.  The Transitional Policy therefore does not injure or harm West Virginia; instead, it allows West Virginia to obtain its preferred policy outcome (or at least some small part of it).  *See* Def.'s Br. at 13-17.

West Virginia's opposition does not deny that the State has benefitted from the Transitional Policy.  Rather, West Virginia's only response is that "the States have no authority to 'consent' to violation of their own Tenth Amendment rights," and thus the Transitional Policy still causes an injury even if the State is ultimately benefitted.  W. Va.'s Br. at 29.  But this argument (like many others offered by West Virginia) confuses the *merits* analysis on a Tenth Amendment claim with the Article III *standing* inquiry at issue here.  It is true that the Supreme Court has held, on the merits, that a Tenth Amendment violation "cannot be ratified by the 'consent' of state officials."  *New York v. United States*, 505 U.S. 144, 182 (1992).  That holding says nothing, however, about whether a purported Tenth Amendment violation has sufficiently *harmed* any particular litigant to give them standing to bring suit.

To illustrate the distinction, the plaintiff here (West Virginia) lacks standing because the Transitional Policy has, at least temporarily, allowed the State to achieve at least part of its desired policy objective. Were some other plaintiff to come forward (and demonstrate their own standing), however, the fact that West Virginia or any other state has benefitted from (or consented to) the Transitional Policy would not preclude the Court from finding a Tenth Amendment violation. That is the holding of *New York*: that a state's consent does not eliminate the existence of a Tenth Amendment violation on the merits. The decision does not support West Virginia's argument here—that a state has *standing* to raise a Tenth Amendment claim even when the state cannot point to any actual *injury* caused by the challenged policy.

**B.    West Virginia's Claimed Injury of "Political Accountability" Is Not Cognizable as a Matter of Law.**

Apart from the State only benefitting from the Transitional Policy, West Virginia's Complaint also fails because it does not allege a cognizable Article III injury-in-fact. West Virginia's primary argument—that a state "has standing to protect its sovereign interest against being held politically accountable for federal policy," W. Va.'s Br. at 20-21—is contrary to binding Supreme Court precedent, and cannot be reconciled with other fundamental standing principles, *i.e.*, that not every federal policy should be subject to judicial challenge by a state. West Virginia fails to meaningfully grapple with these defects, and its theory of "political accountability" must therefore be rejected.

**1.    West Virginia's Theory of Standing is Wholly Unsupported and Contrary to Governing Precedent.**

West Virginia's claimed injury of "political accountability" suffers from numerous defects. Most notably, West Virginia cannot point to a *single* judicial decision accepting the State's asserted injury, which strongly suggests that the injury is not cognizable under Article III.

West Virginia attempts to manufacture precedential support for its injury by relying on the discussion of "political accountability" in the Supreme Court's decisions in *Printz v. United States*, 521 U.S. 898 (1997), and *New York v. United States*, 505 U.S. 144 (1992). *See* W. Va.'s Br. at 21-22. These cases never mentioned "political accountability" in relation to standing, however, and instead discussed the concept as just one aspect of the Court's overall merits reasoning. *See* Def.'s Br. at 21 n.4; *see also Printz*, 521 U.S. at 905-33; *New York*, 505 U.S. at 155-70, 174-83.

Recognizing that *Printz* and *New York* have no direct relevance to the standing inquiry, West Virginia seeks refuge in a broader principle—that a plaintiff may have *standing* to bring a claim, even if the claim is ultimately unsuccessful *on the merits*. *See* W. Va.'s Br. at 22-24. But West Virginia cannot avoid HHS's standing arguments just by characterizing them as overlapping with the merits. HHS's arguments, quite clearly, relate to an antecedent issue— whether the claimed injury of "political accountability" is too abstract to be cognizable in the first place—which must be addressed regardless of any purported overlap with the merits.

And on the fundamental question of whether "political accountability" is too abstract to be cognizable, West Virginia's reliance on *Printz* and *New York* is baseless. It is true that (i) the plaintiffs in *Printz* and *New York* had standing, and (ii) the Court discussed "political accountability" as part of its merits analysis in those cases. But that does not support West Virginia's attempt here to argue for the converse: (i) the Transitional Policy has allegedly caused a shift in political accountability, and (ii) therefore West Virginia must have standing to challenge that policy. Simply because "political accountability" was part of the Court's merits reasoning in *Printz* and *New York* does not mean that "political accountability" is, by itself, a cognizable injury-in-fact under Article III. In this sense, it is West Virginia that has confused the merits and

standing inquiries—by trying to take an abstract concept, elucidated as part of the Supreme Court's merits reasoning, and bootstrap that abstraction into a cognizable Article III injury.

This unprecedented approach to standing would eviscerate the injury-in-fact requirement, allowing plaintiffs (state or individual) to claim injury based on the wide variety of abstractions used throughout judicial opinions.  The Tenth Amendment, for example, protects individual liberty through federalism and separation of powers.  *See Printz*, 521 U.S. at 918-25.  A plaintiff cannot establish standing, however, simply by invoking those concepts—*i.e.*, by alleging that a federal policy has decreased liberty, or transgressed the boundaries of federalism or separation of powers.  *See Bond v. United States*, 131 S. Ct. 2355, 2364 (2011) (noting in a Tenth Amendment case that "[f]ederalism secures the freedom of the individual" but that "of course, these objects cannot be vindicated by the Judiciary in the absence of a proper case or controversy"); *Raines*, 521 U.S. at 816 (rejecting standing based on an alleged violation of separation of powers).  That is exactly what West Virginia is attempting to do here, of course, by arguing that "a State *always* has standing to challenge a federal statute or regulation that the State can colorably claim violates its Tenth Amendment rights."  W. Va.'s Br. at 22 (emphasis modified).[1]

