# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

_____
                                          )
**State of West Virginia,**               )
                                          )
    **Plaintiff,**        )
                                          )
      **v.**    )    **Civil No. 1:14-cv-01287 (APM)**
                                          )
**United States Department of Health and**  )
**Human Services,**                       )
                                          )
    **Defendant.**       )
_____   )

## MEMORANDUM OPINION

## I.  INTRODUCTION

As part of the Patient Protection and Affordable Care Act ("ACA" or "the Act"), all individual health insurance plans are required to comply with eight federally mandated market requirements, unless a plan qualifies for a "grandfathering" exception.  Responsibility for the enforcement of these market requirements is shared by the federal government and the States.  The ACA does not compel the States to enforce the market requirements, but provides them with the option of doing so if they desire.  If a State declines to enforce the Act or does so inadequately, the ACA provides that "the Secretary [of Health and Human Services] shall enforce" the Act's provisions "in such State."

Initially, all health insurance plans that went into effect or were renewed after January 1, 2014, were required to be compliant with the ACA's eight market requirements.  However, after some individuals and small businesses received cancellation notices from their insurance companies, the federal government—through Defendant Department of Health and Human

Services ("HHS")—instituted a change in policy ("the Administrative Fix"[1] or "the Fix").   On November 14, 2013, HHS announced that, subject to certain conditions, it would refrain from enforcing the eight market requirements through October 1, 2014, thereby allowing consumers to retain coverage under non-compliant policies until that date.   HHS further announced that it would encourage States to follow the federal government's lead and refrain from enforcing the eight market requirements.   States, however, remained free to enforce the market requirements if they so wished.   On March 5, 2014, HHS extended the Administrative Fix until October 1, 2016.

Plaintiff State of West Virginia brought this action to challenge the Administrative Fix, claiming that the Fix violates the Affordable Care Act and the Administrative Procedure Act; constitutes an unlawful delegation of federal executive and legislative power to the States; and contravenes state sovereignty under the Tenth Amendment.   The merits of the State's contentions, however, must take a back seat to the threshold issue advanced by HHS in its Motion to Dismiss: that West Virginia lacks standing to challenge the Administrative Fix.

West Virginia asserts that it has standing because the Administrative Fix forces it to make an untenable choice:   either regulate under the ACA or decline to regulate, in which case non-compliant policies will be sold within West Virginia's borders because of HHS' policy decision not to enforce the ACA's market requirements.   These circumstances, West Virginia argues, have caused it to suffer two cognizable injuries.   First, West Virginia contends that HHS' policy decision not to enforce the ACA has shifted enforcement responsibility to the State and made it the "exclusive and unfettered" enforcer of the ACA's eight market requirements within its borders. This purported shifting of enforcement responsibility, West Virginia claims, has caused it to suffer

---

[1] For convenience in referring to the record, the court has decided to use the term used by Plaintiff—"the Administrative Fix"—to describe the policy change.   In its pleadings, Defendant refers to the same policy as "the Transitional Policy."

an "anti-commandeering" injury under the Tenth Amendment.  Second, West Virginia contends that the shift in enforcement responsibility has made the federal government less politically accountable for the non-enforcement of the ACA at the expense of the States.  West Virginia alleges that this heightened "political accountability" to its own citizens constitutes a cognizable injury.

The court rejects these arguments and concludes that West Virginia lacks standing to challenge the Administrative Fix.  The State's asserted injuries are not the kind of concrete and particularized injury-in-fact that is actual or imminent—and not conjectural or hypothetical—that is required to establish standing under the standards set by *Lujan v. Defenders of Wildlife*, 504 U.S. 555 (1992).  Therefore, because this court lacks subject matter jurisdiction over this matter, the court grants Defendant's Motion to Dismiss.

## II.    BACKGROUND

### A.    Factual Background

Congress enacted the Patient Protection and Affordable Care Act ("ACA" or "the Act") on March 23, 2010.  Def.'s Mem. in Supp. of Mot. to Dismiss, ECF No. 13-1, at 4 [hereinafter Def.'s Mem.].  Among the reforms initiated by the ACA was a requirement that all individual health insurance plans that went into effect or were renewed after January 1, 2014, were to meet eight federally mandated market requirements, unless they fell under a grandfathering exception.  Compl., ECF No. 1, ¶ 20.

The ACA established a regime of "cooperative federalism" to enforce these requirements.  Under the Act, States are the first line of enforcement and can elect to use their resources to enforce the ACA, consistent with their own state laws.  *Id.* ¶¶ 25-26; 42 U.S.C. § 300gg-22(a)(1) ("[E]ach State may require that health insurance issuers . . . meet the requirements of this part with respect

to such issuers.").  If a State elects not to enforce the market requirements, the ACA then tasks the Secretary of the Department of Health and Human Services ("HHS") with making a "determination" as to whether "a State has failed to substantially enforce a provision (or provisions) in this part with respect to health insurance issuers in the State."  42 U.S.C. § 300gg-22(a)(2).  If the Secretary makes such a "determination," the ACA provides that "the Secretary *shall* enforce such provision (or provisions) . . . in such State."  *Id.* (emphasis added).  In other words, if a State decides not to enforce the market requirements, the ACA authorizes the federal government to enforce the market requirements within a State's boundaries.

In 2013, before the ACA's market requirements went into effect, health insurance companies began sending insurance cancellation letters to customers whose plans were neither covered by the grandfathering exception nor compliant with the ACA-mandated market requirements.  Compl. ¶ 35.  In response to those cancellations, on November 14, 2013, HHS instituted a policy change—what West Virginia refers to as "the Administrative Fix"—and announced that it would not, subject to two conditions, enforce the eight ACA-mandated market requirements until October 1, 2014.  *Id.* ¶¶ 40, 44-45.  Health insurers would be permitted to continue selling non-compliant insurance coverage as long as (1) the plans had been in effect on October 1, 2013, and (2) the insurers informed affected customers of their plans' non-compliance and the existence of the ACA's health insurance exchanges.  *Id.* ¶¶ 45-46.  HHS "encouraged" the States to adopt the same transitional policy and thus to refrain from state-level enforcement of the market reforms.  *Id.* ¶ 49 & Ex. 6 at 3.  On March 5, 2014, HHS extended the Administrative Fix until October 1, 2016.  *Id.* ¶¶ 51-52.