This expansive approach—that a state has standing to assert a Tenth Amendment claim any time it perceives an affront to its sovereignty—is squarely foreclosed by precedent.  *See, e.g.*, *Mellon*, 262 U.S. at 482 (rejecting state standing when "the nature of the right of the state here asserted" is "that the statute constitutes an attempt to legislate outside the powers granted to

---

[1] West Virginia's expansive theory of standing would not be limited to the Tenth Amendment context.  Any constitutional provision can be re-cast to have a broad, abstract purpose, which would then provide standing to innumerable plaintiffs.  The Commerce Clause, for example, is likewise animated by federalism concerns.  *See United States v. Lopez*, 514 U.S. 549, 579-83 (1995) (Kennedy, J., concurring).  Simply because a state perceives an affront to federalism, however, does not give the state standing to raise a Commerce Clause challenge.  *See Virginia ex rel. Cuccinelli v. Sebelius*, 656 F.3d 253, 271 (4th Cir. 2011).

Congress by the Constitution and within the field of local powers exclusively reserved to the states"). Indeed, this approach is nothing more than "a state is injured any time the Federal Government violates the law," which is an argument the Supreme Court has squarely and soundly rejected as inconsistent with Article III. *See Allen v. Wright*, 468 U.S. 737, 754 (1984) ("This Court has repeatedly held that an asserted right to have the Government act in accordance with law is not sufficient, standing alone, to confer jurisdiction on a federal court."); *see also Bond*, 131 S. Ct. at 2366 (stating that "all litigants and claims," even those invoking the Tenth Amendment, are "subject to the Article III requirements").

West Virginia's support for this expansive theory of standing is a single paragraph from a single D.C. Circuit decision. *See* W. Va.'s Br. at 22 ("[T]he D.C. Circuit has held . . . that a State always has *standing* to challenge a federal statute or regulation that the State can colorably claim violates its Tenth Amendment rights." (citing *Lomont v. O'Neill*, 285 F.3d 9 (D.C. Cir. 2002)). For two reasons, however, the single paragraph in *Lomont* does not come close to supporting the weight West Virginia places on it.

First, the Court in *Lomont* had no opportunity to issue a broad holding about standing to raise Tenth Amendment claims. The context of *Lomont* makes clear that the Court was addressing only the *classes of plaintiffs* who might have standing to raise Tenth Amendment claims, not the types of *injuries* cognizable for such claims. *See Lomont*, 285 F.3d at 13 & n.3 (finding standing because two plaintiffs were "chief law enforcement officers" and noting that it is "uncertain" whether the private citizens had standing). To describe *Lomont* as "holding" anything about standing is even a stretch, because there really was no issue for the *Lomont* court to decide: the standing of the chief law enforcement officers had already been established by a *prior* panel decision, and the standing issue was addressed in *Lomont* only because the

-7-

government stated (in a footnote) that it disagreed with the prior panel's decision (but admitted that the decision governed in *Lomont*).  *See id.* at 13-14; *see also* Brief for Appellees at 34 n.9, *Lomont*, No. 01-5104, *available at* 2001 WL 36037581 (D.C. Cir. filed Nov. 30, 2001).  Plainly, then, *Lomont* says nothing at all about state standing, and is hardly a panacea for West Virginia's standing defects, which is how the State portrays the decision.

Second, even if *Lomont* did announce some broad principle regarding standing, the decision still would not support West Virginia's claimed injury of "political accountability."  The reason the plaintiffs in *Lomont* had standing is because they alleged a recognized commandeering injury—*i.e.*, that as state officials they were being legally compelled to administer federal law.  *See Lomont*, 285 F.3d at 13.  Although the plaintiffs were incorrect in that allegation (and thus the claim failed on the merits), they still had standing for the claim.  *See Lomont v. Summers*, 135 F. Supp. 2d 23, 25 (D.D.C. 2001) ("Even though the regulations do not 'compel' the [law-enforcement] plaintiffs to do anything, their allegations to the contrary are sufficient to confer standing.").  To the extent *Lomont* says anything at all about standing, then, that is the real lesson: a plaintiff may have standing when it alleges a recognized commandeering injury, even if the commandeering claim fails on the merits.

Of course, a recognized commandeering injury—*i.e.*, one of legal command or coercion—is precisely what West Virginia fails to allege here.  See Def.'s Br. at 17. Indeed, West Virginia has expressly disavowed these injuries both in its Complaint, *see* Compl. ¶ 63(c), as well as its opposition.  *See* W. Va.'s Br. at 30-31 ("The State has not claimed harm[] from having to take any particular action.").  What West Virginia has alleged here is a fundamentally different sort of injury: not that the State is *commanded* to act or *coerced* into acting, but rather that the State's discretionary actions now have different political *consequences*.  Unlike a command or

coercion, however, changing a state's political calculus on a particular decision does not impose a *limit* or *restriction* on state decisionmaking; it simply *affects* a state's decisionmaking.  That is the fundamental difference between the present lawsuit (which must be dismissed for lack of standing), and a case like *Lomont* (which alleged a recognized commandeering injury of legal mandate, which thus provided standing, even though the claim failed on the merits).  *See also, e.g.*, *South Dakota v. Dole*, 483 U.S. 203, 211 (1987) (entertaining a Spending Clause claim that "the financial inducement offered by Congress [was] so coercive as to pass the point at which pressure turns into compulsion," but rejecting the claim on the merits).[2]