"West Virginia believes that its citizens should be able to keep their individual health insurance plans if they like them." *E.g., id.* ¶ 6.  To that end, and in anticipation of the Act going

into effect, West Virginia had given insurance carriers "the option to permit early renewal for 2013 policyholders," so that they could extend their current, possibly non-compliant insurance plans through 2014.  Compl., Ex. 13, at 2.  Due to this prior action, West Virginia Insurance Commissioner Michael D. Riley initially announced that West Virginia would not "accommodate the Administrative Fix" because individuals and businesses had "already made extensive changes to comply with the new law."  Compl. ¶¶ 80-81 (internal citation omitted) (internal quotation marks omitted).  After HHS extended the Administrative Fix until 2016, Commissioner Riley announced that West Virginia would refrain from enforcement.  *Id*. ¶ 82-83.  The State "committed not to restrict the renewal of certain non-compliant plans for policy years that end by October 2017," and left it "up to the [insurance] carriers as to whether they want[ed] to offer non-compliant plans through that much longer period."  *Id*. (citation omitted) (internal quotation marks omitted).

### B.    Procedural Background

Four months after HHS extended the Administrative Fix, West Virginia filed this lawsuit. Its Complaint specifies the nature of its alleged injury.   West Virginia alleges that the Administrative Fix caused it injury "by forc[ing it] to become the sole and exclusive enforcer of federal law within its borders" and by "reduc[ing] the political accountability of the federal government at the expense of the States."  *Id*. ¶¶ 68-69.

Soon after it filed its Complaint, West Virginia filed a Motion for Summary Judgment. ECF No. 7.  HHS then moved to stay proceedings on the Motion for Summary Judgment, so that the court first could resolve the question of its subject matter jurisdiction over this suit. ECF No. 10.  Judge Walton, who was then presiding over this case, granted HHS' motion, staying further briefing on West Virginia's Summary Judgment Motion.  Order, ECF No. 17.

HHS filed its Motion to Dismiss on October 17, 2014.  ECF No. 13.  The court heard argument on the Motion on September 3, 2015.  ECF No. 32.

## III.  LEGAL STANDARD

On a motion to dismiss brought, as here, under Federal Rule of Civil Procedure 12(b)(1), a federal court must presume that it "lack[s] jurisdiction unless the contrary appears affirmatively from the record." *DaimlerChrysler Corp. v. Cuno*, 547 U.S. 332, 342 n.3 (2006) (citation omitted) (internal quotation marks omitted).  The burden of demonstrating the contrary, including establishing the elements of standing, "rests upon the party asserting jurisdiction."  *Kokkonen v. Guardian Life Ins. Co. of Am.*, 511 U.S. 375, 377 (1994); *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 561 (1992).  Standing must be demonstrated "for each claim" and "for each form of relief sought," *DaimlerChrysler*, 547 U.S. at 352 (citation omitted) (internal quotation marks omitted), "with the manner and degree of evidence required at the successive stages of litigation," *Lujan*, 504 U.S. at 561.

Further, on a motion to dismiss, the court must accept "well-pleaded factual allegations as true and draw all reasonable inferences from those allegations in the plaintiff's favor." *Arpaio v. Obama*, 797 F.3d 11, 19 (D.C. Cir. 2015).  The court need not, however, assume the truth of legal conclusions, *see Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009), nor "accept inferences that are unsupported by the facts set out in the complaint," *Islamic Am. Relief Agency v. Gonzales*, 477 F.3d 728, 732 (D.C. Cir. 2007).  "Threadbare recitals of the elements of [standing], supported by mere conclusory statements, do not suffice." *Iqbal*, 556 U.S. at 678.  If a complaint does not contain sufficient factual matter "to state a claim [of standing] that is plausible on its face," it must be dismissed.  *Id*. (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)); *see generally Arpaio*, 797 F.3d at 19-20 (setting forth the standard of review for a motion to dismiss that asserts

a lack of standing under Rule 12(b)(1)).  In evaluating a Rule 12(b)(1) motion, a court has broad

discretion to consider relevant and competent evidence—including materials outside the

pleadings.  *Finca Santa Elena, Inc. v. U.S. Army Corps of Eng'rs*, 873 F. Supp. 2d 363, 368

(D.D.C. 2012) (citing 5B Charles Wright & Arthur Miller, *Federal Practice & Procedure* § 1350

(3d ed. 2004)).

## IV.    DISCUSSION

Under Article III of the U.S. Constitution, the jurisdiction of the federal courts is limited

to "Cases" and "Controversies."  Art. III, § 1.  The Constitution does not define either of those

terms, and so federal courts have developed the doctrine of standing to identify exactly which cases

and controversies fall within the scope of federal jurisdiction.  *Lujan*, 504 U.S. at 560.  At a

minimum, in order to establish that it has standing, a plaintiff must allege: (1) injury-in-fact

suffered by the plaintiff; (2) a causal connection between the injury and the complained-of conduct;

and (3) a likelihood that the injury will be "redressed by a favorable decision" from the court.  *Id.*

at 560-61 (citation omitted) (internal quotation marks omitted).  Although HHS contends that West

Virginia cannot meet any of the three elements, Def.'s Mem. at 11-13, the court only focuses on

the first—injury-in-fact.

### A.    West Virginia's Alleged Injuries

Even a cursory reading of West Virginia's Complaint reveals that the injuries it asserts are

not among the traditional kinds of injuries that the Supreme Court has recognized as sufficient to

confer standing on a State that is challenging federal action.  West Virginia does not claim that the

Administrative Fix has caused it to suffer any financial injury.  *See, e.g.*, *Nat'l Fed'n of Indep.*

*Small Bus. v. Sebelius*, 132 S. Ct. 2566, 2604-05 (2012); Tr. of Oral Arg., ECF No. 32, at 19

[hereinafter Tr.] (conceding that West Virginia has not expended any state funds as a result of the

Administrative Fix). Nor does it allege that it has been compelled by the federal government to take a specific action. *See, e.g.*, *New York v. United States*, 505 U.S. 144, 160 (1992); Pl.'s Opp'n to Mot. to Dismiss, ECF No. 20, at 30-31 [hereinafter Pl.'s Opp'n] ("The State has not claimed harm from having to take any particular action."). Nor does it contend that it brings this action in its capacity as *parens patriae* to protect its citizens' interests. *See, e.g.*, *Alfred L. Snapp & Son, Inc. v. Puerto Rico*, 458 U.S. 592, 597-610 (1982); Compl. ¶¶ 67-79 (describing the alleged injury to West Virginia without any mention of harm to its citizens); Pl.'s Opp'n at 16-30 (same).