Because West Virginia does not allege a recognized commandeering injury (*i.e.*, one of legal command or coercion), this lawsuit presents exactly the type of "abstract question[] of political power, of sovereignty, of government" that the Supreme Court has repeatedly held is insufficient to provide a state with standing.  *Mellon*, 262 U.S. at 485; *see also* Def.'s Br. at 19-20 (citing several other Supreme Court cases).  West Virginia seeks to distinguish these precedents on their facts, or as pre-dating *New York* and *Printz* "by at least 50 years" and not "involv[ing] the shifting of political accountability for federal policies[.]"  W. Va.'s Br. at 28.  But these precedents cannot be dismissed so easily.  The precise factual context in which they arose is simply irrelevant.  It does not matter, for example, whether the cases involved a challenge to Spending Clause legislation, or to federal regulation of a waterway, or to something else entirely.  *See* W. Va.'s Br. at 28.  The important point is that all of the cases rejected abstract injuries, precisely of the sort West Virginia is alleging here with its amorphous notion of "political accountability."  *See, e.g.*, *New Jersey v. Sargent*, 269 U.S. 328, 330 (1926) (rejecting

---

[2] In cases like *Printz* and *New York*, the concern about "political accountability" was based on this type of command—*i.e.*, the imposition of federal *mandates* on the states.  That is very different than what the State has asserted here, which is political accountability flowing from the *expansion* of state discretion.  *See* Section I.A, *supra*.

standing based on an "abstract question respecting the relative authority of Congress and the state"). These cases squarely foreclose West Virginia's injury here.

Furthermore, even if those cases do not directly foreclose the injury of "political accountability," that still would not help West Virginia's argument—it would only confirm that there are no cases recognizing such an injury. States have been litigating policy disputes with the Federal Government for over a hundred years. In any of these cases, the states could easily have alleged a "political accountability" harm stemming from the challenged federal action.[3] The absence of those allegations (and the consequent lack of standing) therefore confirms that no such injury is cognizable under Article III. *See Raines*, 521 U.S. at 826 (consulting historical practice and concluding that no standing exists, because there were "several episodes in our history that in analogous confrontations . . . no suit was brought on the basis of [the] claimed injury"); *Walker v. Cheney*, 230 F. Supp. 2d 51, 74 (D.D.C. 2002) ("[P]laintiff's failure to produce stronger evidence with respect to historical practice leads unavoidably to the conclusion that he lacks standing to pursue his claim."); *cf. Oregon v. Legal Servs. Corp.*, 552 F.3d 965, 974 (9th Cir. 2009) (rejecting a state's purported injury noting that "such an interest has never before been recognized"). Again, West Virginia's failure to identify even a *single* decision accepting political accountability as a cognizable injury is conclusive.

---

[3] Certainly Massachusetts could have alleged an accountability harm stemming from its decision to refuse the Maternity Act's funding. *See Mellon*, 262 U.S. at 479. Or, to take a more recent example, any of the twelve states in *Massachusetts v. EPA*, 549 U.S. 497 (2007), could easily have alleged that the EPA's failure to regulate greenhouse gas emissions increased pressure on the individual states to do so. Yet no such allegations were present, and the Court instead had to rely on the narrow territorial injury of a single state. *Id.* at 522-23; *see also* Def.'s Br. at 20-22 (discussing how any federal action can be construed as affecting state decisionmaking).

**2.      West Virginia Does Not Meaningfully Respond to the Other Strong Reasons Why Political Accountability Cannot Be a Cognizable Injury.**

Apart from being foreclosed by precedent as too abstract, there are several other reasons why "political accountability" is not a valid Article III injury.  West Virginia's opposition does not meaningfully respond to these fundamental defects.

*First*, West Virginia's claimed injury is expressly political, and evaluating the existence and redressability of such a "political accountability" injury would take courts outside the appropriate judicial role.  *See* Def.'s Br. at 19.  West Virginia responds that the Supreme Court was able to evaluate political accountability in *Printz* and *New York* "as a matter of law," without evaluating specific facts or making political predictions.  W. Va.'s Br. at 27.  Of course, the Court's discussion of political accountability in *Printz* and *New York* was done in the abstract, without any need to factually confirm whether political accountability was actually diminished in each particular case.  As a stand-alone Article III injury, however, such factual confirmation is precisely what would be required.  *See Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560 (1992) (injury-in-fact must be "actual or imminent, not conjectural or hypothetical" (internal quotation marks omitted)); *Sierra Club v. EPA*, 292 F.3d 895, 898-99 (D.C. Cir. 2002) (discussing a plaintiff's duty, as the litigation progresses, to come forward with actual evidence proving the existence of an injury-in-fact).  There is plainly a world of difference between a court (1) concluding as a general matter that commandeering of state officials threatens political accountability (as was done in *Printz* and *New York*), versus (2) evaluating whether a specific federal policy has negatively affected a state's political accountability in a particular factual circumstance, and then predicting whether a judicial ruling would redress that political harm

(which is what West Virginia's theory here would require).  Such inherently political exercises are outside the appropriate judicial role.[4]

*Second*, West Virginia's theory of "political accountability" is not cognizable because it would allow states to challenge *every* federal policy in court.  *See* Def.'s Br. at 20-22.  West Virginia displays a remarkable lack of concern for this prospect, with the State's only response again being reliance on *Lomont*.  *See* W. Va.'s Br. at 28-29 (arguing that there is no "slippery slope" to every policy dispute being in federal court, because "this Court will not be going any further than the D.C. Circuit has already concluded is appropriate").  As discussed above, however, there is a fundamental difference between the injury recognized by *Lomont* and other commandeering cases, versus the injury asserted by West Virginia here.  Accepting West Virginia's injury here, therefore, would indeed expand state standing well beyond the boundaries of *Lomont*.  West Virginia does not dispute any of HHS's substantive arguments on this issue— *e.g.*, that any federal action can be framed as a "political accountability" harm, *see* Def.'s Br. at 20-22—which by itself warrants rejection of this expansive theory of standing.