Instead, West Virginia alleges that it has suffered two, less traditional types of injury: (1) harm from "being forced to become the sole and exclusive enforcer of federal law within its borders," Compl. ¶ 68, and (2) harm from "the Administrative Fix reduc[ing] the political accountability of the federal government at the expense of the States," *id.* ¶ 69. Though West Virginia presents these as distinct harms, the court agrees with HHS that, upon closer scrutiny, they actually collapse into one injury: the enhanced "political accountability" that the State will suffer at the hands of its citizens who wish to see the ACA's market reforms enforced.

West Virginia's own briefing demonstrates the unity of its two alleged injuries. West Virginia's second asserted injury—that "the Administrative Fix reduced the political accountability of the federal government at the expense of the States," *id.*—is a straightforward allegation of injury to the State's political accountability, as evident from the very text of its description. West Virginia's first alleged injury—that it has been "forced to become the sole and exclusive enforcer of federal law," *id.* ¶ 68—is also, at its core, an allegation of harm to political accountability, although the State does not explicitly frame it as such. The State argues that the Administrative Fix "forces the State to one of two paths, either of which imposes constitutionally cognizable harms." Pl.'s Opp'n at 18. On one hand, West Virginia contends, "[i]f West Virginia

chooses to enforce federal law, it will be required to expend financial resources and will risk *the displeasure* of those individuals who lose their health insurance plans." *Id.* at 18-19 (emphasis added).  On the other hand, the State claims, "[i]f West Virginia continues on its present course and refuses to enforce the ACA's market requirements, it will *suffer blame* from those who believe the ACA forwards important policy ends and who wish to see the law fully enforced." *Id.* at 19 (emphasis added).  As West Virginia has elected not to enforce the ACA's market requirements, Compl. ¶ 83; Tr. 2-4, 18, its claimed injury then is the "blame" that will be cast upon the State by some of its citizens for declining to enforce the ACA and permitting non-compliant plans to be sold within the State.

West Virginia's statements at oral argument, similar to its briefing, make clear that the two injuries it alleges are really the same.  "The injury is that we are the exclusive enforcer of federal law," the State argued, "and we are, therefore, held accountable—whatever choice you make—as a legal matter." Tr. 20.  The State also agreed that its injury was "the political consequences or the political accountability that flows from having to make" the choice presented by the Administrative Fix.  *Id.*  Additionally, West Virginia admitted that its two allegations of injury could, in fact, be viewed as the same injury, with the only distinction being that the claimed harm of increased political accountability was available only to the States.  *Id.* 20-21 (stating that "the difference between the two theories of standing is that one would only be able to be invoked by states . . . . [W]hereas, the other theory is a broader theory that would apply to anyone that's been made the exclusive enforcer of federal law, whether it would be a private party or the state").[2]

---

[2] Similarly, in its Motion for Summary Judgment, West Virginia stated that "concerns about political accountability are at the core of the anti-commandeering doctrine."  Pl.'s Mem. in Supp. of its Mot. for Summ. J., ECF No. 7-1, at 30 [hereinafter Pl.'s Mem. for Summ. J.].

1.     *West Virginia's Assertion that Political Accountability Is Relevant Only to the Merits*

Despite having staked out this clear position, West Virginia seemingly attempted to change course at oral argument.  It argued:

> [O]ur injury is not political accountability.  I want to be absolutely clear about that. Our injury is that we were commandeered in violation of our Tenth Amendment rights under the Constitution . . . . Political accountability is how we have made our arguments *on the merits*.

Tr. 21 (emphasis added).

West Virginia, however, cannot change horses in the middle of the race.  As its Complaint makes clear, West Virginia defines the alleged harm to its sovereignty in terms of injury to political accountability, and it does not restrict that argument only to the merits.  Under the section heading "Injury to the State of West Virginia from the Administrative Fix," West Virginia alleges that, "[u]nder the Administrative Fix, the lines of political accountability are far less certain. . . . [T]he Administrative Fix creates—at a minimum—confusion as to which government is actually to blame for the ACA's policies."  Compl. ¶ 71.  Later, under the same heading, West Virginia asserts that this "blurred political accountability diminishes the sovereignty of West Virginia . . . by interfering with the relationship between state officials and their constituents, inhibiting the ability of elections to properly hold government and public officials accountable, and harming the reputation and dignity of the States and their officials and agencies." *Id.* ¶ 76.  West Virginia avers that it was "precisely the point of the Administrative Fix[ ] to shift political accountability for the ACA's eight federally mandated market requirements and their enforcement to the States." *Id.* ¶ 125; *see also id.* ¶¶ 72-73.

West Virginia echoes these allegations in its opposition brief. It argues that "the Administrative Fix violates the Tenth Amendment because its grant of exclusive enforcement

responsibility to the States improperly shifted political accountability from the Federal Government to the States," Pl.'s Opp'n at 14-15, and that "the State . . . has standing to protect its sovereign interest against being held politically accountable for federal policy," *id.* at 20-21. West Virginia further contends that its sovereignty is at risk because "the Fix impermissibly shifts political accountability for the enforcement or non-enforcement of the ACA's federal market requirements from the Federal Government to the States, including to West Virginia." Pl.'s Opp'n at 23-24; *see also, e.g.*, *id.* at 15, 17, 20-21, 27, 31.[3]

As the foregoing passages make clear, West Virginia's allegations and arguments about political accountability do not pertain only to the merits of its challenge to the Administrative Fix. Rather, those allegations and arguments go to the very heart of its asserted basis for standing, to which the court now turns.