*Third*, West Virginia's theory of "political accountability" does not provide a cognizable injury to the State *qua* State.  *See* Def.'s Br. at 22.  West Virginia again invokes *New York*, characterizing the plaintiffs there as a state and two counties that likewise did not compete in any elections.  *See* W. Va.'s Br. at 30.  But *New York* only confirms HHS's argument: the Court's concern over political accountability was repeatedly discussed in the context of *state officials*, not the state as an entity itself.  *See New York*, 505 U.S. at 169 ("[W]here the Federal Government directs the States to regulate, it may be state officials who will bear the brunt of

---

[4] And again, the "political accountability" concern in *Printz* and *New York* was fundamentally different—those federal policies *removed* discretion from state officials, whereas West Virginia asserts here that it is harmed by the *enhanced* discretion provided to the State.

public disapproval, while the federal officials who devised the regulatory program may remain insulated from the electoral ramifications of their decision."); *id.* at 182-83 (discussing accountability for individual officials); *cf. Ridge v. Verity*, 715 F. Supp. 1308, 1321 (W.D. Pa. 1989) (rejecting state standing because "[t]he loss of representation in the electoral college also cannot be suffered by a state, but only by electors or voters of a particular state").  As a matter of law, therefore, West Virginia's claimed injury is not cognizable.

C.   **Even Assuming Political Accountability Could Constitute an Injury in Some Circumstances, West Virginia Has Not Established It Here.**

HHS's opening brief discussed at length the speculative, unsupported assertions necessary for West Virginia to establish an actual, non-hypothetical "political accountability" injury.  *See* Def.'s Br. at 22-26.  West Virginia does not dispute these assumptions or their speculative nature, but instead requests that the Court conclude the accountability injury exists "as a matter of law"—*i.e.*, without any evidence (or even allegations) regarding "the specific knowledge or opinions of the State's populous about the particular federal policy at issue."  W. Va.'s Br. at 27 (citing *Printz* and *New York*).

Again, *Printz* and *New York* do not excuse West Virginia from the fundamental requirement that the State establish an actual, non-hypothetical injury-in-fact—based on allegations at the present stage, and actual evidence at potential future stages of the litigation. *See* Section I.B.2, *supra*.  West Virginia offers no support for its argument that its injury should be recognized "as a matter of law," which would be contrary to the principle that the plaintiff has the burden to affirmatively establish jurisdiction through factual allegations in the Complaint. *See* Fed. R. Civ. P. 8(a)(1); *Renne v. Geary*, 501 U.S. 312, 316 (1991) ("We presume that federal courts lack jurisdiction unless the contrary appears affirmatively from the record.").

West Virginia's failure to meaningfully engage on this issue—effectively conceding that, unless the injury is recognized as a matter of law, the allegations in its Complaint do not support the claimed harm—is by itself sufficient to dismiss the Complaint for lack of jurisdiction.

**D.      West Virginia's Asserted "Unlawful Delegation" Injury is Not Cognizable.**

West Virginia's opposition also attempts to construct a second injury, that the State has been unlawfully delegated "the exclusive and unfettered discretion to decide whether certain federally 'non-compliant policies' may be sold within the State." W. Va.'s Br. at 17.  Just as with political accountability, however, there are numerous problems with this purported injury.

To begin with, it is still unclear how this injury is distinct from the "political accountability" injury that is virtually the exclusive focus of West Virginia's Complaint.  *See* Compl. ¶¶ 70-77; *see also* Def.'s Br. at 18.  West Virginia's opposition frames this "unlawful delegation" injury as presenting a "no-win" choice because West Virginia can either (1) choose to enforce federal law and thus "risk the displeasure of those individuals who lose their health insurance plans"; or (2) choose not to enforce federal law and "suffer blame from those who believe the ACA forwards important policy ends and who wish to see the law fully enforced." W. Va.'s Br. at 18-19.

Even accepting this framing of the injury,[5] it still fundamentally collapses into the same "political accountability" injury.   Both claimed injuries derive from the "displeasure" and "blame" West Virginia will receive from citizens who disagree with the State's ACA enforcement choice.  *Compare id.* (unlawful delegation injury), *with id.* at 24 (political accountability, arguing that the State will "bear the brunt of public disapproval" for its enforcement decision (internal quotation marks omitted)), *and* Compl. ¶ 71 (alleging that "the States will be held at least partly

---

[5] Notably, West Virginia omits a third option—West Virginia could have ignored the Transitional Policy (and the ACA's market reforms) and simply done nothing at all.  *See* Def.'s Br. at 17, 20; *see* Section II, *infra.*

accountable by their citizens for having made a federal policy choice"). The two injuries are thus identical, and the arguments above (Sections I.B-C) equally demonstrate that the "unlawful delegation" injury is not cognizable.