## B.     Injury to Political Accountability as Injury-In-Fact

To successfully allege injury-in-fact, a plaintiff must contend that it has suffered "an invasion of a legally protected interest which is (a) concrete and particularized . . . and (b) actual or imminent, not conjectural or hypothetical." *Lujan*, 504 U.S. at 560 (citation omitted) (internal quotation marks omitted). Although "States are not normal litigants" for purposes of standing, *Massachusetts v. E.P.A.*, 549 U.S. 497, 518 (2007), "and have interests and capabilities beyond those of an individual by virtue of their sovereignty," *Oregon v. Legal Servs. Corp.*, 552 F.3d 965 (9th Cir. 2009) (citing *E.P.A.*, 549 U.S. at 518-20), they too must allege a cognizable injury-in-fact to establish standing, *see E.P.A.*, 549 U.S. at 516-23. The court concludes that West Virginia

---

[3] West Virginia's Motion for Summary Judgment advances these same arguments. Its motion asserts that "States have a protectable sovereign interest in not being held politically accountable by their citizens for the enforcement or nonenforcement of federal law within their borders . . ." and that "State officials suffer such cognizable sovereign harm when they are forced to bear the brunt of public disapproval for a federal program . . . or are held politically accountable for the federal program." Pl.'s Mem. for Summ. J., ECF No. 7-1, at 39 (citations omitted) (internal quotation marks omitted); *see generally id.* at 35-40.

has failed to do so here.  Its claimed injury of "political accountability" is not an "invasion of a legally protected interest" that is "concrete and particularized" and "not conjectural or hypothetical." *Lujan*, 504 U.S. at 560 (citation omitted) (internal quotation marks omitted).

For starters, the State's interest in avoiding greater political accountability relative to the federal government is not the kind of sovereign state interest that the Supreme Court has recognized as giving rise to standing if allegedly infringed.  West Virginia's claimed injury does not involve the State's interest in the enforcement of *its own* laws.  *See Snapp*, 458 U.S. at 601 (identifying as a sovereign interest "the power to create and enforce a legal code, both civil and criminal").  It does not involve a demand that West Virginia's sovereignty be recognized by another state.  *See id.* (identifying as a sovereign interest "the demand for recognition from other sovereigns").  It does not involve the State's real property, *see E.P.A.*, 549 U.S. at 519 (recognizing "Massachusetts' well-founded desire to preserve its sovereign territory"); its public fisc, *see Nat'l Fed'n of Indep. Small Bus.*, 132 S. Ct. at 2604-05 (holding that the "threatened loss of over 10 percent of a State's overall budget . . . is economic dragooning that leaves the States with no real option but to acquiesce" in a federal demand); or another form of proprietary interest, *see Snapp*, 458 U.S. at 601 (observing that "a State is bound to have a variety of proprietary interests . . . [such as] own[ing] land or participat[ing] in a business venture").  It also does not involve resolution of public nuisances, *id.* at 603 (recognizing a state's interest in "represent[ing] the interests of their citizens in enjoining public nuisances"); preservation of its citizens' economic or physical well-being, *id.* at 607 ("[A] State has a quasi-sovereign interest in the health and well-being—both physical and economic—of its residents in general."); or protection of its citizens' interest in participating in the federal system of government, *id.* at 608 (recognizing as a quasi-sovereign interest "that the State and its residents are not excluded from the benefits that are to

flow from participation in the federal system"). And it does not involve state action actually coerced, or even allegedly coerced, by the federal government. *See, e.g.*, *New York*, 505 U.S. at 161 (recognizing that the States have a cognizable interest in "whether Congress may direct or otherwise motivate the States to regulate in a particular field or a particular way").

Instead, West Virginia's claimed injury, at bottom, involves a general desire to challenge the legality of a federal action, relying on the abstract concept of political accountability to define its alleged harm, which itself is rooted in abstract concepts of federalism and state sovereignty. The Supreme Court held long ago, however, that a State's general challenge to the lawfulness of federal action, predicated on an abstract injury to the State's sovereignty, is not sufficient to confer standing. *See Massachusetts v. Mellon*, 262 U.S. 447, 484-85 (1923).

In *Mellon*, the Commonwealth of Massachusetts challenged the federal Maternity Act. *Id.* at 479. The Maternity Act presented the States with a simple choice: either accept federal funds and the conditions attached to those funds to implement the Maternity Act or decline to do so. *Id.* Massachusetts elected not to opt into the Act, but nevertheless challenged it on the ground that it "invades the local concerns of the state, and is a usurpation of power, viz., the power of local self-government, reserved to the states." *Id.* at 480. The Court began with the observation that Article III's "case or controversy" requirement meant that the federal courts are not open to the States merely "because a state is a party, but only where it is a party to a proceeding of judicial cognizance." *Id.* The Court then asked:

> What, then, is the nature of the right of the state here asserted and how is it affected by this statute? . . . [W]hat burden is imposed upon the states, unequally or otherwise? Certainly there is none, unless it be the burden of taxation, and that falls upon their inhabitants, who are within the taxing power of Congress as well as that of the states where they reside. *Nor does the statute require the states to do or to yield anything.* If Congress enacted it with the ulterior purpose of tempting them to yield, that purpose may be effectively frustrated by the simple expedient of not yielding.

13

*Id.* at 482 (emphasis added).  Determining that Massachusetts had failed to demonstrate that the Maternity Act had caused it any particularized and concrete burden, the Court held that the Commonwealth had "present[ed] no justiciable controversy, either in its own behalf or as the representative of its citizens." *Id.*  at 480.  The Court concluded that Massachusetts' challenge was ultimately "political, and not judicial in character, and therefore [was] not a matter which admits of the exercise of the judicial power."  *Id.* at 483; *see also New Jersey v. Sargent*, 269 U.S. 328, 337 (1926) (holding that the State's allegation that the congressional act at issue that went "beyond the power of Congress and impinge[d] on that of the state . . . [did] not suffice as a basis for invoking an exercise of judicial power").

Nearly one hundred years later, West Virginia finds itself in precisely the same situation. West Virginia admits that the Administrative Fix does not require it "to do or to yield anything." *Mellon*, 262 U.S. at 482; Pl.'s Opp'n at 30-31 ("The State has not claimed harm[ ] from having to take any particular action.").  Rather, the Fix only presents the State with a simple choice:  either enforce the ACA's market requirements or don't—the very same choice put to the states by the ACA itself.  But merely being put a choice does not give rise to a legally cognizable injury.  *See Mellon*, 262 U.S. at 480, 482 (finding no "justiciable controversy" where the statute did not "require the states to do or to yield anything"); *cf. FERC v. Mississippi*, 456 U.S. 742, 765-66 (1982) (requiring a state merely to "consider" federal proposals does "not threaten the States' 'separate and independent existence' and [does] not impair the ability of the States 'to function effectively in a federal system'") (citations omitted).  West Virginia wisely does not argue otherwise.  Instead, it argues that the *consequences* that flow from being put to such a choice give rise to its injury-in-fact under the Tenth Amendment.  *See* Tr. 20 ("The injury is that we are the exclusive enforcer of federal law, and we are, therefore, held accountable.").