Furthermore, even if the "unlawful delegation" injury were somehow distinct, it would fail on its own terms. For one thing, the "no-win" choice that West Virginia complains about—being forced to choose whether to enforce federal law or not, and then receiving blame for whatever choice is made—is not caused by the Transitional Policy, but rather is inherent in the dual-enforcement regime of the Public Health Services Act, *see* 42 U.S.C. § 300gg-22, which West Virginia does not purport to challenge. Even before the Transitional Policy, it was the case that some people would be pleased, and others would be displeased, by whatever enforcement decisions state officials made. Thus, the "unlawful delegation" injury would not provide standing to challenge the Transitional Policy itself.

Perhaps West Virginia's theory is that the Transitional Policy *increases* blame to the State, because the State will be viewed as the *exclusive* enforcer of federal law in the limited situations covered by the Transitional Policy. *Cf.* W. Va.'s Br. at 18-19. But West Virginia had the same choice to make before the Transitional Policy as to enforcement of the ACA's market reforms *in toto*, and thus would receive blame from its citizens in any event. This theory necessarily relies, therefore, on the many speculative assumptions that West Virginia makes no effort to support in its Complaint or dispute in its opposition. *See* Def.'s Br. at 25; Section I.C, *supra*.

Finally, this claimed injury would also succumb to the fundamental contradiction of this lawsuit—that the challenged Transitional Policy has benefitted West Virginia by allowing it to achieve its desired policy objective for a limited time and in certain circumstances. *See* Section I.A, *supra*. To illustrate the point, consider the hypothetical posited by West Virginia.

-15-

*See* W. Va.'s Br. at 19 (discussing a hypothetical statute in which Congress made the National Cattlemen's Beef Association "exclusively responsible for all meat inspections in the United States").  That hypothetical obviously does not correspond to the present factual situation.[6]  As relevant here, the hypothetical would have to be modified so that the Beef Association's policy preference is that *no* meat inspections be conducted (just as West Virginia's preference is that the ACA market reforms not be enforced at all).  In that situation, it hardly seems "unthinkable" to conclude that the Beef Association lacks standing to challenge the delegation—which has only benefitted the Beef Association by allowing it to achieve its preferred policy outcome.  Denying the Beef Association standing is the natural result of a judicial system designed to remedy *harm*, not to oversee general compliance with the law.  *See Lewis v. Casey*, 518 U.S. 343, 349 (1996) ("It is the role of courts to provide relief to claimants . . . who have suffered, or will imminently suffer, actual harm; it is not the role of courts, but that of the political branches, to shape the institutions of government in such fashion as to comply with the laws and the Constitution.").

The Beef Association's lack of standing, of course, would not preclude some other plaintiff from raising an unlawful delegation claim—say, a person or company who was subject to the Beef Association's enforcement authority.  *See Buckley v. Valeo*, 424 U.S. 1, 117 (1976); *Comm. for Monetary Reform v. Bd. of Governors of Fed. Reserve Sys.*, 766 F.2d 538, 543 (D.C. Cir. 1985).  The only case cited by West Virginia to support this injury, *Carter v. Carter Coal*

---

[6] Among other changes necessary to make the hypothetical accurate, the statute would have to provide meat-inspection authority to both a federal agency and the Beef Association, and the agency would then have to announce that it was not going to inspect a certain class of meat, on a temporary basis and according to certain defined criteria.  The analogous standing question would then be: When the Beef Association does not challenge its general authority to conduct meat inspections as an unlawful delegation, does the Beef Association nonetheless have standing to challenge the delegation with respect to those narrow situations in which it is purportedly the "exclusive" enforcer of federal law—*i.e.*, for those categories of meat that the federal agency has announced it will not inspect?  Absent something more than what West Virginia alleges, the answer to that question is "no" for all of the reasons discussed above.

*Co.*, 298 U.S. 238 (1936), arose in that very context—a regulated company challenging the regulator.  *See id.* at 278-79, 310-11 (1936).  *See* W. Va.'s Br. at 20.  That case is clearly distinguishable, then, because it did not involve the *regulator* challenging the delegation, much less a regulator that *benefits* from the delegation (as West Virginia does here).[7]  In sum, West Virginia's purported injury of "unlawful delegation" fails for all the same reasons as "political accountability," as well as on its own terms.

### E.  West Virginia Cannot Establish Standing as the "Object" of the Transitional Policy, Nor Based on Any "Special Solicitude" for State Standing.

West Virginia's opposition relies on two general principles to help support its standing, neither of which is persuasive.  First, West Virginia attempts to characterize itself as "the object" of the Transitional Policy, which, in West Virginia's view, means it has "self-evident" standing to challenge the governmental action.  W. Va.'s Br. at 16-17.  But this principle relates only to the causation and redressability elements of standing—it does not support West Virginia's efforts to establish an injury-in-fact as the State implies.  *See Lujan*, 504 U.S. at 561-62; *Ctr. for Biological Diversity v. Dep't of Interior*, 563 F.3d 466, 477-78 (D.C. Cir. 2009) (discussing the quoted passage from *Lujan* in the context of causation and redressability); *State Nat'l Bank of Big Spring v. Lew*, 958 F. Supp. 2d 127, 133-34 (D.D.C. 2013) (same).