But consequential harm in the form of increased or enhanced "political accountability" is simply too abstract to support standing. Such asserted injury presents "abstract questions of political power, of sovereignty, of government" of the kind that federal courts are not permitted to adjudicate. *Mellon*, 262 U.S. at 485; *see also Valley Forge Christian Coll. v. Ams. United for Separation of Church & State, Inc.*, 454 U.S. 464, 475 (1982) ("[E]ven when the plaintiff has alleged redressable injury sufficient to meet the requirements of Art. III [standing]," [courts] should "refrain[ ] from adjudicating abstract questions of wide public significance which amount to generalized grievances.") (internal citation omitted) (internal quotation marks omitted). For instance, how would the court evaluate whether, as West Virginia claims, the Administrative Fix has resulted in "lines of political accountability [that] are far less certain"? Compl. ¶ 71. Or, determine whether the Administrative Fix has "shift[ed] political accountability away from the federal government to the States"? *Id.* ¶ 72. How would the court measure whether, as a consequence of the Administrative Fix, West Virginia's citizens, in fact, hold the State, as opposed to the federal government, responsible for the non-enforcement of the ACA's market requirements?

These, and similar questions, would require the court to adjudicate "not rights of person or property, not rights of dominion over physical domain, not quasi sovereign rights actually invaded or threatened," *Mellon*, 262 U.S. at 484-85, but instead would lead the court "'into the area of speculation and conjecture,' and beyond the bounds of [its] jurisdiction," *Whitmore v. Arkansas*, 495 U.S. 149, 158 (1990) (quoting *O'Shea v. Littleton*, 414 U.S. 488, 497 (1974)); *see also, c.f.*, *Baker v. Carr*, 369 U.S. 186, 217 (1962) (establishing the factors to be considered when determining justiciability, including "a lack of judicially discoverable and manageable standards

for resolving [a claim]," and "the impossibility of deciding [a claim] without an initial policy determination of a kind clearly for nonjudicial discretion").

The problem of establishing injury-in-fact is further compounded here because the State can, at best, assert that that the Administrative Fix made it *marginally* more politically accountable to its citizens; it cannot claim that the Fix made it newly accountable to them. After all, Congress gave the States a choice whether to enforce the Act's market requirements. 42 U.S.C. § 300gg-22(a)(1). The Administrative Fix did nothing to alter that enforcement regime or political reality. Indeed, West Virginia concedes that "each State has the same decision to make about enforcement that it had before the Administrative Fix." Compl. ¶ 63(c). What the Administrative Fix changed, according to West Virginia, is the *consequence* of a state's decision not to enforce. *Id.*; Tr. 19. West Virginia argues that "[t]his re-writing of the ACA imbues the States' decisions with *significantly greater* practical and legal consequence, and thereby shifts political accountability to the States in violation of the Tenth Amendment." Pl.'s Mem. for Summ. J. at 33 (emphasis added). But alleged injury in the form of newly levied political accountability is itself too abstract to support standing. And alleged injury of *marginally* increased political accountability, as claimed here, is even more attenuated.[4]

---

[4] Even the limited record here demonstrates the impossibility of determining whether the Administrative Fix made West Virginia marginally more accountable to its citizens. An article attached to West Virginia's Complaint cites a state health-policy expert, Brandon Merritt, as saying that the State's decision to allow non-compliant plans to be sold, per the Administrative Fix, "impacts a small segment of the state's population." Compl., Ex. 14, at 3. Merritt is quoted as further opining: "All in all, this makes me feel like this won't have a huge impact on the way the ACA is implemented. It shouldn't impact the implementation in West Virginia much, because we have one of the smallest individual markets in the country." *Id.* (internal quotation marks omitted). The Article estimated that roughly 55 percent of West Virginians receive their insurance from a large employer or through state employment, and more than 30 percent receive public insurance, such as Medicare or Medicare. *Id.* There is no information about exactly how many citizens would be affected by the Fix, *id.* at 2-3 (noting only that the Fix will "likely impact only a small portion of the population [in West Virginia]" or "a small segment of the [ ] population"), or if those affected citizens hold the State accountable for the ACA's non-enforcement.

West Virginia argues that this case differs from *Mellon* and like cases because those cases did not "involve[ ] the shifting of political accountability for federal policies from the Federal Government to the States, nor did the States in those cases assert any violation of the anti-commandeering doctrine." Pl.'s Opp'n at 28. But these attempts to distinguish *Mellon* and related cases fail for two reasons. First, the fact that *Mellon* and other cases do not expressly reject the idea that shifting political accountability can support standing does not mean that such asserted injury is a legally cognizable injury under *Lujan*. After all, West Virginia has not cited any case that recognizes its novel standing theory and distinguishes *Mellon* from the present factual context. Second, and more importantly, the crux of *Mellon* is that abstract injuries, even where advanced by a State, do not suffice to support Article III standing. *See* 262 U.S. at 480 (observing that the effect of Article III's "case or controversy" requirement "is not to confer jurisdiction upon the court merely because a state is a party, but only where it is a party to a proceeding of judicial cognizance"). Thus, the fact that West Virginia here advances an "anti-commandeering" Tenth Amendment claim, but *Mellon* involved a Tenth Amendment challenge to the federal government's exercise of its spending power, is irrelevant. Concrete injury is an indispensable requirement of a valid action regardless of the nature of the challenge.

### C. Political Accountability as Injury-in-Fact Under *New York* and *Printz*

To support its argument that enhanced political accountability constitutes an injury-in-fact, West Virginia relies primarily on two Tenth Amendment "anti-commandeering" cases—*New York v. United States*, 505 U.S. 144 (1992), and *Printz v. United States*, 521 U.S. 898 (1997). At issue in *New York* was the federal Low-Level Radioactive Waste Policy Amendments Act of 1985. *New York*, 505 U.S. at 149-51. That Act provided States monetary and access incentives to follow its terms, but if a State decided not to do so, the Act compelled the State to take title to all internally

generated radioactive waste and made it liable for all damages arising from the failure of the State to take possession of such waste. *Id*. at 152-54. The Supreme Court held that, although the monetary and access provisions in question were constitutional, the "take title" provision was not, because it put the States to an unconstitutionally coercive choice: either regulate as Congress directed or take title to the waste. *Id.* at 171-77 ("A choice between two unconstitutionally coercive regulatory techniques is no choice at all."). West Virginia argues that the Court recognized in *New York* that placing heightened political accountability on the States, without more, could constitute a cognizable "anti-commandeering" injury, Pl.'s Opp'n at 21-22, citing the following passage:

> [W]here the Federal Government directs the States to regulate, it may be state officials who will bear the brunt of public disapproval, while the federal officials who devised the regulatory program may remain insulated from the electoral ramifications of their decision.