In any event, West Virginia clearly is not "the object" of the Transitional Policy.  A plaintiff is not "the object" when the governmental action "neither require[s] nor forbid[s] any action on the part of" the plaintiff.  *Summers v. Earth Island Inst.*, 555 U.S. 488, 493 (2009); *see also State Nat. Bank of Big Spring*, 958 F. Supp. 2d at 133-34.  Here, the Transitional Policy was

---

[7] Even if *Carter Coal Co.* were factually analogous, the decision says nothing about standing (as West Virginia admits, *see* W. Va.'s Br. at 20), and therefore would not be precedential on the issue in any event.  *See Am. Portland Cement Alliance v. EPA*, 101 F.3d 772, 776 (D.C. Cir. 1996) ("[J]urisdictional issues that were assumed but never expressly decided in prior opinions do not thereby become precedents.").

simply an announcement of how the Federal Government would exercise *its* enforcement discretion.  The Transitional Policy neither "require[s] nor forbid[s] any action on the part of" the states, *Summers*, 555 U.S. at 493, and in fact leaves states free to exercise their own enforcement discretion entirely as they see fit, as West Virginia itself admits.  *See* Compl. ¶ 63(c) (noting that "each State has the same decision to make about enforcement that it had before the Administrative Fix"); *see also* W. Va.'s Br. at 30-31 ("The State has not claimed harm[] from having to take any particular action.").  The "object of the challenged action" principle clearly does not apply here to the State.[8]

Second, West Virginia invokes the "special solicitude" afforded to states for standing purposes.  W. Va.'s Br. at 23 (quoting *Massachusetts v. EPA*, 549 U.S. at 520).  As the D.C. Circuit has confirmed, however, this special solicitude was based on the "unique circumstances" of *Massachusetts v. EPA*, *see Ctr. for Biological Diversity*, 563 F.3d at 476, and in any event "does *not* eliminate the state [plaintiff's] obligation to establish a concrete injury, as Justice Stevens' opinion amply indicates."  *Del. Dep't of Natural Res. & Envtl. Control v. FERC*, 558 F.3d 575, 579 n.6 (D.C. Cir. 2009).  This special solicitude, even if applicable here, cannot therefore excuse West Virginia's failure to plead a cognizable injury-in-fact.

**F.  The Amicus Curiae's Arguments are Meritless.**

The Pacific Legal Foundation (PLF) has sought leave to file an amicus brief in support of West Virginia.  *See* ECF No. 19-1 [hereafter "PLF's Br."].  None of PLF's arguments helps establish the State's standing to sue.

---

[8] If anyone is the "object" of the Policy, it is those issuers who are no longer subject to federal enforcement action if they offer insurance policies that do not fully comply with the ACA market reforms (subject to the defined circumstances and conditions), and/or the individuals who may temporarily continue to renew such policies if they so choose.

As an initial matter, PLF largely ignores the actual injuries alleged by West Virginia, and instead argues that West Virginia has suffered a Spending Clause-type injury.   *See id.* at 5 ("[J]ust as the federal government may not compel outright, it is also forbidden to make an 'offer' which is so coercive as to essentially force the state into 'choosing' to enforce federal law.").   West Virginia, of course, has expressly disavowed any such coercion injury, *see* Compl. ¶ 63(c), W. Va.'s Br. at 30-31, which is reason enough to disregard PLF's arguments.

Furthermore, PLF's theory makes no sense in this factual context.   There is no withdrawal of federal funding (or other punitive consequences) associated with whether a state chooses to make the transitional relief available to health-insurance issuers.   And here, West Virginia has chosen *not* to enforce the relevant ACA market reforms in the limited circumstances covered by the Transitional Policy.   *See* Compl. ¶¶ 82-83; Def.'s Br. at 9-10.   Clearly, then, the Transitional Policy is not "forc[ing] states to choose between enforcing federal law or suffering consequences so punitive as to be coercive," PLF's Br. at 2—otherwise West Virginia would be enforcing the market reforms, not providing transitional relief as the State is doing here.[9]

Finally, apart from its coercion theory, PLF argues that "as a state, [West Virginia] is uniquely situated to challenge the federal incursion of state sovereignty."   PLF's Br. at 13.   This argument gets the law exactly backward.   There is no reason to permit West Virginia to move forward with its lawsuit, rather than relying on other interested litigants that *do* have at least colorable claims of standing to come forward, as is the normal course.   *See Bond*, 131 S. Ct.

---

[9] PLF's four asserted bases for the coercion injury are also wholly meritless.   First, the Transitional Policy has nothing to do with the establishment of exchanges (and PLF makes no effort to explain how it does).   There is no impediment to a state choosing both to establish an exchange and to offer the transitional relief.   *See* PLF's Br. at 7-8.   Second, insurance plans covered by HHS's transitional relief are still fully valid and enforceable; nothing in HHS's Transitional Policy supports a conclusion otherwise.   *See id.* at 8-10.   The third and fourth bases are repetitive of West Virginia's arguments, *id.* at 10-13, and thus are foreclosed for the reasons discussed above in Sections I.B-C.

at 2365 ("In the precedents of this Court, the claims of individuals—not of Government departments—have been the principal source of judicial decisions concerning separation of powers and checks and balances."); *Illinois v. City of Chicago*, 137 F.3d 474, 478 (7th Cir. 1998) (Easterbrook, J.) (discussing how states generally lack standing to challenge federal law because that is "a political rather than a legal dispute," and instead "the right litigant" is a person who is genuinely injured by application of the federal law).

In sum, West Virginia has failed to establish a cognizable injury-in-fact sufficient to invoke this Court's jurisdiction under Article III. Consistent with the past century of precedent, this Court should reject West Virginia's standing to bring this policy dispute before the Judiciary.

## II.    WEST VIRGINIA HAS NOT ESTABLISHED CAUSATION.

Even assuming West Virginia has alleged a cognizable injury, West Virginia has not established that the injury is "fairly traceable to the challenged action." *Clapper v. Amnesty Int'l*, 133 S. Ct. 1138, 1147 (2013). That is true for three reasons.