*New York*, 505 U.S. at 169.

*Printz*, the other case on which West Virginia relies, involved a federal law requiring state and local law enforcement officers to conduct background checks and perform other tasks related to gun sales. The Supreme Court held that under the Tenth Amendment the federal government could neither compel a State, nor conscript State officers, to administer or enforce a federal regulatory program. *Printz*, 521 U.S. at 933-35. It noted that "[i]t is an essential attribute of the States' retained sovereignty that they remain independent and autonomous within their proper sphere of authority. It is no more compatible with this independence and autonomy that their officers be 'dragooned' . . . into administering federal law." *Id.* at 928 (citation omitted). The Court answered the government's contention that requiring the States to perform discrete, ministerial acts did not violate the Tenth Amendment by explaining—in a passage cited by West Virginia to support its standing theory, Pl.'s Opp'n at 22—that, "even when the States are not

forced to absorb the costs of implementing a federal program, they are still put in the position of taking the blame for its burdensomeness and for its defects," *Printz*, 521 U.S. at 930.

West Virginia is correct that both *New York* and *Printz* recognize that the States may incur unfair and disproportionate political consequences when the federal government unlawfully "commandeers" the States' regulatory structures and personnel to enforce federal standards. *See New York*, 505 U.S. at 168; *Printz*, 521 U.S. at 921. But neither case holds that the States suffer a legally cognizable injury-in-fact whenever the federal government, without more, presents them with a simple choice about whether to enforce federal standards, and the only discernable consequence of electing not to enforce is that the State becomes politically accountable (or marginally more accountable) to its citizens. Neither *New York* nor *Printz* is a case about standing, and the Court's observations about political accountability came strictly within its discussions of the merits. The court agrees with HHS that West Virginia cannot "take an abstract concept, elucidated as part of the Supreme Court's merits reasoning, and bootstrap that abstraction into a cognizable Article III injury." Def.'s Reply to Pl.'s Opp'n to Mot. to Dismiss, ECF No. 23, at 6 [hereinafter Def.'s Reply].

But, more importantly, the passages in *New York* and *Printz* on which West Virginia relies were written in the context of analyzing federal statutes that *coerced* or *compelled* the States to enforce federal standards—a circumstance that West Virginia concedes does not exist here.[5] *See New York*, 505 U.S. at 161-62, 175-77; *Printz,* 521 U.S. at 933-35; Tr. 10-15; Pl.'s Mem. for Summ J. at 34; *see* Pl.'s Opp'n at 7-8 (stating that the ACA gave the States a voluntary choice to

---

[5] The court uses the phrase words "compel" and "coerce" here as the Court used them in *New York*. There, the Court distinguished statutes that unlawfully "compel" and "coerce" from those that permissibly "encourage" a State to regulate in a particular way. *New York*, 505 U.S. at 166 ("Our cases have identified a variety of methods, short of outright coercion, by which Congress may urge a State to adopt a legislative program consistent with federal interests.").

enforce the market requirements and describing the Fix only as changing the consequence of that choice, rather than the voluntary nature of the choice).  In *New York*, the Court explained that "where the Federal Government *compels* States to regulate, the accountability of both state and federal officials is diminished."  505 U.S. at 168 (emphasis added).  Later in the same paragraph, the Court again observed, "where the Federal Government *directs* the States to regulate, it may be state officials who will bear the brunt of public disapproval."  *Id.* at 169 (emphasis added).  The Court noted that the statute in question "offers state governments a 'choice' of either accepting ownership of waste or regulating according to the instructions of Congress."  *Id.* at 175.  In other words, the statute offered States no real choice at all:  "No matter which path the State chooses, it must follow the direction of Congress."  *Id.* at 177.

Similarly, the key passage in *Printz* cited by West Virginia—"[E]ven when the States are not forced to absorb the costs of implementing a federal program, they are still put in the position of taking the blame," 521 U.S. at 930; *see also* Pl.'s Opp'n at 22—came in reference to a federal statute that, even by the federal government's admission, "*require[ed]* state officers to perform discrete, ministerial tasks specified by Congress," *Printz*, 521 U.S. at 929 (emphasis added). Indeed, the court observed that "the whole *object* of the law [was] to direct the functioning of the state executive, and hence to compromise the structural framework of dual sovereignty."  *Id.* at 932.  In such a scheme, the Court commented, "it will be the [state official] and not some federal official who stands between the gun purchaser and immediate possession of his gun."  *Id.* at 930.

Fairly read, *New York* and *Printz* recognize that, when a State suffers actual concrete injury from a federal government action—such as through the coerced expenditure of state revenues, the compelled enforcement of federal standards, or the forced acceptance of title to property— increased political accountability for the State is a natural, albeit derivative, outgrowth of such

concrete injury.  But neither *New York* nor *Printz* can be reasonably read, as West Virginia asserts, to mean that increased political accountability is a stand-alone, cognizable legal injury for purposes of Article III standing.

Other Supreme Court anti-commandeering cases, although they do not speak of political accountability, also implicitly recognize that no true "commandeering" injury-in-fact exists absent compulsion or coercion by the federal government.  *See, e.g.*, *FERC*, 456 U.S. at 765 (finding no Tenth Amendment violation where there was nothing in the federal statute "directly compelling" the States to enact a legislative program); *Hodel v. Va. Surface Mining & Reclamation Ass'n, Inc.*, 452 U.S. 264, 288 (1981) (finding no Tenth Amendment violation where "the States are not compelled to enforce the [federal] standards, to expend any state funds, or to participate in the federal regulatory program in any manner whatsoever"); *Charles C. Steward Mach. Co. v. Davis*, 301 U.S. 548, 589-90 (1937) (requiring "coercion" to establish an anti-commandeering injury, *i.e.*, "the exertion of a power akin to undue influence").  Indeed, West Virginia has cited no case, and the court has found none, in which alleged injury to political accountability, unmoored from allegations of federal compulsion or coercion, was sufficient to confer standing upon a state.  *See* Pl.'s Mem. for Summ. J. at 34 (arguing that "HHS did not require the States to enforce federal law—as the Federal Government had done in *New York* and *Printz*—[but that] its *novel* effort to grant the States unconditional and unguided discretion over federal law is no less unconstitutional") (emphasis added); *see id.* (admitting that the "courts have not previously encountered" the type of situation at issue here).