First, West Virginia has the same enforcement options as it did before the Transitional Policy's announcement. *See* Def.'s Br. at 26. Contrary to West Virginia's response, *see* W. Va.'s Br. at 30, this argument does indeed relate to causation. Even assuming West Virginia has established that it is being blamed for its enforcement decision, the State has not established that such blame stems uniquely from the Transitional Policy, as opposed to the dual-enforcement regime of the Public Health Services Act itself. *See, e.g.*, *Texas v. EPA*, 726 F.3d 180, 199 (D.C. Cir. 2013) (rejecting standing because "[t]o the extent these are cognizable injuries, they were caused by the Act, not the challenged rules").

Second, the Transitional Policy did not require West Virginia to take any action one way or the other, and thus any harms flowing to the State are the result of its own voluntary actions, not the Transitional Policy. *See* Def.'s Br. at 26-27 (citing *Clapper*, 133 S. Ct. at 1152). West

-20-

Virginia asserts that "this argument entirely ignores the injury-in-fact actually asserted by the State," which is "the 'additional policy option' that HHS itself admits was . . . 'created' by the [Transitional Policy]."   W. Va.'s Br. at 30-31 (modifications omitted).   To the extent West Virginia is now characterizing its injury as the mere *existence* of the Transitional Policy—and not any concrete effects flowing from the Transitional Policy (*e.g.*, actual blame to the State for its enforcement decisions)—that just takes West Virginia's injury to an even higher level of abstraction than discussed above, further confirming that this lawsuit seeks only to litigate an abstract Tenth Amendment claim against the Federal Government.   *See New Jersey*, 269 U.S. at 334 (dismissing a lawsuit when "its real purpose is to obtain a judicial declaration that . . . Congress exceeded its own authority and encroached on that of the state").   And as for causation, this framing of the injury is unconnected to the actual factual situation here—one where West Virginia *has* voluntarily taken actions in response to the Transitional Policy.   West Virginia cannot now, therefore, blame its injuries on the mere existence of the Transitional Policy, as if that Policy existed in a vacuum.

Third, West Virginia wholly ignores HHS's argument that the State cannot claim any injury associated with being the (allegedly) "exclusive enforcer of federal law" given that West Virginia *voluntarily* assumed a dispositive enforcement role even before the announcement of the Transitional Policy.   *See* Def.'s Br. at 26-27.   Again, whatever accountability or blame West Virginia may be suffering, West Virginia voluntarily assumed that blame in 2013—before the Transitional Policy's announcement—when it permitted early renewal of individual policies.

## III.   WEST VIRGINIA HAS FAILED TO ESTABLISH REDRESSABILITY.

The State has also failed to establish the third element of standing, that the claimed injury is "redressable by a favorable ruling."   *Clapper*, 133 S. Ct. at 1147 (internal quotation marks omitted).  Again, that is so for three reasons.

-21-

West Virginia ignores HHS's first argument, that "West Virginia's decision on enforcement in the face of the Transitional Policy has already been made," and thus there is no reason to expect that any alleged harms "would dissipate as a result of a judicial ruling here." Def.'s Br. at 27-28.  Even if the State has been improperly placed in a "no-win" choice, as West Virginia (erroneously) alleges, the State cannot deny that its choice has already been made, and there is no relief the Court can provide to undo the public's awareness of that choice.

Second, West Virginia's requested relief—a declaratory judgment accompanied by a remand "to *permit* the Administration promptly to work with Congress," Compl. at 33 (emphasis added)—does not establish redressability (and such a remand is legally inappropriate in any event).  *See* Def.'s Br. at 28-29.  West Virginia makes no attempt to defend its remand request, but responds that its request for declaratory relief is by itself sufficient to establish redressability. *See* W. Va.'s Br. at 31-32.  While declaratory relief may be sufficient in an ordinary case, that is because it can ordinarily be assumed that the plaintiff, in seeking declaratory relief, actually wants the defendant to cease the challenged practice.  But here, that assumption appears to be incorrect.  *See* Def.'s Br. at 28 n.6.

Notably, West Virginia *still* does not state that it actually wants an injunction precluding HHS from applying the Transitional Policy.  West Virginia suggests equitable relief may be necessary "[i]f HHS were to represent that it would simply ignore a declaratory judgment from this Court[.]"  W. Va.'s Br. at 32.  But that is plainly not what HHS is arguing.  Rather, HHS's argument is that the State has failed to establish redressability because (1) the State does not appear to actually *want* HHS to stop applying the Transitional Policy; and (2) the State's only other explanation for how its injury can be redressed—a remand for a possible legislative

solution—is both legally unavailable and too speculative.[10]  West Virginia does not dispute either of these straightforward propositions, and thus has failed to establish redressability.

Third, even assuming West Virginia is seeking to compel HHS to stop offering its transitional relief, such an injunction would only *exacerbate* any "political accountability" harms suffered by West Virginia (by leading to increased enforcement of the ACA market reforms, contrary to the State's express policy interests).  *See* Def.'s Br. at 28.  West Virginia again responds that this argument misconstrues the State's actual injury—"the mere existence" of the Transitional Policy—which purportedly can be redressed by the Court.  W. Va.'s Br. at 31.  As discussed above, however, this framing of the injury only confirms it is not cognizable.  Indeed, this framing saps the claimed injury of "political accountability" of any potential meaning whatsoever.  If West Virginia's political accountability is *not* worsened by the State achieving something it believes would be harmful to its citizens, then it is entirely unclear what the notion of "political accountability" even means, much less how it could be redressed.  West Virginia's arguments here do not, therefore, establish that its claimed injuries are redressable.