As for the present Complaint, it nowhere alleges that the Administrative Fix compelled or coerced West Virginia to enforce the ACA's eight market requirements.  Admittedly, the Complaint does use the word "conscripted" to describe the impact of HHS' actions on the State.

*See, e.g.*, Compl. ¶ 10(d) ("By making *States* solely responsible for determining under *federal* law whether plans made illegal by the ACA must be cancelled, the President has unlawfully conscripted States into federal service[.]"); *see also id.* ¶ 119 (citing *Printz*'s use of the word "conscript").  But at oral argument, West Virginia conceded that by "conscripted" it meant little more than that the Administrative Fix put the State to a choice:  either enforce the ACA's market requirements or elect not to do so, knowing that without federal enforcement, non-compliant plans could be sold legally within the State's borders.  Tr. 10-11.  As discussed, however, simply offering the State a choice about regulation, without any use of coercion, does not give rise to a cognizable injury-in-fact for purposes of standing.

Elsewhere, West Virginia uses the word "force" in its Complaint, alleging that "the Administrative Fix forces States to become federal policymakers."  Compl. ¶ 64.  But, when read in the context of the Complaint as a whole, West Virginia uses the word "force" no differently than it does the word "conscript"—that is, to mean that the State is asked to make a voluntary choice whether or not to enforce the ACA's market requirements, with the certain consequence that the decision not to enforce will enable non-compliant plans to be sold within the State's borders.

### D.      *Per Se* Injury-in-Fact Under *Lomont*

Unable to root its asserted injury-in-fact in *New York* and *Printz*, West Virginia tries a different tack.  It argues "that a State *always* has *standing* to challenge a federal statute or regulation that the State can colorably claim violates its Tenth Amendment rights."  Pl.'s Opp'n at 22 (emphasis added).  Stated differently, West Virginia argues that inherent in any colorable anti-commandeering claim brought by a State is a legally cognizable injury resulting from federal action.  And, because a court must assume success on the merits of such a claim at the motion to

dismiss stage, *see LaRoque v. Holder*, 650 F.3d 777, 785 (D.C. Cir. 2011) ("[I]n assessing plaintiffs' standing, we must assume they will prevail on the merits of their constitutional claims."), a State that asserts a colorable anti-commandeering claim "always" has plead a sufficient injury-in-fact.

To support its argument, West Virginia relies on the Court of Appeals' decision in *Lomont v. O'Neill*, 285 F.3d 9 (D.C. Cir. 2002) [hereinafter *Lomont II*].  In *Lomont II*, the plaintiffs were private individuals and local law enforcement officials who challenged federal regulations implementing the National Firearms Act of 1934.  285 F.3d at 11-13.  Under those regulations, anyone who wished to transfer a firearm had to obtain a certification from a local chief of police or county sheriff or an appropriate federal official.  *Id.* at 12.  The plaintiffs argued that the certification requirement violated the Tenth Amendment under *Printz* because it "compelled" States to administer the federal regulatory regime.  *Lomont v. Summers*, 135 F. Supp. 2d 23, 24 (D.D.C. 2001) [hereinafter *Lomont I*].  The Court of Appeals ultimately rejected the plaintiffs' claim on the merits, concluding that, unlike the regulations in *Printz*, the challenged regulations did not command local and state officials to do anything; their participation was entirely voluntary. *Lomont II*, 285 F.3d at 14.

But before reaching the merits, the Court of Appeals ruled that the plaintiffs who were local sheriffs had standing to raise their claims.  *Id.* at 13.  The Court of Appeals rejected the government's argument, raised in a footnote in its brief, that the sheriffs had standing only if authorized by state law to act on behalf of the State.  *Id.* at 14-15.  According to West Virginia, because the Court of Appeals expressly and "easily" found standing in *Lomont II*, yet ruled against the plaintiffs on the merits, *Lomont II* requires courts to afford special "solicitude toward standing [that is] based on harm to a State's rights under the Tenth Amendment."  Pl.'s Opp'n. at 23.  In

other words, West Virginia argues that *Lomont II* creates automatic standing for States that assert colorable Tenth Amendment claims.

West Virginia accords *Lomont II* far more weight than it can bear. Nowhere does *Lomont II* say that a State "always" has standing to challenge a federal statute or regulation whenever it asserts a colorable anti-commandeering claim. Pl.'s Opp'n at 22. Had the Court of Appeals intended to announce such a categorical rule, it presumably would have done so explicitly. The better reading of *Lomont II* is a narrower one—namely, that state law enforcement officials have standing to challenge a federal law or regulation whenever they assert that the law or regulation at issue conscripts or impairs the state officers' official functions. *See Arpaio v. Obama*, 27 F. Supp. 3d 185, 201-02 (D.D.C. 2014) (interpreting *Lomont II* as a case conferring standing to challenge "*direct regulation*" of a state officer's official duties), *aff'd*, *Arpaio*, 797 F.3d at 14-15. Such a reading is consistent with the Court of Appeals' citation to both *Printz* and an earlier circuit decision, *Fraternal Order of Police v. United States*, 173 F.3d 898, 904-05 (D.C. Cir. 1999), each of which involved challenges by local sheriffs to federal gun laws that allegedly directly regulated their duties. This narrower reading of *Lomont II* is also consistent with the cursory treatment of standing in the government's appellate brief, which is addressed only in a footnote. The government did not seek to affirm the district court's dismissal of the complaint on the alternative ground that the law enforcement plaintiffs lacked standing.[6] Thus, the Court of Appeals had no occasion to consider the categorical standing rule that West Virginia advocates.

---

[6] This court has reviewed the appellate briefs in *Lomont* and confirmed that the government there did not argue that the district court's dismissal of the complaint could be affirmed on the alternative ground that the plaintiffs lacked standing. All the government did was assert its view, in a footnote, that the law enforcement plaintiffs had "standing only if they are authorized by state law to act on behalf of the State," but acknowledged that in *Fraternal Order of Police*, the Court of Appeals had held that a law enforcement organization had standing to represent the interests of its chief law enforcement members. *See* Br. for Appellees at 34-35 n.9, *Lomont v. O'Neill*, 285 F.3d 9 (D.C. Cir. 2002) (Civ. No. 01-05104).