## IV.  WEST VIRGINIA'S APA CLAIMS ARE NOT WITHIN THE ZONE OF INTERESTS OF THE AFFORDABLE CARE ACT.

Finally, even assuming West Virginia has Article III standing, its APA claims (Counts I-II) must nonetheless be dismissed as outside the ACA's zone of interests.  Although HHS moved to dismiss for lack of subject-matter jurisdiction, *see* ECF No. 13, there is no impediment to the Court dismissing Counts I-II for being outside the zone of interests even if such dismissal would be for failure to state a claim.  *See Maynard v. District of Columbia*, 579 F. Supp. 2d 137, 142 (D.D.C. 2008) (Walton, J.).

---

[10] West Virginia concedes (as it must) that this Court cannot order HHS or Congress to negotiate over any legislative solution, much less agree to one.

Furthermore, this argument is hardly a "throw-away" that West Virginia can "easily" circumvent.  W. Va.'s Br. at 33-34.  The argument here does not require speculating about the "plaintiff's subjective motivations," *id.* at 35, but rather relies on the straightforward allegations in West Virginia's own Complaint—that the purpose of this lawsuit is to undo the ACA.  *See* Compl. ¶¶ 6, 37.

West Virginia argues that it has an interest in "vindicat[ing] the ACA's cooperative federalism regime, under which States are given an optional enforcement role that is backstopped by mandatory federal enforcement."  W. Va.'s Br. at 34.  But West Virginia makes no effort to explain how the relevant statutory provision, 42 U.S.C. § 300gg-22, arguably is intended to protect the State's interests; the provision seems clearly intended to benefit *consumers* in the health insurance market.  And given that HHS's purported enforcement duty is triggered only upon a finding that a state has *failed* to enforce certain provisions, *id.* § 300gg-22(a)(2), that hardly indicates an intent to *protect* states or permit them to compel *federal* enforcement. Ultimately, there is nothing in the statute that indicates even an arguable interest in permitting states to "ensur[e] that HHS does not . . . abdicat[e] its mandatory enforcement responsibility under the statute."  W. Va.'s Br. at 34.

In any event, West Virginia's reliance on that interest ignores the broader context of this lawsuit.   West Virginia's real interest here is in undoing the ACA and precluding *any* enforcement of the market reforms—which West Virginia does not deny—and which is obviously inconsistent with the ACA itself.  *See Clarke v. Sec. Indus. Ass'n*, 479 U.S. 388, 397 n.12 (1987) (stating that "the 'zone of interest' inquiry . . . seeks to exclude those plaintiffs whose suits are more likely to frustrate than to further statutory objectives"); *see also* Def.'s Br. at 30-31 (citing *Ass'n of Am. Physicians & Surgeons, Inc. (AAPS) v. Koskinen*, 768 F.3d 640,

642-43 (7th Cir. 2014)).   West Virginia relegates the highly relevant *AAPS* decision to a footnote—offering no substantive response to it, but merely characterizing the relevant passage as dicta.   *See* W. Va.'s Br. at 35 n.5.   But an alternative holding is not the same as dicta, and the zone-of-interests discussion in *AAPS*, while not binding on this Court, is nonetheless a precedential holding of the Seventh Circuit that cannot merely be ignored.   *See Woods v. Interstate Realty Co.*, 337 U.S. 535, 537 (1949) ("[W]here a decision rests on two or more grounds, none can be relegated to the category of obiter dictum."); *California v. United States*, 438 U.S. 645, 689 n.10 (1978).   Even assuming Article III jurisdiction, therefore, at a minimum Counts I-II must be dismissed as outside the ACA's zone of interests.[11]

## CONCLUSION

For the foregoing reasons, Defendant's motion to dismiss for lack of subject-matter jurisdiction should be granted.

Dated: December 11, 2014                    Respectfully submitted,

                                            JOYCE R. BRANDA
                                            Acting Assistant Attorney General

                                            SHEILA LIEBER
                                            Deputy Branch Director

                                            */s/ Daniel Schwei*
                                            DANIEL SCHWEI
                                            Trial Attorney (N.Y. Bar)
                                            United States Department of Justice
                                            Civil Division, Federal Programs Branch
                                            20 Massachusetts Ave. NW

---

[11] West Virginia briefly asserts that, even if Count I is outside the ACA's zone of interests, the claim may nonetheless proceed "as a 'nonstatutory cause of action' for reviewing *ultra vires* executive action[.]"  W. Va.'s Br. at 35 (citing, *inter alia*, *Leedom v. Kyne*, 358 U.S. 184 (1958)). But if Count I would fail on the merits under the APA, *see* W. Va.'s Br. at 33, West Virginia does not explain why the claim would fare any better under *Leedom*.   And in any event, West Virginia's brief reference to this argument does not satisfy the strict requirements for invoking this "extraordinary" and "extremely narrow in scope" basis for review. *Nat'l Air Traffic Controllers Ass'n v. Fed. Serv. Impasses Panel*, 437 F.3d 1256, 1263 (D.C. Cir. 2006).

Washington, DC 20530
Tel.:    (202) 305-8693
Fax:     (202) 616-8470
Email: daniel.s.schwei@usdoj.gov

<u>Mailing Address:</u>
Post Office Box 883
Washington, D.C. 20044

<u>Courier Address:</u>
20 Massachusetts Avenue N.W.
Washington, D.C. 20001

*Counsel for Defendant*