Furthermore, *Lomont II* does not help West Virginia because the law enforcement plaintiffs there asserted that they were "compel[led]" "to enact or administer a federal regulatory program." *Lomont I*, 135 F. Supp. 2d at 24.  The complaint in *Lomont*, which this court has obtained and reviewed, alleged that the challenged federal regulations "require[d]" local law enforcement officials to complete transfer certificates, which necessitated that local officials undertake a variety of inquiries about the applicant, and thus "commandeer[ed] the resources of [the law enforcement plaintiffs] and all other State and local law enforcement officers so situated throughout the United States."  *Lomont I*, Civ. No. 00-01935 (JR), Compl. ¶¶ 38-39, 42 (filed Aug. 10, 2000).  West Virginia, of course, makes no similar allegation of compulsion here.  It does not allege that the Administrative Fix required it to expend any state resources or its officials to take any particular action.  Thus, West Virginia has not alleged the kind of concrete anti-commandeering injury that the Court of Appeals in *Lomont II* found to confer standing.

Finally, West Virginia's proposed categorical rule that a State "*always* has standing to challenge a federal statute or regulation that the State can colorably claim violates its Tenth Amendment rights" cannot be squared with Supreme Court precedent.  Pl.'s Opp'n at 22 (emphasis added).  The Supreme Court has explained that "[n]o principle is more fundamental to the judiciary's proper role in our system of government than the constitutional limitation of federal-court jurisdiction to actual cases or controversies."  *DaimlerChrysler Corp.*, 547 U.S. at 341 (citations omitted) (internal quotation marks omitted).  "If a dispute is not a proper case or controversy, the courts have no business deciding it, or expounding the law in the course of doing so."  *Id.*  The law of standing sits at the center of the case-or-controversy requirement of Article III, *see Lujan*, 504 U.S. at 341, and "serves to prevent the judicial process from being used to usurp the powers of the political branches,"  *Clapper v. Amnesty Int'l. USA*, 133 S. Ct. 1138, 1146 (2013).

By definition, Tenth Amendment challenges, such as the one at issue here, seek to test the constitutionality of an action taken by a coordinate branch of the federal government, whether it be legislation enacted by Congress or a regulation promulgated by the Executive Branch.  These claims often involve controversial policy questions that courts are ill-equipped to handle and that put the courts at particular risk of encroaching on the proper domain of the political branches; accordingly, such claims are better left to the political branches to resolve.   It is therefore incumbent upon a federal court to ensure that, before proceeding to the merits of a Tenth Amendment challenge, a State asserting such a claim has alleged a "particularized, concrete, and otherwise judicially cognizable" injury.  As the Court wrote in *Raines v. Byrd*:  "[W]e must put aside the natural urge to proceed directly to the merits . . .  [and] [i]nstead, we must carefully inquire as to whether appellees have met their burden of establishing that their claimed injury is personal, particularized, concrete, and otherwise judicially cognizable." 521 U.S. 811, 820 (1997).

In view of the foregoing principles, the court cannot conclude, as West Virginia has argued, that the mere assertion of a colorable Tenth Amendment anti-commandeering claim by a State is enough to establish its Article III standing.  Merely determining whether an anti-commandeering claim is "colorable" falls well short of the "rigorous" standing inquiry required by the Supreme Court.  *Id.* at 819.  It is simply not enough for a State to advance an anti-commandeering claim and assert that injury is inherent within the claim.   The State's burden is to establish a "legally protected interest" under the Tenth Amendment that is "concrete and particularized" and is "not conjectural or hypothetical."  *Lujan*, 504 U.S. at 560 (citation omitted) (internal quotation marks omitted).  West Virginia has failed to carry its burden in this case.

### E.      The State as "Object" of the Administrative Fix

Finally, West Virginia asserts that it has standing because it is "one of only 51 'objects' of the Administrative Fix," Pl.'s Opp'n at 16 (citation omitted), and that "[w]hen a plaintiff is the object of the [government] action (or forgone action) at issue, there is generally little question that the action or inaction has caused him injury, and that a judgment preventing or requiring the action will redress it," *id.* (citing *Lujan*, 504 U.S. at 561-62) (internal quotation marks omitted).   To demonstrate that the States were the "objects" of the Administrative Fix, West Virginia cites only the letter that HHS sent "specifically and only" to state insurance commissioners, *id.*, in which it "encouraged" the States "to adopt the same transitional policy" as HHS, Compl. ¶ 49 & Ex. 6 at 3.

In *Lujan*, the Court distinguished "objects" of a government action or inaction, from those entities whose claimed injury "arises from the government's allegedly unlawful regulation (or lack of regulation) of *someone else*."  *Lujan*, 504 U.S. at 562.  As to the former—the "objects"—the Court observed, "there is ordinarily little question that the action or inaction has caused him injury, and that a judgment preventing or requiring the action will redress it."  *Id.* at 561-62.  By contrast, for a party that is not the object of the challenged conduct, "much more is needed . . . . [and] causation and redressability ordinarily hinge on the response of the regulated (or regulable) third party to the government action or inaction."  *Id.* at 562.  Thus, as HHS correctly observes, *Lujan*'s discussion about a party as the "object" of a government action related to the causation and redressability elements of standing, and not injury-in-fact.  *See* Def.'s Reply at 17.

In any event, just because HHS notified the States about the Administrative Fix and "encouraged" the States to adopt it, it does not follow that the States were the "objects" of the policy decision.  The Administrative Fix "neither require[d] nor [forbade] any action" on the part

27

of the States.  *Summers v. Earth Island Inst.*, 555 U.S. 488, 493 (2009) (concluding that the plaintiffs were not the "objects" of Forest Service regulations that "govern only the conduct of Forest Service officials").  Rather, the Administrative Fix proscribed only HHS personnel from enforcing the ACA's market requirements.  *See id*.  These officials arguably are the "objects" of the Fix.  And, if not them, then the citizens whose non-compliant health insurance policies were cancelled are the "objects" of the Fix.  The States, however, remain free to regulate if they wish.  *See* Compl. ¶ 63(c) ("[E]ach State has the same decision to make about enforcement that it had before the Administrative Fix").  The States simply were not the "objects" of the Administrative Fix as the Court used that term in *Lujan*.

## V.    CONCLUSION

For the reasons stated above, the court grants Defendant's Motion to Dismiss.  A separate order accompanies this Memorandum Opinion.

Dated:  October 30, 2015                      Amit P. Mehta
                                              United States District Judge